# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **BRISTOL BAY AREA HEALTH CORPORATION** | ) | |
| | ) | |
| PLAINTIFF, | ) | No. 07-725C |
| | ) | Hon. Margaret M. Sweeney |
| v. | ) | |
| | ) | |
| **THE UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM**
**IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

# Table of Contents

INTRODUCTION ........ 1

QUESTIONS PRESENTED ........ 1

STATEMENT OF THE CASE ........ 1

I. Introduction ........ 1

II. Statement of Facts ........ 4

A. The ISDEAA and the Importance of Full CSC ........ 4

B. Calculation and Payment of Indirect Costs Under an ISDEAA Contract. ........ 7

C. The IHS Shortfall Reports ........ 7

D. The *Cherokee Nation* Class Action ........ 13

III. Standard of Review ........ 13

IV. Rule of Construction ........ 14

ARGUMENT ........ 15

I. The IHS Failed to Pay BBAHC's Full Indirect Cost Need as Promised in the ISDEAA and the Contracts ........ 15

A. The Government Contention That There Was a Negotiation of a Lesser Amount Is Contrary to Fact and Law ........ 16

B. The Shortfall Reports Confirm the Failure to Pay Full Funding to BBAHC Per the Indirect Cost Agreements ........ 19

II. BBAHC Did Not—and Could Not—Waive its Statutory and Contractual Right to Full Indirect Costs ........ 20

A. BBAHC Did Not Waive Its Claim to Full Indirect Costs Because BBAHC Had No Way to Know the Amount Paid Until the End of the Contract Year ........ 21

B. The Text of the ISDEAA Precludes Tribal Waiver of Statutory Rights ........ 22

C. Tribal Waiver Would Subvert the Purpose and Policies of the ISDEAA, and Is Thus Precluded ...................................... 23

D. The Interior Board of Contract Appeals Considered Waiver in a Similar Case and Rejected Its Application ............................ 26

III. BBAHC's FY 1997 and 1998 Claims Met the Applicable Statute of Limitations Because the Statute Was Tolled by a CSC Class Action ....... 27

A. The 1997 and 1998 Claims Were Timely Because the CDA Statute of Limitations Was Legally Tolled. ................................ 27

B. In the Alternative, the Statute of Limitations Was Equitably Tolled by the CSC Class Action ................................................ 30

IV. BBAHC's FY 1995 Claim Is Not Barred by *Res Judicata* ...................... 35

V. If the Court Does Not Exclude Defendant's Outside Evidence, the Motion to Dismiss Should Be Converted to a Motion for Summary Judgment ................................................................... 38

CONCLUSION ........................................................................................ 40

**EXHIBITS IN THE APPENDIX**

A. Indian Health Service, Alaska Area Shortfall Reports, FY 1993-1999 ............... A1

B. Indirect Cost Rate Agreements, FY 1993-1995 ................................................ A9

C. Affidavit of Robert J. Clark ............................................................................ A11

D. *Appeals of Seldovia Village Tribe*, IBCA 3862 & 3863/97 (Oct. 20, 2003)...... A13

E. *Menominee Indian Tribe of Wisconsin v. United States*, No. 1:07cv00812 (D.D.C.), Plaintiff's Motion for Partial Reconsideration (Mar. 24, 2008) ......... A26

F. Excerpt from United States' Brief in *Tunica-Biloxi Tribe of Louisiana v. United States*, No. 1:02cv02413 (D.D.C.) (Dec. 21, 2006) .............................. A70

G. IHS Brief in *Fort Mojave Indian Tribe v. Leavitt*, CBCA 547-ISDA (Civ. Bd. of Contract Appeals) (April 1, 2008) ............................................................ A72

# Table of Authorities

**Cases**

*Aleutian Constructors v. United States*, 24 Cl. Ct. 372 (1991) .......... 22

*American Airlines, Inc. v. Austin*, 75 F.3d 1535 (Fed. Cir. 1996) .......... 22

*American Pipe & Constr. Co v. Utah*, 414 U.S. 538 (1974) .......... 4, 27, 28

*Ammex, Inc. v. United States*, 334 F.3d 1052, 1055 (Fed. Cir. 2003) .......... 35, 36

*Appeals of Seldovia Village Tribe*, IBCA 3862-3863/97 (October 20, 2003) .......... 20, 26

*Assurance Co. v. United States*, 813 F.2d 1202 (Fed. Cir. 1987) .......... 14

*Athey v. United States*, 78 Fed. Cl. 157 (2007) .......... 29

*Bailey v. West*, 160 F.3d 1360 (Fed. Cir. 1998) .......... 33

*Bell Atlantic Corp. v. Twombly*, 550 U.S. __, 125 S. Ct. 1955 (2007) .......... 14

*Board of Governors of the Univ. of N. Carolina v. United States*, 10 Cl. Ct. 27 (Cl. Ct. 1986) .......... 35

*Brice v. Secretary HHS*, 240 F.3d 1367, 1372 (Fed. Cir. 2001) .......... 34

*Bridgeway Corp. v. Citibank, N.A.*, 132 F. Supp. 2d 297 (S.D.N.Y. 2001) .......... 32

*Brooklyn Sav. Bank v. O'Neill*, 324 U.S. 697 (1945) .......... 24

*Burnside-Ott Aviation Training Center v. Dalton*, 107 F.3d 854 (Fed. Cir. 1997) .......... 22, 24, 25

*Cada v. Baxter Healthcare Corp.*, 920 F.2d 446 (7th Cir. 1990) .......... 33

*C.I.T. Corp. v. Carl*, 85 F.2d 809 (D.C. Cir. 1936) .......... 21

*Carter v. Exxon Co.*, 177 F.3d 197 (3d Cir. 1999) .......... 24

*Casitas Mun. Water Dist. v. United States*, 72 Fed. Cl. 746 (2006) .......... 19

*Cherokee Nation v. Leavitt*, 543 U.S. 631 (2005) .......... 2, 8, 13, 18, 20, 25

*Cherokee Nation of Okla. v. United States*, 199 F.R.D. 357 (E.D. Okla. 2001) .......... 13, 29

*Choctaw Nation of Indians v. United States*, 318 U.S. 423 (1943)....................................14

*Christianson v. Harris County*, 529 U.S. 576 (2000).....................................................23

*Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983) ......................................28

*Cuyahoga Metro. Hous. Auth. v. United States*, 65 Fed. Cl. 534 (2005) ....................18-19

*Do-Well Mach. Shop, Inc. v. United States*, 870 F.2d 637 (Fed. Cir. 1989) ....................25

*E. Walters & Co. v. United States*, 576 F.2d 362 (Cl. Ct. 1978) ....................................22

*Florida Power & Light Co. v. United States*, 198 F.3d 1358 (Fed. Cir. 1999) ................38

*Haghighi v. Russian American Broadcasting Co.*, 173 F.3d 1086 (8th Cir. 1999) ...........24

*Henke v. United States*, 60 F.3d 795 (Fed. Cir. 1995)....................................................14

*Hermes Consol., Inc. v. United States*, 58 Fed. Cl. 409 (2003) ................................22, 24

*In re Braniff Airways, Inc.*, 783 F.2d 1283 (5th Cir. 1986).............................................36

*In re Discovery Zone Securities Litigation*, 181 F.R.D. 582 (N.D. Ill. 1998) ..................29

*In re Fruehauf Trailer Corp.*, 250 B.R. 168 (D. Del. 2000)...........................................32

*Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89 (1990) ........................................... passim

*John R. Sand & Gravel Co. v. United States*, 128 S. Ct. 750 (2008).........................29, 31

*Joseph v. Wiles*, 223 F.3d 1155 (10th Cir. 2000).........................................................29

*K.P. Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004) ........23

*Klein v. John Hancock Mutual Life Ins. Co.*, 683 F.2d 358 (11th Cir. 1982)....................38

*Land Grantors in Henderson, Union & Webster Counties, Ky. v. United States*,
64 Fed. Cl. 661 (2005).....................................................................................32

*Menominee Indian Tribe v. United States*, __F. Supp. 2d__, 2008 WL 680379
(D.D.C. 2008) ...................................................................................15, 30

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) ...........22

*Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759 (1985).........................................14

*Mott v. Dickinson and Co.*, 1993 WL 63445 (D. Kan. 1993) .......... 29

*Moyer v. United States*, 190 F.3d 1314 (Fed. Cir. 1999) .......... 14

*NN&R v. One Beacon Ins. Group*, 2006 WL 1765077 (D. N.J. 2006) .......... 32

*Oelberman v. Toyo Kisen Kabushiki Kaisha*, 3 F.2d 5 (9th Cir. 1925) .......... 21

*Prime Mngmt. Co, Inc. v. Steinegger*, 904 F.2d 811 (2d Cir. 1990) .......... 38

*Pueblo of Zuni v. United States*, 467 F. Supp.2d 1114 (D.N.M. 2006) .......... 17

*Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997) .......... 15, 26, 32

*Ramah Navajo Sch. Bd. v. Babbitt*, 87 F.3d 1338 (D.C. Cir. 1996) .......... 15

*Reservation Ranch v. United States*, 39 Fed. Cl. 696 (1997) .......... 22, 25

*Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746 (Fed. Cir. 1988) .......... 14

*Salkind v. Wang,* 1995 WL 170122 (D. Mass. 1995) .......... 29

*Samish Indian Nation v. United States*, 419 F.3d 1355 (Fed. Cir. 2005) .......... 17, 26

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) .......... 14

*Schimmer v. State Farm Mut.l Auto. Ins. Co.*, 2006 WL 2361810 (D. Colo. 2006) .......... 29, 30

*Scott v. Kuhlmann*, 746 F.2d 1377 (9th Cir. 1984) .......... 39

*Seaboard Lumber Co. v. United States*, 903 F.2d 1560 (Fed. Cir. 1990) .......... 22

*Solow v. United States*, 78 Fed. Cl. 86 (2007) .......... 29

*Stampco Construction Co. v. Guffey*, 572 N.E.2d 510 (Ind. Ct. App. 1st Dist. 1991) .......... 24

*Stone Container v. United States*, 229 F.3d 1345 (Fed. Cir. 2000) .......... 28, 29, 30

*Summitt Health, Ltd. v. Pinhas*, 500 U.S. 322 (1991) .......... 14

*tenBraak v. Waffle Shops, Inc.*, 542 F.2d 919 (4th Cir. 1976) .......... 38

*Tompkins v. United Healthcare*, 203 F.3d 90 (1st Cir. 2000) .......... 24

*Thompson v. Cherokee Nation of Oklahoma*, 334 F.3d 1075

(Fed. Cir. 2003) .......... 2, 17, 20

*Thompson v. Seldovia Village Tribe*, No. 04-1230 (Fed. Cir. March 2004) .......... 27

*United States v. Brockamp*, 519 U.S. 347 (1997) .......... 30, 33, 34

*Whittaker Electronic Systems v. Dalton*, 124 F.3d 1443 (Fed. Cir. 1997) .......... 22, 25

