# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **BRISTOL BAY AREA HEALTH CORPORATION** | ) | |
| | ) | |
| PLAINTIFF, | ) | No. 07-725C |
| | ) | Hon. Margaret M. Sweeney |
| v. | ) | |
| | ) | |
| **THE UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# Table of Contents

QUESTIONS PRESENTED .......... 1

STATEMENT OF THE CASE .......... 1

STANDARD OF REVIEW .......... 3

RULE OF CONSTRUCTION .......... 4

ARGUMENT .......... 5

I. The Government Has a Duty to Pay CSC in Accordance with Section 106 of the ISDEAA, which Requires Full Payment. .......... 5

II. The Indirect Cost Rate Agreements Establish the Rates that Determine "Full" Payment. .......... 6

III. The IHS Did Not Pay the Full Amount Promised, Thus Breaching the Contracts. .......... 9

IV. The Government Breached the Statutory and Contractual Provisions Incorporating the Stable-Funding Requirement of the ISDEAA in FYs 1998 and 1999. .......... 11

CONCLUSION .......... 15

**EXHIBITS IN THE APPENDIX**

A1. Indian Health Service, Alaska Area Shortfall Reports, FY 1993-1999 .......... A1

B1. Indirect Cost Rate Agreements, FY 1993-1995 .......... A9

C1. Indian Health Service Circular No. 96-04 .......... A12

D1. Seldovia Village Tribe, FY 1998 Annual Funding Agreement .......... A28

E1. Seldovia Village Tribe, FY 1999 Annual Funding Agreement .......... A50

# Table of Authorities

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ... 3

*Appeals of the Mississippi Band of Choctaw Indians*, IBCA No. 4711, 2006 WL 1009210 (IBCA 2006) ... 13

*Brush v. Office of Personnel Mngmt.*, 982 F.2d 1554 (Fed. Cir. 1992) ... 13

*Cherokee Nation v. Leavitt*, 543 U.S. 631 (2005) ... 1, 5, 7, 13

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303 (Fed. Cir. 1998) ... 4

*Choctaw Nation of Indians v. United States*, 318 U.S. 423 (1943) ... 4

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002) ... 14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ... 4

*Menominee Indian Tribe v. United States*, __F. Supp. 2d__, 2008 WL 680379 (D.D.C. 2008) ... 5, 7

*Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759 (1985) ... 4

*Norfolk & Western Ry. Co. v. American Train Dispatchers Ass'n*, 499 U.S. 117, 130 (1991) ... 6

*Pathman Constr. Co. v. United States*, 817 F.2d 1573, 1579 (Fed. Cir. 1987) ... 13

*Ramah Navajo Sch. Bd., Inc., v. Babbitt*, 87 F.3d 1338, 1341 (D.C. Cir. 1996) ... 7

*Thompson v. Cherokee Nation of Oklahoma*, 334 F.3d 1075 (Fed. Cir. 2003) ... 1, 2, 5, 7

*United States v. Winstar Corp.*, 518 U.S. 839 (1996) ... 14

*United Van Lines, Inc. v. United States*, 448 F.2d 1190 (D.C. Cir. 1971) ... 6

**Statutes**

Pub. L. No. 100-472, 102 Stat. 2285 (Oct. 5, 1988) ... 6

Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996) ... 13

Pub. L. No. 105-83, 111 Stat. 1543, 1582-83 (Nov. 14, 1997) ....................................... 13

25 U.S.C. § 450f note ........................................................................................................ 4

25 U.S.C. § 450j-1 ............................................................................................................ 1

25 U.S.C. § 450j-1(a)(1) .................................................................................................... 5

25 U.S.C. § 450j-1(a)(2), (3)............................................................................................... 6

25 U.S.C. § 450j-1(b) ........................................................................................................ 3,

25 U.S.C. § 450j-1(c)........................................................................................... 8, 9, 10

25 U.S.C. § 450j-1(g) ........................................................................................................ 5

25 U.S.C. § 450*l*(c)............................................................................................................ 4

31 U.S.C. § 1304(a)(3) ..................................................................................................... 14

**Other**

Indian Health Service Circular No. 96-04 (April 12, 1996) ........................................... 12