*Wilner v. United States*, 24 F.3d 1397 (Fed. Cir. 1994) .......... 14

*Young v. United States*, 535 U.S. 43 (2002) .......... 30, 33

**Statutes**

25 U.S.C. § 450(a)(1) .......... 5

25 U.S.C. § 450a(b) .......... 24

25 U.S.C. § 450b(g) .......... 8

25 U.S.C. § 450b(j) .......... 18

25 U.S.C. § 450j-1 .......... 6

25 U.S.C. § 450j-1(b) .......... 7, 10

25, U.S.C. § 450j-1(a)(1) .......... 5

25 U.S.C. § 450j-1(a)(2), (3) .......... 6

25 U.S.C. § 450j-1(c) .......... 12, 18

25 U.S.C. § 450j-1(c)(2) .......... 12

25 U.S.C. § 450j-1(c)(3)–(5) .......... 8

25 U.S.C. § 450j-1(g) .......... 2, 7

25 U.S.C. § 450k(e) .......... 22, 23

25 U.S.C. § 450*l*(c) .......... 15

25 U.S.C. § 450n .......... 18

25 U.S.C. § 458aaa-11(b)(2) .......... 22

25 U.S.C. § 458aaa-16(e) ........ 23

31 U.S.C. § 7501 ........ 5

41 U.S.C. § 605(a) and (b) ........ 31, 32, 33, 34, 35

**Regulations**

25 C.F.R. Part 900, Subpart K ........ 23

**Other**

15 CORBIN ON CONTRACTS § 88.7 (rev. ed. 2003) ........ 24

Dep't of Health & Human Servs., Appellees' Response to Appellant's Notice of Additional Authority, *Fort Mojave Indian Tribe v. Leavitt*, CBCA 547-ISDA (Civ. Bd. of Contract Appeals) (April 1, 2008) ........ 19

Federal Acquisition Streamlining Act, Pub. L. No. 103-355 § 2351, 108 Stat. 3243 (Oct. 13, 1994) ........ 35

Indian Self-Determination Amendments of 1987, Pub. L. No. 100-472, § 205 (Oct. 5, 1988) ........ 6

Indian Self-Determination Memorandum No. 92-2 (IHS Contract Support Cost Policy) (Feb. 27, 1992) ........ 7, 8, 9, 37

Rules of the Court of Federal Claims
- 8(a) ........ 14
- 8(c) ........ 35, 38
- 12(b)(1) ........ 14, 27
- 12(b)(6) ........ 13, 40
- 20(c) ........ 40
- 56 ........ 38, 40

S. Rep. No. 100-274 (Dec. 21, 1987) ........ 6, 7, 8, 25

S. Rep. No. 103-374 (Sept. 26, 1994) ........ 15

United States' Motion to Dismiss or, in the Alternative, for Summary Judgment, *Tunica-Biloxi Tribe of Louisiana v. United States*, Case No. 1:02CV02413 (D.D.C.) (Dec. 21, 2006) (excerpt) ........ 18, 19

WILLISTON ON CONTRACTS (4th ed. 2000) § 39:22 ........ 21

Wright & Miller, 5C Fed. Prac. & Proc. § 1366 ........ 39

Wright & Miller, 18 Fed. Prac. & Proc. § 4405 .......................................................... 39

**PLAINTIFF'S MEMORANDUM IN OPPOSITION**
**TO DEFENDANT'S MOTION TO DISMISS**

For the reasons set forth below, Plaintiff Bristol Bay Area Health Corporation ("BBAHC") opposes the Defendant's Motion to Dismiss and it should be denied.

**QUESTIONS PRESENTED**

1) Whether contract provisions incorporating Section 106 of the Indian Self-Determination and Education Assistance Act ("ISDEAA"), as interpreted by the Supreme Court in the *Cherokee Nation* case, required the Government to pay BBAHC 100% of its contract support costs ("CSC"), that is, the "full amount," from available appropriations.

2) Whether the full amount of the indirect cost component of CSC owed under the contracts was to be determined by applying the negotiated indirect cost rate to the program base, as agreed by the Government in the contracts and indirect cost rate agreements, and whether the Government in fact paid the full amount required under those agreements.

3) Whether BBAHC's claims for FY 1997 and FY 1998 were timely filed with the benefit of a two-year tolling period caused by a CSC class action.

4) Whether BBAHC's settlement of a breach of contract claim in 1995 precludes, under the doctrine of *res judicata*, its present claim for FY 1995 based on a later breach of the same contract involving different contractual duties.

**STATEMENT OF THE CASE**

**I. Introduction**

The Bristol Bay Area Health Corporation ("BBAHC") claims that the United States, through the Secretary of Health and Human Services ("Secretary") and the Indian Health Service ("IHS") (collectively, the "Government"), breached BBAHC's contracts by failing to pay the full CSC as required by section 106 of the Indian Self-Determination and Education Assistance Act

("ISDEAA") and the contract provisions incorporating it. Section 106 requires that the Secretary "shall add to the contract the full amount of funds to which the contractor is entitled." 25 U.S.C. § 450j-1(g). Section 106 has been interpreted to mean that the Government must pay 100% of a tribal contractor's CSC requirement, as calculated by procedures established by statute and regulation.[1]

During the course of the contract, however, the Secretary took the position that he could pay less than the full amount to which BBAHC was entitled, based on his view that the funds "available" to pay tribal contractors were limited to the amounts identified in non-binding congressional committee reports. This IHS policy of underfunding CSC was challenged in *Thompson*. The court summarized the Secretary's position that he could limit the amounts "available" for CSC to those recommended in the committee reports. 334 F.3d at 1087-88. The Nation argued that the IHS was required to fully fund contracts when the agency had a lump-sum appropriation sufficient to do so. The Federal Circuit and the Supreme Court agreed. The court rejected as unlawful the IHS interpretation of funds available, holding that funds available for payment of CSC included the agency's entire unrestricted lump-sum appropriation. The Court found that the Secretary should have re-programmed funds to fully pay tribal contracts. *Id.* at 1088. The Supreme Court affirmed this holding in *Cherokee Nation v. Leavitt*, 543 U.S. at 644.

The Secretary's adherence to this policy resulted in a similar failure to fully fund BBAHC's contracts and caused the breaches of contract alleged in this case. Having failed before the courts in justifying its failure to pay full contract support based on an asserted lack of appropriations, the Government has taken a new tack, arguing in its Motion to Dismiss ("Def.

---

[1] *Thompson v. Cherokee Nation of Oklahoma*, 334 F.3d 1075, 1081 (Fed. Cir. 2003) ("*Thompson*"), *aff'd Cherokee Nation v. Leavitt*, 543 U.S. 631 (2005) ("*Cherokee Nation*") (Section 106 "require[s] that the Secretary provide funds for the full administrative costs to the tribes"); *Cherokee Nation*, 543 U.S.at 634 ("The [ISDEAA] specifies that the Government must pay a tribe's costs, including administrative expenses.").

MTD"), that the statute does not require any particular method for determining the amount of funding to be paid. It claims that it paid 100% of what it said it would pay in various accounting documents, that the parties negotiated these amounts, that these "negotiated" amounts trumped the statutory right and contractual promise of full payment, and therefore the Government could not be liable for breach.

The Government's position is a clear attempt to undermine the ISDEAA full funding provision, an unfortunate pattern that Congress intended to put a stop to in 1988. Yet the Government carries on trying to make its case that it need not fully fund ISDEAA contracts contrary to the terms of the statute and clear Congressional intent. The Government's argument is also unsupported by the practices of the agency and the actual facts as to how the contract is funded. Critically, the Government ignores the indirect cost rate agreements that set the full amount of funding owed under the contract. The Government also ignores its own admission of failure to fully fund the contracts as it reported to Congress in its shortfall reports. Simply put, no matter how it manipulates the facts, the Government cannot show that the amount it paid equaled the amount owed, so its motion to dismiss on grounds of full performance must fail.

The Government suggests that BBAHC waived its statutory right to full indirect cost funding by "acquiesc[ing]" in the lesser amounts the IHS provided. In fact, however, BBAHC did not waive its rights, and indeed could not waive by contract any rights that are guaranteed by the ISDEAA, which was enacted for the benefit and protection of Indian tribes and tribal organizations in contracting with the Government.

The Government also moves to dismiss BBAHC's FY 1997 and FY 1998 claims based on BBAHC's alleged failure to comply with the statute of limitations in the Contract Disputes Act ("CDA"). This argument ignores the well-established rule that the filing of a class action—such

as the CSC class action filed by the Cherokee Nation in 1999—tolls the statute of limitations as to all members of the putative class.[2] Taking the period of tolling into account, BBAHC's claims were timely filed.

Finally, the Government argues that BBAHC's claim for FY 1995 is barred by *res judicata*. The Government points to a 1995 court case and settlement, but those involved a different breach of contract than that alleged here and it was only that claim which was settled. The current FY 1995 shortfall claim, which was not before the court in 1995, arose from different facts and did not accrue until after the settlement agreement was signed by the parties. Therefore it could not be barred by *res judicata*.

## II. Statement of Facts

Established in 1973, BBAHC is a tribal organization as defined in the ISDEAA, 25 U.S.C. § 450b(*l*), representing and serving 34 Native Villages in Southwest Alaska. In 1980, BBAHC began managing and operating Kanakanak Hospital and the IHS's Bristol Bay Service Unit under an ISDEAA contract, the first tribal organization in the country to do so. In 1994, BBAHC was a founding member of the Alaska Tribal Health Compact ("Compact" or "ATHC"), establishing a government-to-government relationship between the United States and the Native Villages represented by BBAHC.

### *A. The ISDEAA and the Importance of Full CSC*

The ISDEAA was enacted in 1975 to redress "the prolonged Federal domination of Indian service programs" by allowing tribes to exercise increased control over those programs. 25 U.S.C. § 450(a)(1). The mechanisms for doing so relevant to this action are (1) a self-determination contract under Title I of the ISDEAA, which BBAHC carried out in FY 1993 and FY 1994; and (2) a self-governance compact and annual funding agreement ("AFA") under Title

[2] *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974).

III of the ISDEAA, which BBAHC carried out in FY 1995 through FY 1999.[3] Pursuant to these agreements, BBAHC administered the Kanakanak Hospital and provided a wide variety of health care programs and services for eligible individuals in Southwest Alaska. *See generally* FY 1995 AFA § 3 (describing responsibilities assumed by BBAHC).

To enable BBAHC and other contractors to provide such services, the ISDEAA requires that the Secretary provide two types of funding: the "program" amount and CSC. The contract must include program funding in an amount "not less than the ... Secretary would have otherwise provided for the operation of the program or portions thereof for the period covered by the contract." 25 U.S.C. § 450j-1(a)(1). This amount, often referred to as the "Secretarial" or "program" amount, does not reflect the full cost of carrying out programs in the contract. BBAHC incurs costs that the Secretary does not incur when he carries out the activities directly, such as obtaining insurance and completing annual audits under the Single Agency Audit Act, 31 U.S.C. § 7501 *et seq*. Moreover, BBAHC must carry out administrative activities that the Secretary does not need to carry out because they are done by other federal agencies—for example the Office of Personnel Management, the General Services Administration, the General Accountability Office, and the Department's Office of General Counsel.

Before the enactment of the current section 106 in 1988, Tribes were compelled either to divert federal program funds to cover these additional administrative costs, thus reducing services, or to expend tribal funds, in effect subsidizing the federal program. Congress recognized this dilemma twenty years ago:

---

[3] For the purposes of this action, there are no legal differences between Title I contracts and Title III compacts and AFAs. Title III specified that compacting Tribes were to receive the same level of funding, including CSC, as they would have carrying out the same programs under Title I. *See* 25 U.S.C. 450f note (1994) (Section 303(a)(6) of Title III). Therefore in this Memorandum, unless the context indicates otherwise, the term "contracts" includes BBAHC's Title I contracts and its Title III compacts and AFAs. In 2000, Congress repealed Title III, and replaced it with the current Title V, in the Tribal Self-Governance Amendments of 2000, Pub. L. No. 106-260, *codified at* 25 U.S.C. § 458aaa *et seq*.

> [T]he single most serious problem with implementation of the Indian self-determination policy has been the failure of the Bureau of Indian Affairs and the Indian Health Service to provide funding for the indirect costs associated with self-determination contracts.