Indian Self-Determination Memorandum No. 92-2 (IHS Contract Support Cost Policy)
(Feb. 27, 1992) ............................................................................................................ 7, 8

Office of Management and Budget, Circular A-87 ........................................................... 9

Rules of the Court of Federal Claims
56 ................................................................................................................ 1, 2, 3, 4, 14

S. Rep. No. 100-274 (Dec. 21, 1987) ........................................................................... 8, 11

S. Rep. No. 103-374 (Sept. 26, 1994) ................................................................................ 4

WILLISTON ON CONTRACTS § 30:19 (4th ed.) ..................................................................... 6

## QUESTIONS PRESENTED

1) Whether Defendant breached FY 1993-1997 contract provisions incorporating section 106(a) of the Indian Self-Determination and Education Assistance Act ("ISDEAA"), 25 U.S.C. § 450j-1(a), by failing to pay Plaintiff's full indirect costs, as determined by the indirect cost rates negotiated by the parties, and thus under both the contracts and applicable law is required to pay to Plaintiff the remainder of the full indirect costs.

2) Whether Defendant breached contract provisions incorporating section 106(b)(2) of the ISDEAA, 25 U.S.C. § 450j-1(b)(2), in FY 1998 and FY 1999 by reducing contract support cost funding below the level of the previous year's full requirement and thus under both the contracts and applicable law is required to pay to Plaintiff the remainder of the full indirect costs.

## STATEMENT OF THE CASE

For several years, the Defendant United States, acting through the Secretary of Health and Human Services ("Secretary") and the Indian Health Service ("IHS") (collectively, the "Government") adopted a policy which systematically underpaid tribes and tribal organizations for their contract support costs ("CSC"), including indirect costs, mandated by section 106 of the Indian Self-Determination and Education Assistance Act ("ISDEAA"), 25 U.S.C. § 450j-1. The Secretary did so based on a fundamental legal error: he interpreted the appropriations acts as limiting the funds "available" for CSC to the amounts recommended in congressional committee reports. The Government's policy was fully documented and the Secretary's interpretation of its discretion under the appropriation act was summarily rejected by both the Federal Circuit and the Supreme Court. These courts found that the appropriation was unrestricted and the entire lump-sum appropriation was available for payment of CSC under an ISDEAA contract. *Thompson v. Cherokee Nation of Oklahoma*, 334 F.3d 1075, 1087-88 (Fed. Cir. 2003) ("*Thompson*"), *aff'd Cherokee Nation v. Leavitt*, 543 U.S. 631 (2005) ("*Cherokee Nation*").

Given the *Thompson* ruling, which affirms the right to full contract support funding when appropriations are available, Plaintiff, the Bristol Bay Area Health Corporation ("BBAHC"), moves this Court for summary judgment on the issue of the Defendant's liability in failing to fulfill its duty to pay the full amount of CSC as promised in its agreements with BBAHC and as required by the ISDEAA. The *Cherokee* cases confirm that under the ISDEAA Section 106, the Government was required to fully fund BBAHC's indirect costs because the IHS had funds available to pay them. On this ground, BBAHC is entitled to judgment as a matter of law. RCFC 56(c).

In this case, there is no dispute as to the amounts paid by the Government. The dispute centers around whether the Government had a legal duty to pay more than it actually paid. The answer to that question is resolved by defining the "full amount" of CSC the Government had a duty to pay under the statute and contract. The Government contends that it paid all that was owed because the amount owed is subject to negotiation and it paid what was negotiated.

BBAHC sees it differently. Aside from the fact that there was no negotiation of the amounts added to the contracts, the Government's position is simply an attempt to divert the court's attention from the reality of its own policies as applied to BBAHC and all other contractors. The reality is that the amounts paid by the Government were insufficient because the payments were based on the IHS policy, rejected by the Federal Circuit and Supreme Court, of underfunding CSC. The contract documents establish that the full amount of CSC owed under BBAHC's contract is readily determined by the indirect cost agreements, which are part of the contract. IHS failed to pay the total amount of CSC per the indirect cost rate agreement because of IHS's misinterpretation of the law. BBAHC seeks summary judgment on liability for this claim. There can be no dispute--these amounts were not paid.