S. Rep. No. 100-274, at 8 (1987).

Responding to "the overwhelming administrative problems caused by indirect cost shortfalls," *id*. at 12, Congress in 1988 amended the ISDEAA by adding a new section 106.[4] Section 106(a)(2) and (3) requires payment of CSC as follows:

> **(2)** There shall be added to the amount required by paragraph (1) contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which --
>
> **(A)** normally are not carried on by the respective Secretary in his direct operation of the program; or
>
> **(B)** are provided by the Secretary in support of the contracted program from resources other than those under contract.
>
> **(3)** **(A)** The contract support costs that are eligible costs for the purposes of receiving funding under this Act shall include the costs of reimbursing each tribal contractor for reasonable and allowable costs of-
>
> **(i)** direct program expenses for the operation of the Federal program that is the subject of the contract, and
>
> **(ii)** any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract, except that such funding shall not duplicate any funding provided under section 106(a)(1).

25 U.S.C. § 450j-1(a)(2), (3). Congress emphasized in section 106(g) that tribal contractors are to receive not just some CSC, but their full need: "Upon approval of a self-determination contract, the Secretary shall add to the contract the <u>full amount</u> of funds to which the contractor is entitled under section 106(a)...." *Id*. § 450j-1(g) (emphasis added).[5]

---

[4] Indian Self-Determination Amendments of 1987, Pub. L. No. 100-472, § 205 (Oct. 5, 1988), codified at 25 U.S.C. § 450j-1.

[5] The Senate Report emphasizes several times that these provisions are not half-way measures meant to <u>reduce</u> diversion of program and tribal funds, but to <u>eliminate</u> such diversion by mandating full funding. *E.g.*, S. Rep. No. 100-274, at 12 ("The most relevant issue is the need to fully fund indirect costs associated with self-determination contracts."); *id*. at 13 ("Full funding of tribal indirect costs associated

In section 106(b)(2), Congress prohibited the Government from reducing CSC and other funding from year to year, unless one of five narrow exceptions applies. 25 U.S.C. § 450j-1(b)(2). The recurring nature of the funding promotes predictability and stability in tribal contractors' provision of services to their members and other beneficiaries. "The protection of contract funding will provide year-to-year stability for tribal contractors, and will contribute to better tribal planning, management and service delivery." S. Rep. No. 100-274 at 30 (Dec. 21, 1987).

This stable-funding rule was incorporated into BBAHC's agreements with the Secretary. *See* FY 1998 AFA § 4(a) (funding amounts "subject to reduction only in accordance with Section 106 of [the ISDEAA] during the term of this Annual Funding Agreement or thereafter"); FY 1999 AFA § 4(a) (same).

***B. Calculation and Payment of Indirect Costs Under an ISDEAA Contract***

For BBAHC, as for the vast majority of tribal contractors, the indirect cost requirement for a given fiscal year was (and is) calculated under established federal procedures by multiplying a negotiated indirect cost rate by the direct cost base.[6] There can be no doubt, this is the Government's standard method, the method contemplated by Congress when it enacted section 106, and the principal method used and recognized by the IHS's own policies. Def. Ex. G at A19 (IHS CSC policy circular ISDM 92-2 provision that indirect costs for recipients with

with self-determination contracts is essential if the federal policy of Indian Self-Determination is to succeed.").

[6] The direct cost base, for the purpose of calculating indirect costs, is comprised of the "Secretarial" or program amount under section 106(a)(1), less capital expenditures and pass-through funds, plus direct contract support costs. *See* Def. Ex. G at A17 (IHS CSC policy circular, ISDM 92-2, provision that direct contract support funds will be considered part of the recurring base).

indirect cost rates "will be determined by applying the negotiated rate(s) to the direct cost base amount for this purpose"). The Government has admitted as much.[7]

When Congress enacted Section 106, it recognized that the indirect cost rate was the predominant method by which the full amount of the necessary CSC was calculated and it expected the use of the indirect cost rate to continue. The Senate report stated, "Tribal governments, like state and local governments, use indirect costs to pay for these administrative costs. ... The term indirect cost is used [in the statute, *see* 25 U.S.C. §450b(f) and (g)] because it is associated with known management practices. Those practices are recognized and defined in [OMB] Circular A-87." S. Rep. 100-274 at 17. This intent was carried through in the 1988 amendments. *See* 25 U.S.C. § 450j-1(c)(3)–(5) (requiring IHS, in its CSC shortfall report to Congress, to include information on indirect cost rates, direct cost bases, and the resulting indirect cost pool amounts); *id*. § 450b(g) (defining "indirect cost rate" as "the rate arrived at through negotiation between an Indian tribe or tribal organization and the appropriate Federal agency"). The amount of indirect costs required for a given fiscal year can be expressed in the following equation: Direct Cost Base x Rate = Indirect Cost Requirement.

Following the statutory expectations and the practice of the IHS, this is the method the Government agreed to in its contracts and AFAs with BBAHC. *E.g.*, Contract No. 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, Modification #65 § G.1.E ("Indirect Costs during the period of this contract shall be reimbursed at rates established by agreement between the Contractor and the Division of Cost Allocation, Region X, Department of Health and Human Services."); FY 1995 AFA § 4(b) ("The amount shall be based upon the Bristol Bay Area Health Corporation's indirect cost agreement....").

---

[7] *See, e.g.*, *Cherokee Nation v. Leavitt*, 543 U.S. 631, 635 (2005) (quoting Government's brief as saying that indirect costs are "generally calculated by applying an 'indirect cost rate' to the amount of funds otherwise payable to the Tribe"); *see also* quotations from Government briefs in the *Tunica-Biloxi* and *Fort Mojave* cases below at pp. 18-19.

The method for determining how much CSC is to be paid under the contracts is also fairly uniform. Prior to the beginning of each fiscal year, BBAHC and the IHS negotiated initial amounts for the various programs, functions, services, and activities ("PFSAs") to be performed, as well as an initial amount for CSC. Generally there was an indirect cost rate in place although in some instances it still could have been under negotiation. *See* Plaintiff's Exhibit ("Pl. Ex.") C, ¶ 2 (Affidavit of Robert Clark). The parties' understanding and practice was that additional funds would be added incrementally to the AFA by amendment, during the year. *Id.* ¶ 4. These funds were added without negotiations between the parties.[8] *Id.* Rather, the IHS had the authority to add the funds because there was an existing indirect cost rate and a known direct cost base, which meant there was a known "full amount" of CSC. Since the contracts had incorporated the rate and Section 106 if the ISDEAA, and the ISDM 92-2 was applicable, the agency could add funds without violating the law.

The CSC provision in the FY 1995 AFA—quoted by the Government at length, Def. MTD at 16-17—describes both the method of calculating indirect costs and the incremental payment of those costs.

> Subject to Congressional appropriation, an additional lump sum amount shall be added to this Agreement for the [BBAHC] under ISDM 92-2 or its successor.[9] The amount shall be based upon the [BBAHC's] indirect cost agreement and applicable law and will be added to this Agreement as soon as available through appropriations....

---

[8] For example, once the amount of formula funding for a particular PFSA was determined, funding would be added. *See, e.g.*, FY 1995 AFA § 4(a) (providing that direct cost base funding amounts "are subject to additions for new funds received during the term of this Agreement"); Def. Ex. F (FY 1995 AFA addendum providing additional funds). In addition, if either the direct cost base or the rate went up because BBAHC assumed new or expanded PFSAs, the amount of indirect costs that BBAHC was entitled to be paid went up.

[9] Indian Self-Determination Memorandum ("ISDM") 92-2, *see* Def. Ex. G, sets forth the IHS's method for calculation and payment of CSC.

FY 1995 AFA § 4(b); *see also* Def. Ex. F at A13 (addendum replacing Section 4(b) with similar language but adding additional "Indirect/Contract Support" amounts). This provision makes clear, first, that the initial AFA does not identify all indirect cost funds BBAHC will receive for the year, and that the full amount of funding will be determined by applying the rate. Second, the additional funds are not subject to negotiation, because the rate that determines full payment has already been negotiated and agreed on. Instead, the additional indirect cost funds "shall be added" as soon as they are "available."

Additional CSC funds were in fact added to BBAHC's agreements in every year at issue here. For example, the initial FY 1995 AFA provided $590,428 for "Indirect/contract support funds," while the October 1, 1994 addendum raised that figure to $787,396. FY 1995 AFA § 4(b); Def. Ex. F at A13 (FY 1995 addendum). Throughout the course of the fiscal year, the IHS made several other indirect cost payments to BBAHC as funds became "available," so that by the end of the year the IHS reported to Congress that BBAHC had received $3,150,771. Pl. Ex. A at A3 (FY 1995 shortfall report).[10] While the Government alleges there were negotiations of these modifications, this allegation cannot be found in the complaint and BBAHC has presented evidence to counter that assertion. *See* Pl. Ex. C, ¶ 4.

Similarly, the initial FY 1996 AFA provided a first indirect cost installment of $371,701. FY 1996 AFA § 4(a). The AFA states that "[o]ther non-recurring [CSC] funds will not be specifically identified in this Agreement, but will be provided to BBAHC in the future to the same extent as they have historically been provided." *Id.* § 4(a) n.2. Significantly, this AFA contains a placeholder for "CSC on Tribal Shares," which had not yet been calculated. Thus, no amount was specified at the beginning of the contract. *Id.* § 4(a)(6). But by the end of the fiscal

[10] BBAHC may have received some of this additional CSC as a result of a settlement agreement, as discussed below.

year, the IHS reported to Congress that it had paid BBAHC $2,882,517 for indirect costs. Pl. Ex. A at A4 (FY 1996 shortfall report). Again, the Government has presented no evidence that these were negotiated and it is BBAHC's position that they were not. *See* Pl. Ex. C, ¶ 4.

The IHS followed a similar incremental payment process with the Title I agreements in FYs 1993 and 1994, adding base funding for programs and services, as well as funding for indirect costs, through contract "modifications" throughout each fiscal year. *See, e.g.*, Contract No. 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, Mod. No. 70 (April 4, 1994 modification adding base funding for nine different PFSAs); *id*., Mod. No. 72 (July 18, 1994 modification adding base funding and CSC). Both base and indirect cost funding could be added to the contract right up to the last day of the fiscal year. *E.g.*, *id*., Mod. No. 64 (adding funds to FY 1993 contract on final day of fiscal year, September 30, 1993).

Unfortunately, in none of the years at issue did the IHS's incremental payments of additional indirect cost funding bring BBAHC up to 100% of its full requirement in that year, as documented in the IHS's own CSC shortfall reports.

***C. The IHS Shortfall Reports***

Even though section 106 required full payment of CSC from available appropriations, the IHS continued to underpay tribal contractors considerably based on the agency's interpretation of section 106(b), which makes funding "subject to the availability of appropriations." 25 U.S.C. § 450j-1(b). The IHS maintained it was bound by the limitations on CSC spending recommended in congressional committee reports issued in conjunction with the appropriations bills. It defined these recommended amounts as "available" under section 106. *See Thompson*, 334 F.3d at 1083 (describing Secretary's position). Thus the IHS distributed only the amounts recommended in the reports, despite the higher CSC requirements of tribes and tribal organizations. The

difference between the full funding calculated under Section 106 and the lesser amount designated as "available"—and actually paid—was treated as a CSC "shortfall."

Section 106(c) requires that the Secretary provide Congress an annual report that includes "an accounting of any deficiency in funds needed to provide required contract support costs to all contractors for the fiscal year for which the report is being submitted." 25 U.S.C. § 450j-1(c)(2). These "shortfall reports" were to include detailed information for each tribal contractor on direct cost bases, indirect cost rates, and indirect cost shortfalls, if any. *See id*. § 450j-1(c).