BBAHC makes one further claim which is an extension of the Government's failure to fully fund CSC. The ISDEAA prohibits the Secretary from reducing funding from year to year unless one of five narrow exceptions applies. 25 U.S.C. § 450j-1(b)(2). Had the Secretary properly interpreted the ISDEAA and the appropriations acts, BBAHC's FY 1997 CSC would have been fully funded as required by section 106. BBAHC seeks a ruling that given the statutory prohibition on funding reduction, the Secretary then would have been required to pay BBAHC at least the same amount of CSC in FYs 1998 and 1999. The IHS's failure to fund the FY 1998 and 1999 AFAs at the required FY 1997 level violated the statute and breached the contracts.

The facts, as established in the Government's own records, are not in dispute. The statute, contracts, and indirect cost rate agreements all confirm the Government's duty to fully fund CSC, provide a basis for determining that funding amount, and confirm the Government's failure to fulfill that duty. On this ground, this Court should grant BBAHC's motion for summary judgment.

**STANDARD OF REVIEW**

Summary judgment is appropriate under RCFC 56 when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original). A "material fact" is one that will "affect the outcome of the suit under the governing law." *Id*. at 248. The Court must "deem the material facts claimed and adequately supported by the moving party to be established, except to the extent that such material facts are controverted

by affidavit or other written or oral evidence." RCFC 56(h)(3). Doubts as to whether a genuine issue of material fact exists must be resolved in favor of the non-moving party. *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307 (Fed. Cir. 1998). But when the moving party has met its initial burden, "an adverse party may not rest upon the mere allegations or denials in the adverse party's pleading, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." RCFC 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

**RULE OF CONSTRUCTION**

Statutes enacted for the benefit of Indians, such as the ISDEAA, must be liberally construed in their favor. *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 431–32 (1943) (agreements with tribes to be liberally construed). The ISDEAA explicitly incorporates this canon of construction, mandating that "[e]ach provision of the [ISDEAA] and each provision of this Contract shall be liberally construed for the benefit of the Contractor...." 25 U.S.C. § 450*l*(c), sec. 1(a)(2); *see also* 25 U.S.C. § 450f note, sec. 303(e), (f) (Title III provisions requiring interpretation of federal laws and regulations in manner that will facilitate agreements and inclusion of PFSAs therein); S. Rep. 103-374 (Sept. 26, 1994) at 11 (conveying understanding that ISDEAA model contract provision requiring liberal construction of statute and contract "incorporates the longstanding canon of statutory interpretation that laws enacted for the benefit of Indians are to be liberally construed in their favor"). The Compacts also reflect the liberal construction canon. *See, e.g.*, FY 1995 Compact Art. I § 2 ("This Compact shall be liberally construed to achieve its purposes...."); FY 1996 Compact Art. I § 2 (same); FY 1997 Compact Art. I § 2 (same). Therefore any ambiguities in the contracts, as well as the ISDEAA, must be resolved in favor of BBAHC.

# ARGUMENT

## I. The Government Has a Duty to Pay CSC in Accordance with Section 106 of the ISDEAA, which Requires Full Payment.

In FY 1993 and FY 1994 BBAHC operated the Kanakanak Hospital and provided a variety of health care services to Alaska Natives and others pursuant to contracts with the IHS under Title I of the ISDEAA. From FY 1995 through FY 1999, BBAHC operated the Hospital and provided health care pursuant to the Alaska Tribal Health Compact ("Compact") with the Secretary and the United States, and associated Annual Funding Agreements ("AFAs") under Title III of the ISDEAA.

Section 106 of the ISDEAA governs funding of contracts and AFAs under the statute. Section 106(g) mandates that, once an agreement is approved, "the Secretary shall add to the contract the full amount of funds to which the contractor is entitled under subsection (a)." 25 U.S.C. § 450j-1(g). Subsection (a), in turn, requires payment not only of the funds the Secretary would otherwise have expended on the contracted programs, functions, services, and activities ("PFSAs"), but also CSC to support those PFSAs. *Id.* § 450j-1(a). Although CSC funding, like all funding under the ISDEAA, is "subject to the availability of appropriations," *id.* § 450j-1(b), if appropriations are available, tribal contractors have a statutory right to full payment. *Thompson*, 334 F.3d at 1081; *Cherokee Nation*, 543 U.S. at 634 (citing section 106(a)(1) and (2) for the proposition that "[t]he [ISDEAA] specifies that the Government must pay a tribe's costs, including administrative expenses"); *Menominee Indian Tribe of Wisconsin v. Leavitt*, ---F. Supp. 2d ---, 2008 WL 680379 (D.D.C. March 14, 2008) (holding that the "ISD[EA]A mandates the payment of *full* indirect CSC and ISD[EA]A itself establishes that entitlement") (court's emphasis).