Like other IHS Area Offices, the Alaska Area Office, in whose region BBAHC is located, created shortfall reports documenting CSC underpayments to tribal contractors in its region. *See* Pl. Ex. A (Alaska Area shortfall reports for FYs 1993 through 1999). Although the format of the reports varied over the years, all included the essential information to calculate the shortfall: (1) the tribe's "requirement" or "need" (i.e., full funding under section 106(a) and (g)); (2) the amount paid; and (3) the difference (i.e., the shortfall). For example, the FY 1994 report shows an "indirect cost Funding requi[rement]" of $4,941,844, and "Available ICSC and ISD" of $2,848,960, leaving a shortfall of $2,092,884.[11] Pl. Ex. A at A2 (last three columns). This is the amount of the FY 1994 claim BBAHC presented to the contracting officer and the amount claimed in the Complaint. Complaint ¶ 29.

Some of the shortfall reports indicate the indirect cost rates used to calculate the indirect cost funding requirement. *E.g.*, Pl. Ex. A at A2 (FY 1994 report showing 42.0% rate for BBAHC); *id.* at 3 (FY 1995 report showing 41.4% rate for BBAHC).[12]

---

[11] "ICSC" stands for indirect contract support costs. "ISD" refers to the Indian Self-Determination (ISD) Fund, from which the IHS paid start-up costs for new and expanded contracts. *See* Def. Ex. G at A15.

[12] The calculations were complicated by the fact that from FY 1994 through FY 1997, the rate agreements set forth two different rates each year, one for "on-site" activities (those in the Hospital compound), and one for "off-site" (Village-based) activities. Thus, for example, the composite rate for FY 1994 can be calculated by dividing the indirect cost requirement ($4,941,844) by the base after exclusions

### *D. The* Cherokee Nation *Class Action*

On March 5, 1999, the Cherokee Nation filed a class action suit alleging that the IHS's systematic underpayment of CSC violated the ISDEAA and breached the contracts of tribal contractors. The putative class included "[a]ll Indian tribes and tribal organizations operating Indian Health Service programs under contracts, compacts or annual funding agreements authorized by the [ISDEAA] that were not fully paid their contract support cost needs, as determined by IHS, at any time between 1988 and the present." *Cherokee Nation of Oklahoma v. United States*, 199 F.R.D. 357, 360 (E.D. Okla. 2001). On February 9, 2001, the *Cherokee Nation* court declined to certify the class, holding, *inter alia*, that individual questions predominated over class issues. 199 F.R.D. at 363. The case proceeded to a judgment on the merits, and eventually reached the Supreme Court. The Tenth Circuit had held substantively that the Tribe was not entitled to CSC. This ruling was overruled by the Supreme Court in *Cherokee Nation v. Leavitt*. *Cherokee Nation of Oklahoma v. Thompson*, 311 F.3d 1054 (10th Cir. 2002), *rev'd Cherokee Nation v. Leavitt*, 543 U.S. 631, 647 (2005).

## III. Standard of Review

In considering Defendant's motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"), the court must presume that all well-pleaded allegations are true, resolve all doubts and inferences in BBAHC's favor, and view the Complaint in the light most favorable to BBAHC. *Summitt Health, Ltd. v. Pinhas*, 500 U.S. 322, 325 (1991); *Bell Atlantic Corp. v. Twombly*, 550 U.S. __, 125 S. Ct. 1955, 1965 (2007) ("*Twombly*"). The issue in reviewing the sufficiency of a complaint is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support his or her

($12,797,166) for an overall rate of 38.6%, even though the report lists only the on-site rate of 42.0%, presumably because a portion of BBAHC's PFSAs recovered at the lower off-site rate of 23.0%. *See* Pl. Ex. B at A9 (indirect cost agreement).

claim. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *see also* RCFC 8(a) (requiring only short, plain statement showing entitlement to relief). A claim will not be dismissed if it "nudge[s] ... across the line from conceivable to plausible." *Twombly*, 125 S. Ct. at 1974 (2007). Once a claim is stated adequately, "it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id*. at 1969.

In considering a motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1), the court assumes the truth of the allegations made and views all reasonable inferences in plaintiff's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). If jurisdictional facts alleged in the complaint are disputed, the court may receive and consider extrinsic evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988); *Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999).

An appeal from a contracting officer's decision under the Contract Disputes Act is reviewed *de novo*. 41 U.S.C. § 609(a)(3); *Wilner v. United States*, 24 F.3d 1397, 1401-02 (Fed. Cir. 1994) (en banc); *Assurance Co. v. United States*, 813 F.2d 1202, 1206 (Fed. Cir. 1987).

**IV. Rule of Construction**

Statutes enacted for the benefit of Indians, such as the ISDEAA, must be liberally construed in their favor. *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 431–32 (1943) (agreements with tribes to be liberally construed). The ISDEAA explicitly incorporates this canon of construction, mandating that "[e]ach provision of the [ISDEAA] and each provision of this Contract shall be liberally construed for the benefit of the Contractor...." 25 U.S.C. § 450*l*(c), sec. 1(a)(2); *see also* 25 U.S.C. § 450f note, sec. 303(e), (f) (Title III provisions requiring interpretation of federal laws and regulations in manner that will facilitate agreements and inclusion of PFSAs therein);

See also S. Rep. 103-374 (Sept. 26, 1994) at 11. The Compacts also reflect the liberal construction canon. *See, e.g.*, FY 1995 Compact Art. I § 2 ("This Compact shall be liberally construed to achieve its purposes...."); FY 1996 Compact Art. I § 2 (same); FY 1997 Compact Art. I § 2 (same). Therefore any ambiguities in the contracts, as well as the ISDEAA, must be resolved in favor of BBAHC.

## ARGUMENT

### I. The IHS Failed to Pay BBAHC's Full Indirect Cost Need as Promised in the ISDEAA and the Contracts.

BBAHC's claims are straightforward: the Government is bound by statute and contract to pay BBAHC's full indirect costs as required by Section 106. The Supreme Court has confirmed this obligation, as have other courts.[13] The Government also agreed to a contract that incorporated an indirect cost rate which would be used to determine the full amount of indirect costs. The Government failed to pay 100% of BBAHC's indirect costs in each of the years at issue, as determined by applying the negotiated rate to the applicable direct cost base. The contracts and AFAs, the indirect cost rate agreements, and the IHS shortfall reports, all detailed above, confirm this to be so.

The Government argues that "the ISDEAA does not mandate the payment of a specific amount of indirect CSC or that a specific formula be included in a contract." Def. MTD at 15. But the ISDEAA does require payment of a specific amount: the "full amount." In this case, the method agreed to by the parties was the application of the negotiated indirect cost rate. The IHS is bound by this agreement and indeed, has never objected to the rate or its use. Instead, IHS took it upon itself to adopt a policy which ignored the statutory requirements and the indirect

[13] *See Ramah Navajo School Board v. Babbitt,* 87 F.3d 1338, 1341 (D.C. Cir. 1996) (CSC is an entitlement of contracting tribes); *Thompson*, 334 F.3d at 1081 (describing "this obligation of the government to pay full contract support costs"); *Menominee Tribe of Indians v. United States*, __F.Supp.2d__, 2008 WL 680379, *2 (D.D.C. 2008) ("[T]he statutory promise is full funding.").

cost rate. The IHS relied on its own interpretation of the statute and contract to short change BBAHC. No amount of restating the facts can change that. The IHS failed to pay BBAHC 100% of its indirect cost requirement as determined by the agreed-upon method.

### *A. The Government Contention That There Was a Negotiation of a Lesser Amount Is Contrary to Fact and Law.*

Completely discounting or ignoring the specific statutory and contractual requirements for full funding, the Government spins a tale as to how the CSC is determined and paid under the contract that has no relationship to reality. For example, the Government points to two figures identifying payment of indirect cost funding, $590,428 in section 4(b) of the initial FY 1995 AFA, and $787,396 in the FY 1995 AFA addendum and argues that these CSC amounts were arrived at by negotiation between the parties. Def. MTD at 17. Once agreed upon, the Government says, there can be no other measure of the amount owed. *Id*. These amounts, the Government suggests, supersede the statutory duty to pay full CSC as Congress intended. This is nonsense. The contract requires payment according to Section 106 and the indirect cost rate agreement. These installment payments are part of carrying out the contract. As we establish in the affidavit of Robert Clark, the Government pays (or does not pay) additional CSC without negotiation. Pl. Ex. C, ¶ 4. The amounts added are justified from a government accounting perspective since the "full amount," i.e., the indirect cost rate amount, is the contract ceiling. These intermittent installment payments are made toward that amount. This is completely in line with the rest of AFA section 4(b), which states that more indirect cost funding will be provided incrementally, as soon as available, and that the full amount to be paid will be based on BBAHC's indirect cost agreement. Def. Ex. E at A11.

Despite the clear language of the statute and contracts, the Government argues that the ISDEAA does not require full payment, or indeed any payment. Def. MTD at 15-16. In the

Government's view, the ISDEAA requires only that the parties negotiate a contract, and "there is no 'independent' right under the ISDEAA to CSC." *Id.* at 15. In support of this proposition, which runs directly counter to the *Thompson* and *Cherokee Nation* decisions quoted above, the Government cites *Samish Indian Nation v. United States*, 419 F.3d 1355 (Fed. Cir. 2005). *Samish* is inapposite since in that case, the Nation sought to collect funds for ISDEAA contracts it never had, but could have had if the federal government had not wrongly removed the Nation from its list of federally recognized tribes. The court declined to award "damages for contract support costs never incurred, on contracts never created." *Id.* at 1367.[14] Here of course BBAHC has an agreement.

The Government also misreads *Cherokee Nation* as "mandat[ing] that the an [sic] ISDEAA contract be treated as any other procurement contract," Def. MTD at 14, suggesting that there is no duty to pay more than required in these documents. *Cherokee Nation* importantly holds that the Government cannot shirk its contractual and statutory duties by claiming CSC funds were not available, when in fact they were. This is the reason for the Government's failure to pay full funding, not some purported "negotiation" of lesser amounts.

Moreover, the ISDEAA provides: "[N]o contract ... entered into pursuant to Title I of this Act shall be construed to be a procurement contract." 25 U.S.C. § 450b(j). The Court in Cherokee did not strike down or otherwise contradict this provision. Rather, the Court said that ISDEAA agreements are as <u>legally binding</u> as procurement contracts. *Cherokee Nation*, 543

[14] The Government cites *Pueblo of Zuni v. United States*, 467 F. Supp.2d 1114, 1116-17 (D.N.M. 2006) in support of the idea that "tribes may not bring claims for additional contract funding under the ISDEAA alone." Def. MTD at 16. In that case, the court held that the Pueblo could not avoid the mandatory administrative exhaustion requirement of the Contract Disputes Act ("CDA") by framing its contract claims as statutory rights. That holding is irrelevant to this case, because BBAHC has exhausted its administrative remedies under the CDA and seeks damages for the breach of contractual provisions incorporating statutory requirements. Thus BBAHC does not bring its claims "under the ISDEAA alone."

U.S. at 639. The Court did not suggest that the contract could trump the requirements of Section 106 or in any other way imply that the Government shed its trust responsibility to BBAHC.[15]

The simple fact is that the parties agreed to indirect cost rate agreements that applied to all grants, contracts, and other agreements with the Federal Government. Consistent with the ISDEAA, 25 U.S.C. § 450j-1(c), the ISDEAA regulations, OMB Circular A-87, and the IHS's own CSC policy circulars, the IHS calculated the indirect cost requirement for BBAHC by applying its approved rate to the direct cost base. The rate agreements were signed by the Director of the Division of Cost Allocation in the Department of Health and Human Services, and were binding on the IHS.