This statutory mandate to fully fund CSC was enacted in 1988, and applies to all of the contracts at issue in this action. *See* Pub. L. No. 100-472, § 205 (Oct. 5, 1988) (adding to ISDEAA the current section 106, 25 U.S.C. § 450j-1). The full-payment requirement of section 106 was also incorporated into BBAHC's contracts. *E.g.*, FY 1996 AFA § 4(b) ("Pursuant to section 106(a)(2) of the [ISDEAA], Bristol Bay Area Health Corporation shall receive contract support as defined in sections 106(a)(2) and (3)."); FY 1997 AFA § 4(b) (same).[1]

Thus it is clear that the Government has a duty to pay the "full amount" of CSC. But how was the full amount to be determined? To answer that question, BBAHC and the Government entered a second series of contractual agreements: the indirect cost rate agreements.

## II. The Indirect Cost Rate Agreements Establish the Rates that Determine "Full" Payment.

The Government takes the position that the ISDEAA does not mandate that "a specific formula" be used to calculate indirect costs. Def. MTD at 15. Recently, faced with this identical argument—and virtually the identical language—the U.S. District Court for the District of Columbia rejected this position as reflecting "a very troubling misapprehension" of the ISDEAA.

> In his brief, the Secretary asserts that "ISDA does not mandate the payment of a specific amount of indirect CSC," ... and "[i]t is the contracts themselves that create an entitlement to CSC." ... These statements represent a very troubling misapprehension of the statute. ISDA mandates the payment of *full* indirect CSC and ISDA itself establishes that entitlement.

*Menominee Indian Tribe of Wisconsin v. United States*, --- F. Supp. 2d ---, 2008 WL 680379 at *2 (D.D.C. 2008) (court's emphasis), *citing Ramah Navajo Sch. Bd., Inc., v. Babbitt*, 87 F.3d 1338, 1341 (D.C. Cir. 1996) ("[T]he [ISDEAA] requires the Secretary ... to cover the full

[1] Even if the FY 1993 and 1994 contracts do not contain an analogous provision, applicable provisions of law existing at the time of the making of a contract enter into and form a part of the contract as fully as if expressly incorporated therein. *Norfolk & Western Ry. Co. v. American Train Dispatchers Ass'n*, 499 U.S. 117, 130 (1991); *United Van Lines, Inc. v. United States*, 448 F.2d 1190, 1195 (D.C. Cir. 1971); 11 WILLISTON ON CONTRACTS § 30:19 (4th ed.). Thus the FY 1993 and 1994 contracts incorporated section 106's promise of full payment.

administrative costs the Tribe will incur ... which the statute refers to as an entitlement...."). The case law is unanimous in upholding the plain language of section 106: When the Secretary has funds available, as he did from his unrestricted lump-sum appropriation in FYs 1993-1997, "[t]he Secretary is not free to negotiate hard and require the Tribe to accept less than full funding." *Menominee* at *2; *accord Thompson*, 334 F.3d at 1084-85; *Cherokee Nation*, 543 U.S. at 644. Thus, the statute mandates payment of the full amount.

Determining that "full amount" is not done on an ad hoc basis. Pursuant to Government policy and practice, the calculation of 100% need of contract support costs is based on an indirect cost rate agreement negotiated with the Government agency charged with that duty, in this case the Division of Cost Allocation in the Department of Health and Human Services. As stated in the rate agreements, the approved rates "are for use on grants, contracts and other agreements with the Federal Government." Pl. Ex. B1 at A9, A10, A11. Thus, for BBAHC, as for the vast majority of Tribes and indeed federal contractors generally, the CSC need under the contract is determined by applying a negotiated indirect cost rate to the direct cost base. This has been IHS policy under IHS Circulars since at least 1992. For contractors with established indirect cost rates, such as BBAHC, the IHS is required to award indirect costs "by applying the negotiated rate(s) to the direct cost base amount for this purpose." Def. Ex. G at A19 (Indian Self-Determination Memorandum ("ISDM") 92-2 at 6).