The Government's attempt to disclaim the rate method now, when application of that method has been agency policy and practice for over fifteen years, is disingenuous at best. While the Government now argues that the ISDEAA does not require a "specific formula" to determine indirect cost requirements, Def. MTD at 13, the Government recently argued exactly the contrary: "the plain language of the 1988 amendments [to the ISDEAA] demonstrates that Congress fully expected IHS to continue to use OMB A-87 indirect cost rates as the starting point for calculating indirect costs." Pl. Ex. F at A71 (Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment at 35, *Tunica-Biloxi Tribe of Louisiana v. United States*, Case No. 1:02CV02413 (D.D.C.) (Dec. 21, 2006)). The Government also stated that "the text of the ISD[EA]A demonstrates ... that Congress intends IHS to use indirect cost rates, negotiated under OMB A-87, to make indirect CSC funding awards...."[16] *Id*. This argument was restated

---

[15] *See* 25 U.S.C. § 450n (providing that nothing in the ISDEAA "shall be construed as ... authorizing or requiring the termination of any existing trust responsibility"); FY 1995 Compact, Art IV § 1 ("Nothing in this Compact waives, modifies, or diminishes in any way the trust responsibility of the United States with respect to the Alaska Native Tribes....").

[16] If the Government succeeds in its argument in the *Tunica-Biloxi* case, then it could very well be precluded by judicial estoppel from taking a contrary approach here. *See Cuyahoga Metro. Hous. Auth. v.*

by the Government as recently as yesterday in a pleading filed with the Civilian Board of Contract Appeals. The Government stated unambiguously in that pleading that indirect CSC "are calculated by applying a pre-determined 'indirect cost rate' to the amount of funds otherwise payable to a tribe ... [a]ccordingly, such CSC are fixed according to this formula and must be paid pursuant to the ISDEAA, even if a tribe and IHS has [sic] somehow negotiated a lower amount and included that amount in the terms of the contract." Pl. Ex. G at A73 (IHS brief in *Fort Mojave* case) (citing 25 U.S.C. § 450j-1(g) and concluding that "the amount of indirect CSC is not subject to negotiation once the Section 106(a)(1) amount is negotiated").

The Government's statements in the *Tunica* and *Fort Mojave* cases are correct. This Court should reject the Government's attempts in this case to argue the complete opposite.

### *B. The Shortfall Reports Confirm the Failure to Pay Full Funding to BBAHC Per the Indirect Cost Agreements.*

The use of indirect costs rates and the Government's systematic failure to abide by these agreements for many contractors, including BBAHC, is demonstrated in the annual shortfall reports provided to Congress by the IHS, which detail the inadequate funding or funding needed to pay CSC in its entirety to tribal contractors. The Government argues that the shortfall reports have no bearing on either liability or damages, because "[n]othing suggests that a requirement of need for additional funds translates to a contractual requirement to pay that amount, even though Congress failed to make funds available to do so." Def. MTD at 18.[17]

---

*United States,* 65 Fed. Cl. 534, 553-554 (2005); *Casitas Mun. Water Dist. v. United States*, 72 Fed. Cl. 746, 752 (2006).

[17] The Government's argument that the shortfall reports are not part of the contract is a classic red herring. Def. MTD at 17-18. BBAHC does not contend that they are. These are public documents that are intended to detail to Congress the very facts that we claim—that contractors like BBAHC were not paid in full, but rather were systematically underpaid by IHS. These documents also illustrate the use of the indirect cost rate to determine how much funding *should* have been paid under the contracts.

Essentially the Government is saying that it could simultaneously report a shortfall of funding based on the use of indirect cost calculations and claim to have fully paid the amount owed despite the indirect cost calculation. After acknowledging the CSC shortfalls for years, the Government has now adopted this post hoc litigation position that the amounts made available in the contracts and AFAs were always necessarily exactly what was owed. In this new construct, there could never have been any shortfalls, because the promise of full payment in accordance with section 106 means the payment of that amount which was actually paid. But the facts are otherwise. Congress and the agencies were well aware that contractors like BBAHC were not being funded to the full contract amount required by statute and contract and this fact was reported to Congress. The court should reject this novel, and wishful, notion of a breach-proof contract.

This argument also ignores the lesson of *Thompson* and *Cherokee Nation*, which is that Congress did make funds "available" to the IHS to pay full CSC in the agency's unrestricted lump-sum appropriation, but the Secretary failed to use those funds to meet his contractual and statutory duty to pay full CSC. *Thompson*, 334 F.3d at 1088; *Cherokee Nation*, 543 U.S. at 644. Instead the agency reported a shortfall to Congress, claiming they did not have enough to fully fund all contracts per the indirect cost calculations. This report was apparently false. When, at the end of each year, the IHS had failed to pay the total amount due under the contract, meaning the amount arrived at through the indirect cost rate calculation, as was the case in each of the years at issue, the IHS did not use its lump-sum appropriation to pay the full amount. Instead, it breached the contract.[18]

[18] *Cherokee Nation v. Leavitt*, *supra*; *Appeals of Seldovia Village Tribe*, IBCA 3862-3863/97 (October 20, 2003) (attached as Exhibit D) (holding IHS liable for failure to amend AFA to reflect a higher negotiated indirect cost rate, despite IHS payment of full amount of CSC specified in AFA).

## II. BBAHC Did Not—and Could Not—Waive its Statutory and Contractual Right to Full Indirect Costs.

The Government suggests that BBAHC waived its right to claim additional indirect cost funding by "acquiesc[ing]" in the lower funding amount and performing the contracts rather than declining to enter them and appealing the inadequate funding levels. Def. MTD at 15. The Government points to no express waiver by BBAHC of its contract or statutory rights. Rather the argument appears to be that BBAHC's acceptance of the partial payments implies a waiver of any claim to additional funding. Any waiver express or implied cannot be substantiated by the Government.

### *A. BBAHC Did Not Waive Its Claim to Full Indirect Costs Because BBAHC Had No Way to Know the Amount Paid Until the End of the Contract Year.*

The Government takes the position that BBAHC implicitly waived its right to recover for breach by accepting partial performance. The Government's waiver argument might be more plausible if BBAHC had known, when it entered the contract for each year, (1) what its direct cost base would be for the year; (2) what its approved indirect cost rate would be for the year; (3) what its full indirect cost requirement would be for the year; (4) how much the IHS would pay for indirect costs in that year; and thus (5) whether BBAHC would suffer an indirect cost shortfall, and the extent of the shortfall, in that year.

Waiver requires the "intentional relinquishment of a known right." *C.I.T. Corp. v. Carl*, 85 F.2d 809, 811 (D.C. Cir. 1936) (quoting *Oelberman v. Toyo Kisen Kabushiki Kaisha*, 3 F.2d 5, 6 (9th Cir. 1925), *cert. denied* 268 U.S. 693 (1925)); *see also* WILLISTON, CONTRACTS (4th ed. 2000) § 39:22 (citing cases). Given that the contract incorporated the statutory right to full payment of CSC and given the intermittent payment process, BBAHC could not have known when it signed the contract or accepted contract modifications adding payments the extent to

which the Government would not fulfill the promise of full payment of CSC. Since it was an unknown, BBAHC did not waive the right to full payment or its right to recover the unpaid indirect cost funding.[19]

***B. The Text of the ISDEAA Precludes Tribal Waiver of Statutory Rights.***

The equitable doctrine of waiver cannot trump statutory law. "Generally, a provision in a government contract that violates or conflicts with a federal statute is invalid or void." *American Airlines, Inc. v. Austin*, 75 F.3d 1535, 1538 (Fed. Cir. 1996). When the text of a statute, or its legislative policies, indicates that waiver was not intended, waiver cannot be applied. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985) (agreement to arbitrate invalid if Congress has indicated intent to preclude waiver of judicial remedies); *Burnside-Ott Aviation Training Center v. Dalton*, 107 F.3d 854, 858-59 (Fed. Cir. 1997) (waiver of right to appeal invalid where it would subvert policies of statute). The text and policies of the ISDEAA preclude waiver of tribal statutory rights such as the right to full CSC.

The ISDEAA contains a number of provisions authorizing, and providing a mechanism for, the Secretary to waive applicable regulations <u>when so requested in writing by a tribe</u>. In 25 U.S.C. § 450k(e) Congress provided that "The Secretary may ... waive such regulations, if the Secretary finds that such exception or waiver is in the best interest of the Indians served by the contract or is consistent with the policies of this subchapter, and is not contrary to statutory law. In reviewing each request, the Secretary shall follow [declination procedures]." Similarly in 25 U.S.C. § 458aaa-11(b)(2), the statute provides that "Not later than 90 days after receipt by the

[19] These facts distinguish the cases allowing waiver, all of which involve contractors who see a problem (such as an illegal contract clause) *prior* to execution, yet sign and perform the contract anyway. *Whittaker Elec. Sys. v. Dalton*, 124 F.3d 1433, 1446 (Fed. Cir. 1997) (invalid contract clause not challenged prior to execution); *Seaboard Lumber Co. v. United States*, 903 F.2d 1560 (Fed. Cir. 1990 (acceptance of contract provision at variance with statute); *Reservation Ranch v. United States*, 39 Fed. Cl. 696 (1997) (same); *Hermes Consol., Inc. v. United States*, 58 Fed. Cl. 409 (2003) (acceptance of contract clause later challenged as illegal); *E. Walters & Co. v. United States*, 576 F.2d 362 (Cl. Ct. 1978) (same); *Aleutian Constructors v. United States*, 24 Cl. Ct. 372 (1991) (same).

Secretary of a written request by an Indian tribe to waive application of a regulation...the Secretary shall either approve or deny the requested waiver in writing." *See also* 25 C.F.R. Part 900, Subpart K ("Waiver Procedures"). There is even authority for tribes to agree to what would otherwise be inapplicable agency rules or policies, provided the tribe does so expressly in the compact or funding agreement. 25 U.S.C. § 458aaa-16(e).

But there is no ISDEAA provision for tribes to waive any statutory rights. Because Congress has expressly and thoroughly considered waiver in the statute, and limited it to specific parties and subjects, the ISDEAA must be deemed to preclude its general application beyond these subjects.[20] In those few instances in the ISDEAA where Congress has allowed waiver, Congress created a procedure requiring that the waiver be expressed in writing from the tribe and that the Secretary expressly agree. If Congress intended to protect tribes from any attempt by the Secretary to waive regulations unilaterally or by a tribe to waive regulations inadvertently, then certainly Congress did not intend to allow an implicit waiver of the statute itself. Moreover, Congress set forth a clear test for waiver of regulations. The Secretary may waive regulations only when the "waiver is in the best interest of the Indians served by the contract or is consistent with the policies of the Act, and is not contrary to statutory law." 25 U.S.C. § 450k(e). In effect, Congress expressly banned a statutory waiver. To imply a waiver of the statute here would go far beyond what is permitted in the statute.

### *C. Tribal Waiver Would Subvert the Purpose and Policies of the ISDEAA, and Is Thus Precluded.*

[20] *See, e.g.*, *Christianson v. Harris County*, 529 U.S. 576, 583 (2000) (noting canon of construction that "[w]hen a statute limits a thing to be done in a particular mode, it includes a negative of any other mode"); *K.P. Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 118 (2004) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citations and internal quotation marks omitted).