Congress was well aware that this mechanism was being used under the ISDEAA. For example, the IHS is required by statute to prepare an annual CSC shortfall report to Congress. By law, the report must include the direct cost base, the indirect cost rate, resulting need, the amount of CSC paid, and the shortfall (if any). 25 U.S.C. § 450j-1(c). See also S. Rep. 100-274 at 17-18 (Dec. 21, 1987) (explaining intent to define "indirect costs" in accordance with "known management practices" codified in OMB Circular A-87). The IHS prepared shortfall reports for

the Alaska Area in FY 1993-1999 reflecting BBAHC's indirect cost rate and shortfalls as required by law. Pl. Ex. A1.

In fact, in line with the statute, policy and practice, the Government agreed by contract to use this "specific formula" to calculate BBAHC's indirect cost requirement. Following the statutory expectations and the practice of the IHS, the Government agreed to the use of the indirect cost rate to calculate CSC in its contracts and AFAs with BBAHC. The CSC provision in the FY 1995 AFA, quoted by the Government at length in its motion to dismiss, MTD at 16-17, makes this clear:

> Subject to Congressional appropriation, an additional lump sum amount shall be added to this Agreement for the [BBAHC] under ISDM 92-2 or its successor.[2] *The amount shall be based upon the [BBAHC's] indirect cost agreement* and applicable law and will be added to this Agreement as soon as available through appropriations....

FY 1995 AFA § 4(b); *see also* Def. Ex. F at A13 (addendum replacing Section 4(b) with similar language but adding additional "Indirect/Contract Support" amounts); Contract No. 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, Modification #65 § G.1.E ("Indirect Costs during the period of this contract shall be reimbursed at rates established by agreement between the Contractor and the Division of Cost Allocation, Region X, Department of Health and Human Services."). Under this agreement, based on historical and projected figures, the Government and BBAHC would negotiate a "provisional" indirect cost rate, during or before the contract year, on which to base payment for that year. *See, e.g.*. Pl. Ex. B1 at A9 (rate agreement dated June 16, 1992, showing provisional rate of 20.80% for FY 1993).[3] Later, once actual costs for that year were known (typically two

---

[2] Indian Self-Determination Memorandum ("ISDM") 92-2, *see* Def. Ex. G, sets forth the IHS's method for calculation and payment of CSC.

[3] The criteria for indirect cost negotiations are set forth in OMB Circular A-87, which can be found at http://www.whitehouse.gov/omb/circulars/a087/a87_2004.html

years later), a "final" rate would be assigned. *See, e.g.*. Pl. Ex. B1 at A11 (rate agreement dated June 9, 1994, showing final rate of 22.20% for FY 1993).[4]

The Government does not claim that it paid the full amount of CSC requirement as calculated using the approved rate. Rather the Government ignores the indirect cost rate and the amount of CSC calculated with those rates, to claim that indirect costs were subject to "negotiation," *see* Def. MTD at 15, pointing to a few contract modifications as proof. We agree there was a negotiation. But as we establish in the opposition to the motion to dismiss, these contract modifications are not negotiated. See Pl. Opp. to MTD at 10-11. The negotiation occurred during the indirect cost rate negotiation. These agreements, in tandem with the contracts that set forth the direct cost base, define the scope of the Government's obligation for "full" indirect costs.

## III. The IHS Did Not Pay the Full Amount Promised, Thus Breaching the Contracts.

IHS's own shortfall reports stand as an admission that the IHS did not pay BBAHC's full indirect cost requirement in any of the years at issue. As required by section 106(c) of the ISDEAA, the IHS prepared summaries, on a tribe-by-tribe basis,[5] of the direct cost base, approved indirect cost rate, indirect cost requirement, amount "available," and (if the amount deemed available is less than the requirement) the resulting shortfall. 25 U.S.C. § 450j-1(c); *see also* Pl. Opp. to MTD at 12. The IHS then certified and submitted these reports to Congress.

---

[4] In the years after FY 1993, the parties negotiated two sets of rates, one for "on-site" activities (the vast majority), and one for "off-site" activities.