Not only the text, but the policy and purposes of the ISDEAA preclude tribal waivers of statutory rights. The legislative policies underlying a statute may prohibit waiver even when the express language of the statute or contract does not. *Brooklyn Sav. Bank v. O'Neill*, 324 U.S. 697, 704-05 (1945). In *O'Neill*, the court emphasized that the FLSA was designed to redress the unequal bargaining power between employers and employees, so to allow employees to waive its protections—even expressly and in writing—would thwart the legislative intent. *Id*. at 706.[21] Similarly, in *Burnside-Ott Aviation Training Center v. Dalton*, 107 F.3d 854 (Fed. Cir. 1997), a contract provision purported to make the "Award Fee" determination a unilateral Government decision that could not be reviewed under the Contract Disputes Act ("CDA"). The Federal Circuit found that this provision conflicted with the CDA's guarantee of appeal rights and subverted the statute's intent, to equalize the bargaining power of contractors and the Government. 107 F.3d at 858. The court found that the CDA trumped the contract provision because there was no statutory warrant for the contract language. *Id*. at 859.

Like the FLSA and the CDA, the ISDEAA is legislation designed to redress unequal bargaining power: that between the Government and the tribes for whom it acts as trustee. *See* 25 U.S.C. § 450a(b) (declaring policy of ISDEAA to enable transition from "Federal domination" to tribal self-determination).[22] Consistent with the federal trust responsibility,

---

[21] *Accord, Tompkins v. United Healthcare*, 203 F.3d 90, 98 (1st Cir. 2000) (party cannot waive application of preemption provisions of Employee Retirement Income Security Act); *Carter v. Exxon Co.*, 177 F.3d 197, 210 (3d Cir. 1999) (gas station franchisees cannot waive protections granted by federal Petroleum Marketing Practices Act); *Haghighi v. Russian American Broadcasting Co.*, 173 F.3d 1086 (8th Cir. 1999) (inclusion of statutorily-required language in settlement agreement cannot be waived; applying Minnesota law); *Stampco Construction Co. v. Guffey*, 572 N.E.2d 510, 513 (Ind. Ct. App. 1st Dist. 1991) (employee in employment agreement cannot waive benefits of prevailing-wage statutes; "[a]llowing settlement or release of a claim would permit unscrupulous contractors to force employees to submit to economic pressures and accept lower wages"). *See* 15 CORBIN ON CONTRACTS § 88.7, at 595 (rev. ed. 2003).

[22] While some courts have held that a contractor may waive by contract its rights under law, none of these cases involves a contract provision at odds with a statute that specifically benefits the class of contractors of which the party is a member. *See e.g.*, *Hermes Consolidated, Inc. v. United States*, 58 Fed. Cl. 409 (2003) (contractor waived right to object to a contract provision arguably at odds with the Federal Acquisition Regulation (FAR) because the provision was not contrary to the statutes of the United States

Congress sought to end "Federal domination" of services to Indians by transferring resources and responsibility to tribes. *Id*. In 1988 Congress enacted the present section 106 to address "the consistent failure of federal agencies to fully fund tribal indirect costs." S. Rep. 100-274, 1987 U.S.C.C.A.N. 2620, 2627 (Dec. 21, 1987). See discussion above pp. 6-7. The Senate committee emphasized the centrality of full CSC to the core policy of the ISDEAA: "Full funding of tribal indirect costs associated with self-determination contracts is essential if the federal policy of Indian Self-Determination is to succeed." *Id*. at 2632. Just as the Government in *Burnside-Ott* could not subvert the policy of the CDA, the Government here should not be allowed to subvert the ISDEAA with an inconsistent contract provision. If the Government could fix CSC funding at whatever level it wished, despite available appropriations to carry out the statutory mandate of full CSC, tribal contractors would be returned to the position they occupied before passage of the 1988 ISDEAA amendments, rendering the statute pointless and skewing the Congressionally crafted balance of power.[23]

If the contracts' full-funding provision is at all ambiguous, the ISDEAA's legislative instructions for interpretation resolve that ambiguity. See discussion above pp. 14-15. Congress

---

or public policy); *Whittaker Electronic Systems v. Dalton*, 124 F.3d 1443 (Fed. Cir. 1997) (contractor accepted the contract term at odds with a Defense Acquisition Regulation presumably after weighing whether the risk was "undue," and performed the contract, thereby waiving the right to protest; no statutory provision or public policy implicated). Moreover, the cases allowing waiver of statutory rights require that the contractor knowingly and affirmatively waive the right by agreeing to a contrary contract term. *Reservation Ranch v. United States*, 39 Fed. Cl. 696, 712 (1997) (waiver by agreement with contrary term); *Do-Well Mach. Shop, Inc. v. United States*, 870 F.2d 637, 641 (Fed. Cir. 1989) (same). BBAHC made no such agreement here.

[23] Defendants also suggest that BBAHC should have suspended performance if the IHS did not provide sufficient funds. Def. MTD at 13. First, the Government made this argument in *Cherokee Nation*, and the Supreme Court rejected it, finding that this boilerplate language does not excuse the agency's failure to fully fund the contract. *Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631, 638-639 (2005). Second, faced with the choice of suspending health care services to its members altogether, or offsetting a lack of CSC with program funds and/or tribal funds, BBAHC of course chose the latter option. Defendants' suggestion that BBAHC's choice to use its own funds to continue serving its members should now be used against BBAHC illustrates the extent to which the Government, in developing its litigation position, has lost sight of the Secretary's trust responsibility to Indian tribes and their members.

adopted this interpretive principle in recognition that the ISDEAA is remedial legislation and that a longstanding canon of construction requires that laws for the benefit of Indians must be interpreted liberally in favor of Indians. *See Samish Indian Nation v. United States*, 419 F.3d 1355, 1367 (Fed. Cir. 2005); *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1461 (10th Cir. 1997).

In summary, the text and policy of the ISDEAA fully establish that BBAHC's statutory right to full CSC has not been and may not be implicitly waived.

### *D. The Interior Board of Contract Appeals Considered Waiver in a Similar Case and Rejected Its Application.*

Far more pertinent than the defense acquisition cases in which the waiver issue typically arises is the *Seldovia* case, which is directly on point. *Seldovia Village Tribe*, IBCA 3862-3863/97 (October 20, 2003) (attached as Exhibit D). The Seldovia Village Tribe had executed an AFA with the IHS, including a specified amount for indirect costs, an amount that was fully paid during the contract year. During the year, however, Seldovia had negotiated a new indirect cost rate agreement that contained a higher indirect cost rate and thus required additional indirect cost funding from the IHS. The IHS refused to amend Seldovia's AFA to reflect the higher rate, and the Tribe appealed to the Interior Board of Contract Appeals ("IBCA").

Just as in this case, the IHS sought to defend itself by saying it paid every dollar in the contracts and Seldovia acquiesced in accepting those amounts. Judge Parrette of the IBCA rejected that argument, ruling that the IHS could not refuse to amend Seldovia's AFAs to reflect its higher indirect cost rate, then claim both full performance and waiver. *Seldovia*, Exhibit B at 9-11.

The Government initially appealed the *Seldovia* case to the Federal Circuit, but later moved to stay the appeal pending the Supreme Court's ruling in *Cherokee Nation*, because

*Cherokee* involved, in the Government's own words, "issues almost identical to the ones raised in this appeal." *Thompson v. Seldovia Village Tribe*, No. 04-1230, Unopposed Motion to Stay Appellate Proceedings, at 1 (Fed. Cir. March 2004). The Government abandoned the appeal once the Supreme Court decided *Cherokee Nation*, indicating that the Government understood that the *Seldovia* case, including Judge Parrette's conclusion that Seldovia could not waive its right to full CSC in its agreements with the IHS, to fall squarely within the scope of the *Cherokee Nation* decision.

## III. BBAHC's FY 1997 and 1998 Claims Met the Applicable Statute of Limitations Because the Statute Was Tolled by a CSC Class Action.

The Government's motion to dismiss the claims for FY 1997 and 1998 should be denied, because the Government ignores the well-established rule that a class action tolls the statute of limitations as to members of the putative class, and the Government does not provide the legal and factual analysis required to meet the stringent RCFC 12(b)(1) standard. *See* discussion above pp 13-14.

### *A. The 1997 and 1998 Claims Were Timely Because the CDA Statute of Limitations Was Legally Tolled.*

In *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974), the Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." 414 U.S. at 554. The Court reasoned that without this rule, every potential class member would have to file its own action or motion to intervene in order to protect itself in case class certification were denied, "precisely the multiplicity of activity which Rule 23 was designed to avoid." *Id.* at 551. At the same time, the Court noted that "[t]his

[tolling] rule is in no way inconsistent with the functional operation of a statute of limitations." *Id*. at 554.

As described by the Supreme Court in a later case affirming and extending the class-action tolling rule, statutes of limitations "are intended to put defendants on notice of adverse claims and to prevent plaintiffs from sleeping on their rights ... but these ends are met when a class action is commenced." *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 352 (1983) (citations omitted).

> Class members who do not file suit while the class action is pending cannot be accused of sleeping on their rights; Rule 23 both permits and encourages class members to rely on the named plaintiffs to press their claims. And a class complaint "notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment."

*Id*. at 352-53 (quoting *American Pipe*, 414 U.S. at 555).

In *Crown, Cork*, the Supreme Court clarified that tolling extends not only to plaintiffs who intervene in the pending action, but also to would-be class members who file actions of their own. 462 U.S. at 350. The Court stated that "[o]nce the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied," at which point "class members may choose to file their own suits or to intervene as plaintiffs in the pending action." *Id*. at 354.

Numerous courts have held that the tolling announced in *American Pipe* is legal, not equitable tolling, and required by the Federal Rules of Civil Procedure ("FRCP").[24] *Stone Container Corp. v. United States*, 229 F.3d 1345, 1353-54 (Fed. Cir. 2000) (tolling mandated by

---

[24] Although procedures in this court are controlled by the RCFC rather than the FRCP, RCFC 23 "is modeled largely on the comparable FRCP." Rules Committee Notes, 2002 Revision (noting differences not germane to tolling). As discussed below, this Court has applied the *American Pipe* tolling rule in recent cases. Moreover, tolling should be determined with reference to the rules of the court where the class action is filed, not those of the court where the later action is filed.

statute); *Joseph v. Wiles*, 223 F.3d 1155, 1166-67 (10th Cir. 2000) (legal tolling occurs in class actions); *Schimmer v. State Farm Mutual Automobile Ins. Co.*, 2006 WL 2361810 at *4 (D. Colo. 2006) (class action tolling is a form of legal rather than equitable tolling); *In re Discovery Zone Securities Litigation*, 181 F.R.D. 582, 600, n.11 (N.D. Ill. 1998) (same); *Salkind v. Wang,* 1995 WL 170122, at *3 (D. Mass. 1995) (same); *Mott v. R.G. Dickinson and Co.*, 1993 WL 63445 at *5 (D. Kan. 1993) (same). This court has recently applied the *American Pipe* tolling rule as well. *Solow v. United States*, 78 Fed. Cl. 86, 89 (2007); *Athey v. United States*, 78 Fed. Cl. 157, 160 (2007).[25]

In *Stone Container*, the Federal Circuit made it clear that class action tolling is not equitable because it is "mandated by statute" (FRCP 23). 229 F.3d at 1353. As such it applies to the Government. "Having determined that Rule 23 tolling is statutory rather than equitable, it follows that the rule of *American Pipe* applies to the government just as it does to private parties...." *Id.* at 1354.

As discussed above at p. 13, the *Cherokee Nation* class action was filed on March 5, 1999. BBAHC fit squarely within the definition of the proposed class, and had the class been certified, BBAHC would have been bound by any judgment unless it opted out. Thus, under the rule of *American Pipe*, the statute of limitations for BBAHC's individual claims was tolled on March 5, 1999. In a ruling dated February 9, 2001, the court denied the Cherokee motion for class certification, and the statute began to run again. *Cherokee Nation of Oklahoma v. United States*, 199 F.R.D. 357 (E.D. Okla. 2001). The statute was tolled for one year and 341 days.