[5] The Government's contention, Def. MTD at 18, that section 106(c) does not require the IHS "to report deficiencies of payment in specific AFAs" is puzzling, and certainly wrong, as it is contradicted by the plain language of the statute, as well as IHS's longstanding practice. *See, e.g.*, 25 U.S.C. § 450j-1(c)(3) (requiring IHS to report to Congress "the indirect cost rate and type of rate for each tribal organization that has been negotiated with the appropriate Secretary") (emphasis added); *id.* § 450j-1(c)(4) (requiring IHS to report to Congress "the direct cost base ... for each tribal organization") (emphasis added); *id.* § 450j-1(c)(6) (requiring IHS to report "any deficiency in funds ... to any Indian tribes") (emphasis added); Pl. Ex. A1 (IHS shortfall reports showing CSC deficiencies for each specific tribal contractor).

While these reports are not part of the contract, the reports usefully summarize data that the agency itself gleaned from the contracts and modifications, AFAs and addenda, and the indirect cost rate agreements to quantify each contract's underfunding or shortfall.[6]

To illustrate the use of the indirect cost rate and the shortfall reports: in a BBAHC rate agreement dated June 9, 1994, a provisional rate for of 42.0% was established for on-site programs for FY 1994, and a rate of 23.0% for off-site programs. Pl. Ex. B1 at A10. As reflected in the shortfall report for that year, *see* Pl. Ex. A1 at A2, BBAHC had total direct costs of $13,310,185, from which the IHS excluded $513,019, presumably because that amount was for capital expenditures or subawards, which the indirect cost agreement specifies should be excluded before applying the rate. The applicable base, then, was $12,797,166. *Id*. Applying the 42.0% rate, the indirect cost requirement would be $5,374,810, but the IHS calculated a requirement of $4,941,844, presumably because some of the direct cost base consisted of "off-site" activities subject to the lower rate. The IHS paid only $2,848,960, the amount it deemed "available," leaving a shortfall of $2,092,884. Even assuming, favorably to the Government, that the IHS excluded the appropriate amount from the direct cost base before applying the rate(s), and that the IHS properly applied the lower off-site rate to the appropriate proportion of direct costs, the IHS clearly did not pay the "full amount" of CSC required by section 106 and the contracts, and as determined by the indirect cost rate agreements as applied to the contract's

[6] The Government may attempt to dismiss these reports as estimates. We find however, that the shortfall reports closely track the data in the contract documents and indirect cost rate agreements. To take FY 1993 as an example, the final contract modification shows a direct cost base of $13,719,741. Contract No. 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, Mod. No. 65 (Sept. 30, 1993). The parties agreed on a provisional indirect cost rate for FY 1993 of 20.80%. Pl. Ex. B1 at A9. Thus the IHS should have paid BBAHC $2,853,706 in indirect costs. Yet the IHS made "available" only $2,477,917, Pl. Ex. A1 at A1, falling short of its contractual promise of full payment by $375,789. Similarly, the shortfall report for FY 1993 shows an "Indirect cost Funding requir[ement]" of $2,818,802, which is 20.97% of the direct cost base (less exclusions), very close to the 20.80% provisional rate, leaving a shortfall of $340,885. *Id*. Notably, the IHS did not pay the full requirement even at the provisional rate—let alone the larger amount that would have been due using the "final" rate of 22.20%. Pl. Ex. B1 at A11.

direct cost base. These reports are fully sufficient to establish the fact of underpayment of CSC for liability purposes.

## IV. The Government Breached the Statutory and Contractual Provisions Incorporating the Stable-Funding Requirement of the ISDEAA in FYs 1998 and 1999.

Beginning in FY 1998, Congress enacted appropriations language which sought to cap the amount of funds spent on CSC. Accepting without conceding that the cap limits the amount the IHS could have paid in FY 1998 and 1999, and that BBAHC is not entitled to claim 100% of all CSC owed for that year, BBAHC has a claim for what is known as "recurring funding." BBAHC claims that if the IHS had fully funded BBAHC's FY 1997 CSC, then under the statute, contracts and IHS policies, the Secretary would have been required to pay BBAHC at least the same amount of CSC in FYs 1998 and 1999 as recurring funding.