[25] While the Supreme Court recently held that the statute of limitations, 25 U.S.C. § 2501, could not be waived, and the timeliness of an action could be considered by this court *sua sponte*, *John R. Sand & Gravel Co. v. United States*, 128 S. Ct. 750 (2008), 2008 WL 65445, this ruling does not call *Solow* and *Athey* into question. *John R. Sand* addressed equitable waiver, not the legal tolling triggered by a class action. In *Solow*, the court refers to equitable tolling at one point, but ultimately relies on the *American Pipe* class action tolling precedent. 78 Fed. Cl. at 88-89. *Athey* did likewise. 78 Fed. Cl. at 160.

The Government posits that BBAHC's claims accrued at the end of each contract year. Def. MTD at 10. Accepting for the moment that the Government is correct, BBAHC's 1997 claim accrued on October 1, 1997, the day the fiscal-year contract expired. Ordinarily, then, the Tribe's claim for FY 1997 would have been due by October 1, 2003. Adding the *Cherokee Nation* tolling period, however, pushes the deadline back one year and 341 days, to September 7, 2005. BBAHC filed its claims for 1997 on July 5, 2005, well within the time period.

With the benefit of the tolling period, BBAHC's FY 1998 claim could have been filed as late as September 7, 2006 (again, assuming the Government is correct about the accrual date). BBAHC filed its FY 1998 claim on July 5, 2005, over fourteen months before the deadline, even using the Government's accrual date.

### *B. In the Alternative, the Statute of Limitations Was Equitably Tolled by the CSC Class Action.*

Generally, if a statute is legally tolled, a court need not address equitable tolling. *Stone Container,* 229 F.3d at 1353; *Schimmer*, 2006 WL 2361810 at *4, n.4. If this Court finds that the statute of limitations was not legally tolled, BBAHC argues in the alternative that the statute of limitations was equitably tolled by the *Cherokee Nation* class action.[26]

In *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89 (1990), the Supreme Court held that a "presumption" of equitable tolling applies to suits against the United States even though a waiver of sovereign immunity is to be strictly construed. The Supreme Court has confirmed this ruling in several subsequent cases. *E.g.*, *Young v. United States*, 535 U.S. 43, 49 (2002); *United States v. Brockamp*, 519 U.S. 347, 350 (1997). Under *Irwin* there is a presumption in favor of tolling

[26] Recently a federal district court ruled in a short opinion with little analysis, that tolling did not apply to class members like BBAHC. See *Menominee Tribe of Indians v. United States,* 2008 WL 680379 (D.D.C. 2008). This ruling is seriously flawed and a motion to reconsider has been filed. See Pl. Ex. E (Menominee Memorandum in Support of Motion for Partial Reconsideration).

which can be rebutted if either (1) tolling would not be applicable in a similar suit between private parties, or (2) Congress did not want tolling to apply.

The Government argues that the statute of limitations for the CDA, 41 U.S.C. § 605(a), is jurisdictional and may not be waived, citing to *John R. Sand & Gravel Co. v. United States*, 552 U.S. __ (2008) among other cases. Def. MTD at 10. In the *John R. Sand & Gravel* decision, the Supreme Court, affirming a ruling of the Federal Circuit, held that § 2501 is jurisdictional and may not be *equitably waived* by the government. 128 S. Ct. 750, 756-57. In so doing, the Supreme Court did not overrule the *Irwin* test but rather relied largely on *stare decisis*, citing cases back to 1883, which held that § 2501 is jurisdictional and not subject to equitable waiver. In addressing *Irwin*, the Court acknowledged the presumption of waivability, but it read *Irwin* as a "prospective rule, ... which does not imply revisiting past precedents." *Id.* at 756 (citation omitted). In other words, *Irwin* did not overrule prior cases which found that §2501 could not be tolled. But the Court made clear: "Any anomaly the old cases and *Irwin* together create is not critical; at most, it reflects a different judicial assumption about the comparative weight Congress would likely have attached to competing legitimate interests." *Id.* Thus, the court acknowledged that other statutes could be read differently under *Irwin*, and that this case was decided based on *stare decisis*. Justice Ginsberg noted in her dissent that because of the majority's use of *stare decisis* for this one statute, other statutes, although nearly identical, such as 28 U.S.C. § 2401, may be construed differently under *Irwin*. *Id*. at 760-61. The majority did not disagree, but rather acknowledged that fact in the text quoted above. In assessing the issue under *Irwin*, the Court found that Congress's presumed awareness of the Court's prior interpretations of § 2501 and acquiescence in that interpretation, was enough to rebut the *Irwin* presumption that tolling would otherwise apply to § 2501. *Id.* at 756.

Given that *Irwin* is still good law and that 41 U.S.C § 605 has never been interpreted by the Supreme Court to permit or deny tolling, nor are there precedents directly on point that suggest § 605 is jurisdictional, this Court may then freshly analyze equitable tolling under *Irwin*. Under that test, the CDA statute of limitations may be tolled because (1) tolling would be available in a similar suit between private parties and (2) Congress did not state any clear intention that tolling not apply. *Irwin*, 498 U.S. at 95-96.

*1. The Tolling Rule Would Apply in a Contract Dispute between Private Parties.*

Applying the first prong of the *Irwin* test, the question is whether tolling would apply in a private action when a class action is pending, and we have shown above, pp. 27-30, that it would. Class actions involving claims for breach of contract under the ISDEAA have also been established. *See, e.g.*, *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455 (10th Cir. 1997) (class action alleging failure of Bureau of Indian Affairs to fully fund CSC under contracts in violation of ISDEAA). Courts routinely apply tolling doctrines to breach of contract actions both between private parties and between private parties and the United States.[27]

Thus the first part of the *Irwin* test has been met. Class action tolling is available to private litigants in breach of contract actions and therefore may apply to the Government.

*2. There is No Evidence that Congress Did Not Intend the Tolling Rule to Apply to 41 U.S.C. § 605(a).*

Because it has become "hornbook law that limitations periods are customarily subject to equitable tolling, ... Congress must be presumed to draft limitations periods in light of this

---

[27] *See, e.g.*, *NN&R v. One Beacon Ins. Group*, 2006 WL 1765077 at *8 (D. N.J. 2006) (applying New Jersey law to toll statute as to breach of contract claim against insurer); *Bridgeway Corp. v. Citibank, N.A.*, 132 F. Supp. 2d 297, 304 (S.D.N.Y. 2001) (holding that "the statutes of limitations for plaintiff's claims of breach of contract ... are equitably tolled"); *In re Fruehauf Trailer Corp.*, 250 B.R. 168, 194 (D. Del. 2000) (tolling Delaware statute of limitations on breach of contract and other claims); *Land Grantors in Henderson, Union & Webster Counties, Ky. v. United States*, 64 Fed. Cl. 661, 712 (2005) (applying *Irwin* to hold that "a breach of contract action brought under the Tucker Act is sufficiently similar to a similar private cause of action that consideration of the doctrine of equitable tolling is appropriate and necessary, particularly where 'harsh and unjust results' may occur if the statute is not tolled.").

background principle." *Young v. United States*, 535 U.S. 43, 49-50 (2002) (citations and internal quotation marks omitted). The Supreme Court has explained that analysis of a statute focuses on "*Irwin*'s negatively phrased question: Is there good reason to believe that Congress did not want the equitable tolling doctrine to apply?" *United States v. Brockamp*, 519 U.S. 347, 350 (1997) (Court's emphasis). Rebutting the *Irwin* presumption in favor of tolling requires positive evidence of Congressional intent otherwise with respect to the particular statute at issue. *Bailey v. West,* 160 F.3d 1360, 1368 (Fed. Cir. 1998) ("*Irwin* commands that tolling should be presumed absent a clear contrary intent of Congress....") (emphasis added).

The text of the CDA reveals no indication that Congress intended to rebut the presumption in favor of equitable tolling. Section 605(a) simply says that, "Each claim by a contractor against the government relating to a contract and each claim by the government against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim." 41 U.S.C. § 605(a). This language does not preclude tolling or any other background principle of the common law. If anything, starting the running of the statute from "accrual" indicates that Congress intended the limitations period to be flexible under appropriate circumstances. Rather than running from a hard-and-fast date, such as the contract termination date, the statute runs from accrual, which could be delayed if, for example, the contractor did not immediately discover the breach or the damage it caused. *See, e.g.*, *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990), *cert. denied* 501 U.S. 1261 (1991) (stating that "the 'discovery rule' of federal common law ... is read into statutes of limitations in federal-question cases ... in the absence of a contrary directive from Congress"). Tolling, like the discovery rule, must be read into the statute as well, and certainly cannot be read out of the statute absent clear congressional intent under the rule of *Irwin*.

In *United States v. Brockamp*, 519 U.S. 347 (1997), the Supreme Court confirmed the *Irwin* analytical framework and added more detail to the questions to be asked in examining Congressional intent. *Brockamp* considered: (1) the statute's detail and technical language; (2) whether the limitations were reiterated substantively and procedurally; (3) whether explicit exceptions to limitations were included; and (4) the underlying subject matter of the statute. 519 U.S. at 352; *see also Brice v. Secretary of Health & Human Servs.*, 240 F.3d 1367, 1372 (Fed. Cir. 2001). Applying the *Brockamp* factors to the statute in this case, it is clear that the CDA is not "detailed" or "technical" as to the statute of limitations—certainly not to the same extent as the Internal Revenue Code scheme at issue in *Brockamp*. Nor does the CDA reiterate the limitation "several times in several different ways" and in both substantive and procedural forms, or set forth exceptions for the contractor, as in *Brockamp*.[28] 519 U.S. at 351. As for the underlying subject matter of the statute, the *Brockamp* Court noted that "[t]ax law, after all, is not normally characterized by case-specific exceptions reflecting individualized equities." 519 U.S. at 352. Contract law, by contrast, is primarily a common-law realm in which tolling, the discovery rule, and other "case-specific exceptions reflecting individualized equities" are well established.

If anything, the general purposes of the CDA and the emphasis on fairness support the intent to allow tolling by providing "a fair and balanced system of administrative and judicial procedures for the settlement of claims and disputes relating to government contracts,"[29] and to

[28] Section 605(a) does include an exception for *Government* claims: "The preceding sentence [the six-year deadline] does not apply to a claim by the government against a contractor that is based on a claim by the contractor involving fraud." First, this is not a tolling provision; it is a complete exemption from the statute for the government with respect to fraudulent claims. Second, it applies only to the government. In *Brockamp*, the statute included exceptions that applied to taxpayers, completely unlike section 605(a).

[29] H. R. Rep. No. 95-1556, at 5 (1978).

"equalize the bargaining power of the parties when a dispute exists."[30] This emphasis on fairness supports the presumption that Congress intended tolling to be available to contractors' claims and does not provide any evidence to rebut the *Irwin* presumption. These purposes, combined with the lack of any express intent to preclude equitable tolling,[31] establish that under *Irwin/Brockamp* the doctrine of equitable tolling may be applied and it is appropriate to do so in this context. As noted in *Irwin* itself, reliance on a class action, such as BBAHC's reliance on *Cherokee Nation*, provides a basis for equitable tolling. *Irwin*, 498 U.S. at 96 n.3 (citing *American Pipe*).