In section 106 Congress prohibited the Government from reducing CSC and other funding from year to year, unless one of five narrow exceptions applies. ISDEAA § 106(b)(2); 25 U.S.C. § 450j-1(b)(2) (amount of funds required by section 106(a), including CSC, "shall not be reduced by the Secretary in subsequent years" unless one of the exceptions applies). The recurring nature of the funding promotes predictability and stability in tribal contractors' provision of services to their members and other beneficiaries. This was a key point in the 1988 amendments. "The protection of contract funding will provide year-to-year stability for tribal contractors, and will contribute to better tribal planning, management and service delivery." S. Rep. No. 100-274 at 30 (Dec. 21, 1987).

The IHS adopted a policy reflecting the recurring nature of CSC funding in Circular 96-04. Pl. Ex. C1. Under the Circular, CSC funding recurs to the Area <u>and to each tribe</u>, provided that a tribe's CSC requirement does not drop below the previous year's level. *Id*. at A16 (direct CSC "shall be awarded on a recurring basis"); *id*. at A24 ("indirect CSC to each awardee, if

justified in subsequent years, shall not be reduced by the IHS . . . ."). For example, if a tribe's indirect cost rate dropped, then a tribe's total CSC requirement would also drop below the prior year's level. Under the Circular, the recurring funding that had been paid to the Area would not recur to that tribe, but rather would remain within the Area for distribution to other underfunded tribes in that Area. But for tribes whose CSC needs increased, and that is true here, the Circular, like section 106(b)(2), is clear that CSC funding would and must recur not only to the Area but also to the tribe.[7]

The stable-funding rule was incorporated into BBAHC's agreements with the Secretary. *See* FY 1998 AFA § 4(a) (funding amounts "subject to reduction only in accordance with Section 106 of [the ISDEAA] during the term of this Annual Funding Agreement or thereafter"); FY 1999 AFA § 4(a) (same). The duty to provide recurring funding is not impacted by the appropriation cap for FY 1998 and 1999 because under the ISDEAA, CSC may be reduced when there "has been a reduction in appropriations from the previous fiscal year for the program or function to be contracted." 25 U.S.C. § 450j-1(b)(2) [106(b)(2)]. In FY 1997, Congress enacted a lump-sum appropriation for IHS of $1,806,269,000. *Dep't of the Interior & Related Agencies Appropriations Act,* Pub. L. No. 104-208, 110 Stat. 3009, 3009-212 (Sept. 30, 1996). Congress enacted another lump-sum appropriation in FY 1998 of $1,841,074,000, which

---

[7] IHS understands that underfunding in one year will carry forward to every subsequent year, so that making a contractor whole requires paying not only the shortfall in the year of the breach, but also amounts that would have recurred in subsequent years but for that breach. In a similar situation, IHS agreed to pay funding on a recurring basis, the IHS explicitly agreed with a tribal contractor that had pending claims against the IHS for unpaid CSC in 1996 and 1997 that if the tribal contractor prevailed on its CSC claims for FYs 1996 and 1997, the IHS would pay any resulting additional CSC funding on a recurring basis in FYs 1998 and 1999. *See* Annual Funding Agreement Between Seldovia and the Native Village of Nanwalek and The Secretary of Health and Human Services § 4(A) n.1 (Oct. 1, 1997) ("The IHS agreed to add to this AFA any increase in indirect contract support costs funds under IHS Circular 96-4 that the tribe may be entitled to in FY 1998 based on the outcome of the [IBCA] claim."). Seldovia's FY 1999 AFA contained the same provision. (Both AFAs are enclosed as Exhibits D1 and E1, respectively.) Importantly, these provisions make clear that the Tribe's entitlement to additional CSC in FY 1998 and thereafter derives not from the provisions themselves, which merely acknowledge the entitlement, but from the Circular, from ISDEAA § 106(b)(2), and from the contract provisions incorporating the Circular and § 106(b)(2).

increased overall appropriations for the agency, but designated a capped amount for CSC in the appropriations act. *Dep't of the Interior & Related Agencies Appropriations Act,* Pub. L. No. 105-83, 111 Stat. 1543, 1582-83 (Nov. 14, 1997). The amount designated for CSC was actually an increase of $7.98 million from the level Congress informally set in 1997. The agency abided by that level and distributed it according to its queue and shortfall policies, never stating that it was not paying recurring funding under a § 106(b)(2) exception. Even though there was a cap, IHS has paid recurring amounts every year thereafter because there was no option under the statutory § 106(b)(2) exceptions to refuse to fund them. Indeed, this is also IHS policy. Pl. Ex. C1 at A24 (IHS CSC Circular No. 96-04).