**IV. BBAHC's FY 1995 Claim Is Not Barred by Res Judicata.**

Finally, the Government asserts as an affirmative defense to the FY 1995 claim, *res judicata*, in its Motion to Dismiss. Def. MTD at 19-22; RCFC 8(c) (listing *res judicata* among affirmative defenses).[32] The burden of proof is on the party asserting *res judicata*. *Ammex, Inc. v. United States*, 334 F.3d 1052, 1055 (Fed. Cir. 2003) (party asserting the bar must prove all elements of defense). Particularly in the context of a motion to dismiss, which requires

---

[30] S. Rep. No. 95-1118, at 1 (1978). This report briefly discusses the 90-day period for appealing the contracting officer's decision: "Section 7 [41 U.S.C. § 606] establishes the time limits available to the contractor to initiate an appeal to an agency board of contract appeals. This time frame (90 days) is considered adequate to insure the contractor the necessary time to review his position and to decide whether to appeal to an agency board." *Id*. at 23. Nothing in this description would appear to indicate any intent to preclude tolling when, for some good reason, 90 days is not adequate.

[31] The scant legislative history relevant to the six-year limitation period reveals no indication that Congress intended that tolling not apply. As enacted in 1978, the CDA contained no statute of limitations period for presenting claims to the contracting officer (CO).[31] *See, e.g.*, *Board of Governors of the Univ. of N. Carolina v. United States*, 10 Cl. Ct. 27, 30 (Cl. Ct. 1986) (when first enacted, "the CDA provided no limitations period in which claims must be presented (or certified) to the CO"). In 1994, Congress enacted the Federal Acquisition Streamlining Act (FASA), which amended the CDA, 41 U.S.C. § 605(a), to include the six-year limitation. Pub. L. No. 103-355 § 2351, 108 Stat. 3243, 3322 (Oct. 13, 1994). Neither the FASA itself nor its legislative history discusses the reason for adding the six-year limitation to § 605(a).

[32] Because of the factual basis of this defense—a prior judgment precludes a second action only if it involves the same "transactional facts"—it should generally be brought in a motion for summary judgment unless the defense appears on the face of the complaint. Wright, Miller & Cooper, 18 Fed. Prac. & Proc. § 4405 at 103 (citing cases).

resolution of doubts and inferences in favor of BBAHC, *see* above, pp. 13-14,[33] the Government cannot meet this burden for two reasons: (1) the claims are not identical; and (2) the claim presented in this action had not accrued at the time the previous action was filed. We note too that none of the facts relied upon by the Government are found in the Complaint. On that ground alone, the motion to dismiss is improper. See discussion below.

In order for res judicata to be established, the party must show that the second claim is based on the same set of transactional facts as the first. *Ammex v. United States*, 334 F.3d 1052, 1056 (Fed. Cir. 2003). Based on extrinsic evidence, the Government makes only conclusory assertions to show that BBAHC's current claim is the same cause of action litigated in 1995 for the broad reason that both asserted claims for CSC under the same contract. The Government's position is that BBAHC is merely asserting different legal theories. Def. MTD at 21.

However, there are clear differences between the two suits. On July 7, 1995, BBAHC, along with two other tribal organizations, filed a complaint in the U.S. District Court for the District of Alaska. In essence, this case was about the Government failing to promptly pay what was owed in the newly signed compact. Part of the funds that were not paid were tribal shares and the CSC associated with those tribal shares.[34] BBAHC settled its claims with the IHS in an agreement dated September 21, 1995. Def. Ex. I ("Settlement Agreement"). The Settlement Agreement expressly states that it applies only to claims "currently before the court." Those claims dealt with a delay in payment of CSC <u>on tribal shares</u>, and did not purport to address the

[33] *See also In re Braniff Airways, Inc.*, 783 F.2d 1283, 1289 (5th Cir. 1986) (stating general rule that doubts are to be resolved against application of *res judicata*).

[34] The term "tribal shares" refers to PFSAs associated with the Area Office and Headquarters of the IHS—primarily administrative functions—assumed by BBAHC in the Compact and AFA. Tribal shares are one small component of the direct cost base on which indirect costs are owed, a base that also includes hospital and clinic services, alcohol and drug treatment, mental health programs, dental services, health education, and many other PFSAs. *See* FY 1995 AFA § 3 (describing PFSAs carried out by BBAHC under the agreement). For BBAHC, the Area and Headquarters tribal shares were funds and associated responsibilities newly assumed in FY 1995.

entire shortfall associated with all other PFSAs BBAHC carried out in FY 1995. *See* Def. Ex. I at A52 (calculating indirect costs, in Settlement Agreement, on "HQ Shares" and "Area Shares").

The agreement specifies that "[p]ayment of this amount will be made from the FY 1995 Indian Self-Determination (ISD) fund on or before September 30, 1995." Settlement Agreement ¶ 3, Def. Ex. I at A50. The ISD Fund covers startup costs and initial CSC for "new and expanded contracts"—that is, for PFSAs newly assumed from the IHS by a contractor. *See* ISDM 92-2 § 4.A, Def. Ex. G at A15 (describing ISD Fund as covering cost of initial transfer or additional assumption of programs). In fact, Congress appropriated ISD funds in a separate earmark dedicated solely to new and expanded contracts.[35] Thus it is clear that the 1995 action sought—and recovered—CSC related solely to new and expanded PFSAs, namely tribal shares. The present action seeks to recover damages based on underpayment of indirect costs for ongoing PFSAs, which were not at issue in the 1995 action and do not involve the ISD Fund.[36]

Not only is the current claim different from the 1995 action, it had not even accrued when that action was filed or even settled. When BBAHC brought suit in July 1995, the IHS had not yet breached its promise to pay full CSC in accordance with the ISDEAA. The 1995 complaint was filed in July 1995, well before the current claim accrued, as the Government acknowledges.

[35] *See* Dept of the Interior and Related Agencies Appropriations Act, 1995, Pub. L. No. 103-332, 108 Stat. 2499, 2528 (1994) ("of the [IHS] funds provided, $7,500,000 shall remain available until expended, for the Indian Self Determination Fund, which shall be available for the transitional costs of initial or expanded tribal contracts"). Indirect cost funding shortfalls for ongoing PFSAs—those not newly assumed in FY 1995—would and could not be paid from the ISD Fund but only from the IHS's general unrestricted appropriation. *See id.*; *see also* ISDM 92-2 § 6, Def. Ex. G at A20 (indirect costs associated with previous year's base to be treated as "recurring" to Area).

[36] BBAHC acknowledges that the settlement and subsequent dismissal of the 1995 court action extinguished BBAHC's right to recover any further CSC on tribal shares. But BBAHC's current FY 1995 claim is for indirect cost shortfalls on ongoing PFSAs associated with BBAHC's operation of the Kanakanak Hospital, community health aides and practitioners, mental health, dental services, maternal and child health programs, environmental health—in short, all PFSAs other than Area and Headquarters tribal shares in that year.

Def. MTD at 10 (arguing that ISDEAA claim accrues at end of fiscal year, on September 30, 1995 for FY 1995). Thus neither the lawsuit nor the settlement could have included this claim.

A breach of contract suit will not bar a subsequent suit for a breach of the same contract that occurred after the first suit commenced. *Florida Power & Light Co. v. United States*, 198 F.3d 1358, 1360-61 (Fed. Cir. 1999); *Prime Mngmt. Co, Inc. v. Steinegger*, 904 F.2d 811, 816 (2d Cir. 1990); *Klein v. John Hancock Mutual Life Ins. Co.*, 683 F.2d 358, 360 (11th Cir. 1982). The Second Circuit expressed the distinction succinctly:

> [W]hen the parties have entered into a contract to be performed over a period of time and one party has sued for a breach, res judicata will preclude the party's subsequent suit for any claim of breach that had occurred prior to the first suit; it will not, however, bar a subsequent suit for any breach that had not occurred when the first suit was brought.

*Prime Mngmt.*, 904 F.2d at 816 (citing *tenBraak v. Waffle Shops, Inc.*, 542 F.2d 919, 924 n.6 (4th Cir. 1976)).

Given the fact that the current claim had not accrued, the test for establishing *res judicata* cannot be met and the 1995 lawsuit is not preclusive.

**V. If the Court Does Not Exclude Defendant's Outside Evidence, the Motion to Dismiss Should Be Converted to a Motion for Summary Judgment.**

RCFC 12(b) states that, in a motion to dismiss under Rule 12(b)(6), if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in RCFC 56, and all parties shall have reasonable opportunity to present all material made pertinent to such a motion by RCFC 56."

The Government attaches to its Motion to Dismiss several exhibits containing extrinsic evidence in support of its affirmative defense of *res judicata*. *Res judicata* is an affirmative defense, RCFC 8(c), which ordinarily should not be raised in a motion to dismiss. Under some circumstances, as when the defense appears on the face of the complaint or other pleadings,

courts have allowed *res judicata* to be raised in a motion to dismiss. *See, e.g.*, *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984) (recognizing general rule that "affirmative defenses may not be raised by motion to dismiss," but affirming dismissal on ground of *res judicata* where record and pleadings made clear claim was precluded). Here, the affirmative defense is not apparent on the face of the pleading and should not be permitted. Wright & Miller, 5C Fed. Prac. & Proc. § 1366 at 204 (citing cases). Assuming, however, that the defense is heard on the motion to dismiss, then this motion under Rule 12(b)(6) is properly treated as one for summary judgment, since it requests that matters outside the pleadings be considered. *Stockton v. Lansiquot*, 838 F.2d 1545, 1547 (11th Cir. 1988); Wright & Miller, 18 Fed. Prac. & Proc.: Juris.2d § 4405 at 105 (2d ed. 2002) (citing cases). The wisdom of this general rule is illustrated by the instant case, in which claim preclusion is not shown even by Defendants' extrinsic evidence, let alone being apparent on the face of the Complaint.

If the Government is to be permitted to pursue this defense, it should be in a summary judgment setting and BBAHC should have the opportunity to discover facts bearing on the preclusion argument—for instance, whether the IHS paid installments of indirect cost funding during or even after settlement of the claim, which would rebut the Government's assertion that the Settlement Agreement pertained to all indirect cost funding for FY 1995.

With regard to its Rule 12(b)(6) motion as to the terms of the contract, the Government also raises factual allegations, with no supporting evidence, that are not included in the Complaint and are not subject to judicial notice. These include allegations that the "agreed" amounts of CSC in the contracts were established through "negotiation" of the parties. Def. MTD at 17. BBAHC disputes these "facts," and has provided contrary evidence in this response. Moreover, they go beyond testing the sufficiency of the Complaint and thus, like Defendant's

Exhibits H through K, remove the Government's Motion from the sphere of RCFC 12(b)(6) to that of RCFC 56. If the Court does not exclude these outside matters, it must convert the motion to one for summary judgment under the express terms of RCFC 12(b).

**CONCLUSION**

For the reasons above, BBAHC respectfully requests that this Court deny Defendant's Motion to Dismiss in its entirety. In the alternative, if the Court does not exclude Defendant's matters from outside the pleadings, BBAHC asks that the Court convert Defendant's Motion to Dismiss to one for summary judgment and allow BBAHC reasonable opportunity to present all material pertinent to such a motion.

Pursuant to RCFC 20(c), BBAHC requests an oral hearing on the Motion.

Respectfully Submitted,

/s/ Geoffrey D. Strommer by /s/ Lisa F. Ryan
Geoffrey D. Strommer, Attorney of Record
Stephen D. Osborne, Of Counsel
Hobbs, Straus, Dean & Walker, LLP
806 SW Broadway, Suite 900
Portland, OR 97205
503-242-1745 (Tel.)
503-242-1072 (Fax)

/s/ Lisa F. Ryan
Lisa F. Ryan, Of Counsel
Marsha Kostura Schmidt, Of Counsel
Hobbs, Straus, Dean & Walker, LLP
2120 L Street, NW, Suite 700
Washington, DC 20037
202-822-8282 (Tel.)
202-296-8834 (Fax)

Attorneys for the Bristol Bay Area Health Corporation

DATED: April 2, 2008.