Because of the recurring nature of CSC, the IHS's underpayments in FY 1995-1997 essentially cascaded into FY 1998 and every year thereafter. In this case, BBAHC's claim for FY 1998 and FY 1999 should be confirmed. Failure to permit recovery for the effects of the IHS's historic and continuing mistakes would allow the Government to profit from its own breaches, which it may not do. *Brush v. Office of Personnel Mngmt.*, 982 F.2d 1554, 1563 (Fed. Cir. 1992) (government agency not permitted to breach statutory duty then profit by its own failure); *Pathman Constr. Co. v. United States*, 817 F.2d 1573, 1579 (Fed. Cir. 1987) ("The government cannot take advantage of its own failure to perform its statutory obligations.")[8] The IHS violated the contractual and statutory stable-funding requirements in FYs 1998 and 1999 by

---

[8] The Government may argue that the cap precludes recovery of damages since those funds have been expended. However, for this claim, as for the shortfall claims, the recovery would be in the form of damages, not contract performance, and would be paid from the Judgment Fund. Therefore appropriations are not implicated. See *Appeals of the Mississippi Band of Choctaw Indians*, IBCA No. 4711, 2006 WL 1009210 (IBCA 2006). In the *Choctaw* case, the BIA mistakenly failed to pay over $4 million in CSC, but argued that its error could not be corrected because the agency had already paid out all of the CSC appropriated under the cap. The Interior Board of Contract Appeals rejected that argument, holding that the BIA's denial of "CSC funds due under 25 U.S.C. § 450j-1(a)(2) but withheld by error is clearly a breach of contract that is redressable through the Contract Disputes Act and the Judgment Fund, 31 U.S.C. § 1304(a)(3), to the extent that other funds are unavailable." *Id*. (*citing Cherokee Nation*, 543 U.S. 631 (2005) and *United States v. Winstar Corp.*, 518 U.S. 839 (1996)).

perpetuating the artificially low CSC funding levels established by its breaches in previous years.[9] The IHS's failure to fund the FY 1998 and 1999 AFAs at the required FY 1997 level breached section 4(a) of the AFAs for those years and violated section 106(b)(2) of the ISDEAA.

[9] For this reason, in the alternative the damages claimed for FYs 1998 and 1999 could be conceived as foreseeable consequential or "expectancy" damages attributable to the breach of the FY 1997 contract. *See Energy Capital Corp. v. United States*, 302 F.3d 1314, 1324 (Fed. Cir. 2002) ("One way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred. The benefits that were expected from the contract, 'expectancy damages,' are often equated with lost profits, although they can include other damage elements as well."). The IHS's FY 1997 breach of the full-funding provision directly and foreseeably caused measurable damage to BBAHC not only in FY 1997, but in FYs 1998 and 1999 as well.

## CONCLUSION

For the reasons above, BBAHC respectfully requests that the Court grant the Plaintiff's Motion for Summary Judgment.

Pursuant to RCFC 20(c), BBAHC requests an oral hearing on the Motion.

Respectfully Submitted,

s/ Geoffrey D. Strommer by s/ Lisa F. Ryan
Geoffrey D. Strommer, Attorney of Record
Stephen D. Osborne, Of Counsel
Hobbs, Straus, Dean & Walker, LLP
806 SW Broadway, Suite 900
Portland, OR 97205
503-242-1745 (Tel.)
503-242-1072 (Fax)

s/ Lisa F. Ryan
Lisa F. Ryan, Of Counsel
Marsha Kostura Schmidt, Of Counsel
Hobbs, Straus, Dean & Walker, LLP
2120 L Street, NW, Suite 700
Washington, DC 20037
202-822-8282 (Tel.)
202-296-8834 (Fax)

Attorneys for the Bristol Bay Area Health Corporation

DATED: April 15, 2008.