# Exhibit D1

# Seldovia Village Tribe
# FY 1998 Annual Funding Agreement

# ANNUAL FUNDING AGREEMENT

## BETWEEN SELDOVIA AND THE NATIVE VILLAGE OF NANWALEK

## AND

## THE SECRETARY OF HEALTH AND HUMAN SERVICES

## OCTOBER 1, 1997

# TABLE OF CONTENTS

**SECTION 1 -- OBLIGATIONS OF THE INDIAN HEALTH SERVICE. .......1**
**SECTION 2 -- OBLIGATIONS OF SELDOVIA. ........................3**
**SECTION 3 -- TRIBAL PROGRAMS AND BUDGET. ....................3**

1) CONTRACT HEALTH CARE ....................................3
2) EMERGENCY MEDICAL SERVICES ..............................3
3) COMMUNITY HEALTH REPRESENTATIVE .........................3
4) MENTAL HEALTH ...........................................3
5) ALCOHOL AND DRUG ABUSE ..................................4
6) EPIDEMIOLOGY ............................................4
7) OTHER PROGRAMS/SERVICES FUNDED ...........................4

**SECTION 4 -- AMOUNTS AVAILABLE IN FY 1998. ..................4**

**B) Base Budgets. .........................................6**

1) CATEGORIES AND BASE YEAR ................................6
2) ADJUSTMENTS .............................................6

**SECTION 5 -- METHOD OF PAYMENT. .............................7**

**A) Payment Schedule. .....................................7**
**B) Availability of Tribal Shares. ........................7**

1) HEADQUARTERS' TRIBAL SHARES .............................7
2) AREA TRIBAL SHARES ......................................7

**C) Periodic Payments. ....................................7**
**D) Buyback/Withholding. ..................................7**

1) GENERALLY ...............................................7
2) DETERMINATION OF COST ...................................8

i) Generally. ..............................................8
ii) Conditions for Partial Year Withhold and Buyback. .......8

a) IPA/MOA..................................................8

I) Contingent Authorization for Partial Year Withhold and Buyback..................................................8

II) Conditions regarding IPA/MOA............................8

1. Advance Withhold. .......................................8
2. Late Payment Provision. .................................8

b) Central Warehouse........................................8

I) Advance Withhold.........................................8
II) User Fees...............................................8
III) Late Payment Provision.................................9

c) Village Based Clinics....................................9

I) Advance Withhold. .....................................9
II) Late Payment Provision. ................................9

d) Other Services........................................9

I) Advance Withhold. .....................................9
II) Incidental Services. .................................9
III) Late Payment Provision. ...............................9

e) Administrative Surcharge...............................9
f) No Other Charges.......................................10

3) METHOD OF PAYMENT .........................................10

i) Full Year Withhold. ....................................10
ii) Purchases Through Buyback Under Subsection (D)(2)(ii). .....10

a) Calculations..........................................10

I) Of Initial Estimated Monthly Payment. ..................10
II) Of Total Withhold Amount. .............................10

b) Payment Schedule......................................10

I) First Payment. ........................................10
II) Subsequent Estimated Monthly Payments. ..................11
III) Default Date. ........................................11

iii) Reconciliation and Adjustment ..........................11

a) For Categories of Service...............................11
b) For Administrative Surcharge............................11

(iv) Use of Other Funds Due Seldovia to Avoid Default or Satisfy Obligations to IHS. ..........................................12

4) DISPUTE RESOLUTION .........................................12

**SECTION 6 -- ADJUSTMENTS. ...................................12**

**A) Adjustment Due to Congressional Actions. ................12**

**SECTION 7 -- RECORDS. .......................................12**
**SECTION 8 -- PROGRAM RULES. .................................12**
**SECTION 9 -- RETROCESSION AND DISCONTINUANCE. ...............12**

**A) Retrocession. .........................................12**
**B) Discontinuance. .......................................13**
**C) Withdrawal Procedures. ................................13**

1) PROCESS ...................................................13
2) DISTRIBUTION OF FUNDS .....................................13

**SECTION 10 -- CONSOLIDATION OF CONTRACTS AND PREVIOUS AFAS. 13**
**SECTION 11-- HEADQUARTERS RESPONSIBILITIES. .................14**
**SECTION 12 -- ACCESS TO TRAINING AND TECHNICAL ASSISTANCE. .14**
**SECTION 13 -- AMENDMENT OR MODIFICATION OF THIS AFA. .......14**

A) Form of Amendments....................................14
B) Services from IHS.......................................14
C) Due to Addition of New Programs.........................14
D) Due to Availability of Additional Funding..............14
E) Other Adjustments.......................................15
F) General Procedures for Amending or Modifying this AFA..15

SECTION 14 -- MEMORANDA OF AGREEMENT WITH MEMBER VILLAGES. .15
SECTION 15 -- SEVERABILITY...................................15
SECTION 15 -- EFFECTIVE DATE AND DURATION. ..................16

# ANNUAL FUNDING AGREEMENT

## BETWEEN SELDOVIA AND THE NATIVE VILLAGE OF NANWALEK

## AND

## THE SECRETARY OF HEALTH AND HUMAN SERVICES

## OCTOBER 1, 1997

This Annual Funding Agreement is entered into by and between the Seldovia Village Tribe (Seldovia), I.R.A., located in the lower Cook Inlet region with withdrawal boundaries which include Seldovia Lake to Boundary Creek to Bear Cove to Laida Spit to Crescent Valley to McNeil River to Fourth of July Creek (the "Seldovia Village Withdrawal Area") for itself and on behalf of the Native Village of Nanwalek (Nanwalek), which has authorized Seldovia to sign this Annual Funding Agreement (AFA) and be responsible for carrying out certain programs, functions, services and activities (PFSAs) identified in this AFA on its behalf, and the Secretary of the Department of Health and Human Services.

**SECTION 1 -- OBLIGATIONS OF THE INDIAN HEALTH SERVICE.** This AFA obligates the Indian Health Service (IHS) to provide funding and services identified herein and as provided in the Alaska Tribal Health Compact (Compact) between Seldovia and Nanwalek and the United States in FY 1998. A Memorandum of Agreement (MOA) regarding the Continuing Services Plan for the Area Office of the Alaska Native Health Service for FY 1998, among the Co-Signers and the Alaska Area Native Health Service to reflect the understanding of the parties regarding services, attached as Appendix C, is hereby incorporated by reference.

In addition, although funds are provided from Headquarters and Area Office in support of this compact, the IHS will agree to continue to make available to Seldovia services from both Area Office and Headquarters unless 100 percent of the total tribal shares for these PFSAs have been specifically transferred to Seldovia in this AFA. In cases where a portion of a tribal share has been transferred, there may be some diminishment in the level of the PFSAs provided by the IHS. Furthermore, the IHS will reorganize both Headquarters and the Area Office to continue to provide the remaining functions which have not been included in this AFA in the most effective and efficient manner possible, provided that decisions about the array and level of services to be offered by the IHS shall be made in consultation with Alaska Tribes. The IHS PFSAs not negotiated or listed in Appendices A are the responsibilities of the IHS, including the Region X attorney support which Seldovia is not compacting for its share.

The Alaska Native Medical Center (ANMC) will continue, subject to available appropriations, in its historical capacity as primary, secondary, tertiary, and specialized provider of patient care to the

Seldovia withdrawal area within the larger Anchorage Service Unit, to provide the PFSAs which have historically been provided to Seldovia when operating under a Title I P.L. 93-638 contract. This is to include accepting all referrals of Alaska Natives and American Indians from Seldovia, providing specialty care field clinics, consultation to Seldovia physicians (including contract Health Care physicians), pathology, radiology, and laboratory support, medivac and ambulance support, medivac support for emergencies, patient travel support for Seldovia, and patient travel for patients returning home from treatment at ANMC.

ANMC will continue to provide temporary assistance for lab, x-ray and other professional support personnel, and other services, at no lower level than that which has historically been provided and in a manner consistent with past practices to Seldovia when operating under a Title I P.L. 93-638 contract.

The Alaska Area immunization program will continue to provide vaccines for Hepatitis A, Hepatitis B, Hemophilus Influenza B and other vaccines without charge to Seldovia, in a manner consistent with past practices, provided that this service may be discontinued by the IHS if the State of Alaska assumes these responsibilities. The Alaska Area Office will continue to provide, without charge to Seldovia, consulting radiology services and reference laboratory services.

The Alaska Area Office will continue, subject to the availability of appropriations, to provide consultations and technical support and services that have historically been provided to Seldovia when operating under a P.L. 93-638 Title I contract. These include but are not limited to services from the following offices, divisions and departments: Region X legal consultation; Environmental Health and Engineering; Financial Management; Regional and Contract Health; Awards and Administrative Services; Personnel and Training; and Community Health Services. Services from Community Health Services shall include, but not be limited to, dental, nutrition education and consultation services, as well as various program advice, coordinator support, and special project assistance in Maternal and Child Health, Community Health Representative Program, Behavioral Health, Health Promotion/ Disease Prevention, and Injury Prevention. Additionally, the Alaska Area Office shall ensure that any discretionary funding associated with the services described in this paragraph that may become available to the Area Office shall be used to provide additional services to Seldovia to the same extent as if the Tribe were operating under a P.L. 93-638 Title I contract. IHS will also provide remote access to the IHS Network through maintenance of a wide area network with a link to Seldovia. IHS will also provide Seldovia with a communication link at data speeds greater than 9600 baud as these links become available.

The IHS shall continue to process RPMS core data, and accept core data from non-RPMS sites provided it is transferred on standard formatted media (such as ASCII text, dBASE, Lotus, Excel). This processing shall include patient registration data, statistical workload data and contract health data. The IHS shall continue to provide and maintain the IHSNET. This shall include LAN and WAN support, Network design and planning, FTS processing and

implementation, IHS-wide E-mail, vendor control support, network security, Internet access, telemedicine and teleradiology planning and budgeting. The IHS shall also distribute additional IP addresses when requested by the Co-Signer. The IHS shall continue to support all ANMC and Alaska Area Native Health Service office RPMS hardware, including maintenance contracts and licenses. Confidentiality of patient records shall be maintained in accordance with procedures set forth in the Federal Privacy Act of 1974, 5 U.S.C. § 552a.

**SECTION 2 -- OBLIGATIONS OF SELDOVIA.** This AFA obligates Seldovia to be responsible for and to provide health PFSAs identified in Section 3, to the extent resources are transferred under this AFA. This AFA further authorizes Seldovia to consolidate and redesign PFSAs identified in Section 3 as provided in the Indian Self-Determination and Assistance Act, as amended, and the Compact. Seldovia is obligated to seek third party reimbursement as provided by federal law.

**SECTION 3 -- TRIBAL PROGRAMS AND BUDGET.**

**A)** Seldovia agrees to administer the delivery of certain IHS services within the Seldovia Village Withdrawal Area and to provide and be responsible for the health PFSAs identified below in accordance with the Compact and this AFA, utilizing the resources transferred under this AFA. For the purposes of this AFA, Seldovia's General Budget Categories consolidate related health PFSAs as follows:

Seldovia agrees to provide certain health care services to the Alaska Native and American Indian beneficiaries of the IHS within the Seldovia Village Withdrawal Area. Services may be provided to non-beneficiaries (i.e., persons who are not Alaska Native or Indian) on a fee-for-service basis in accordance with and subject to the provisions of section 813(b)(1)(B) of the Indian Health Care Improvement Act, as amended. These health care services include Contract Health Care services such as Hospital, Doctor & Dental Services; Emergency Medical Service (EMS); Community Health Representative (CHR); and support services including Mental Health. These services include the following:

1) CONTRACT HEALTH CARE: Seldovia is committed to purchasing the best medical and dental health care available subject to funding limitations imposed, to meet inpatient and outpatient needs on a contractual or open market basis.

2) EMERGENCY MEDICAL SERVICES: Seldovia is committed to provide trained coordination for the first responders and an organized emergency medical system.

3) COMMUNITY HEALTH REPRESENTATIVE: Seldovia is committed to provide village based services to determine health needs, improve health knowledge and promote healthy lifestyles and practices, provide advocacy service, provide administrative services.

4) MENTAL HEALTH: Seldovia is committed to provide services to address family, child, adolescent and community mental health problems subject to funding limitations.

5) <u>ALCOHOL AND DRUG ABUSE</u>: Seldovia is committed to provide services to reduce substance abuse and associated problems through outpatient services, prevention/education services, referral services, transitional/residential care services, outreach services, and community involvement.

6) <u>EPIDEMIOLOGY</u>: Seldovia intends to establish an MOA with and provide funds to the Alaska Native Health Board - Epidemiology Center to perform epidemiology functions on behalf of the Tribe. In the event that Seldovia and ANHB fail to conclude an MOA, Seldovia will assume these responsibilities.

7) <u>OTHER PROGRAMS/SERVICES FUNDED</u>: Seldovia agrees to administer any new health care programs funded during FY 1998 including, but not limited to, programs identified in the Indian Health Care Improvement Act; and any new health care program resulting from the reallocation of funds and redesign of programs during FY 1998 which will be in accordance with the terms of the Compact.

**B)** Seldovia also agrees to provide alcohol program services as described in section (A)(5) above to the Alaska Native and American Indian beneficiaries located in Nanwalek in accordance with the Compact and this AFA, utilizing the resources transferred by the IHS to Seldovia under this AFA. For the purposes of this AFA, Seldovia's General Budget Categories consolidates the funds related to Nanwalek's alcohol program services with similar funds available for Seldovia.

**C)** The applicability of the Federal Tort Claims Act to all of the PFSAs described above shall be pursuant to Article V, Section 3 of the Compact.

**SECTION 4 -- AMOUNTS AVAILABLE IN FY 1998.**

**A)** The following amounts are available to Seldovia pursuant to the Compact and Title III of the Indian Self-Determination and Education Assistance Act, as amended, and are subject to reductions only in accordance with Section 106 of that Act during the term of this AFA or thereafter.

| | |
|---|---|
| Recurring base: Inclusive of all recurring funding including recurring contract support funds and Village Built Clinic funds. | $ 654,288.00 |
| Non-Recurring funding: | $ 37,027.00[1] |

1 This amount represents the amount of non-recurring contract support funds that the Indian Health Service paid Seldovia in FY 1997. The IHS and Seldovia Village Tribe disagree about the matters described below, which are being resolved through litigation. Seldovia believes that for the past two fiscal years (FY 1996 and FY 1997) IHS has failed to pay the tribe non-recurring contract support funds in accordance with IHS Memorandum 92-2, the contract support cost policy applicable during these two years. Seldovia filed a claim before the Interior Board of Contract Appeals on June 2, 1997 seeking to recover these unpaid funds.

The IHS agreed to add to this AFA any increase in indirect contract support costs funds under IHS Circular 96-4 that the tribe may be entitled to in FY 1998 based on the outcome of the claim. Other non-recurring funds will not be specifically identified in this AFA but will be provided to Seldovia in the future

| | |
|---|---|
| Subtotal: (Base funding from existing P.L. 93-638) | $ 780,579.00 |
| Area "Tribal" share to include funding identified from Area Office and identified in Appendix A to this AFA: | $ 44,155.00[2] |
| Headquarters - Tribal share: "Tribal Size Adjustment pool" | $ 28,736.00[3] |
| Headquarters - Tribal share: "program formula pool" to include all funds identified in Appendix A, and such additional funds which the IHS may make available on the programs accepted for this allocation in Appendix A. | $ 287.00 |
| ISD support on the "Tribal shares:" | $ 42,812.00 |
| Subtotal - Tribal Shares and ISD support: | $ 115,990.00 |

These amounts are subject to additions for new funds received during the term of this AFA, including amounts that have historically been distributed as non-recurring funds under Indian Self-Determination contracts.

---

to the same extent as they have historically been provided.

2 Funds from Area were distributed according to methodology agreed upon by Alaska Tribes and tribal organizations in a caucus open to all Alaska. The specific methodology is identified in Appendix A. The IHS and Seldovia Village Tribe disagree about the matters described below, which are being resolved through litigation. Although Seldovia has agreed to accept funds distributed on this basis, it protests the distribution of any funds from the IHS on the basis of authorizing resolutions from entities other than federally recognized tribes. Seldovia believes that it is improper for the IHS to distribute funds under tribal shares methodologies that are based on permitting an Alaska Native Regional Corporation to authorize a non-profit organization to serve the Alaska Native population of Anchorage. Acceptance of funds based on the Area and Headquarters' tribal share methodologies does not constitute a waiver of these objections or of any action Seldovia might choose to undertake.

The amount identified does not include the total tribal shares that Seldovia believes it should receive on behalf of the Village of Nanwalek. These remaining Tribal Shares of the Village of Nanwalek reside with Nanwalek, which may or may not provide them to Seldovia separate of this AFA. The only Tribal Shares that Seldovia receives for Nanwalek are based on the funds which Seldovia receives for Nanwalek's portion of the alcohol program known as SKIAP. These funds were negotiated between the IHS, Chugachmiut, and Seldovia in August of 1995. The amount of funds moved into Seldovia's compact for Nanwalek's portion of SKIAP (Mod 42) was $62,931 in recurring base and $16,133 in contract support. Nanwalek is entitled to this amount should it ever withdraw it's resolution from Seldovia.

3 Headquarters shares were allocated according to the following process, which was adopted in a caucus open to all Alaska Tribes and Tribal organizations: The Alaska Area Tribal Share of Headquarters was first defined using the national IHS recommended methodology. The total Alaska Area Tribal Share was then reallocated to each Co-Signer according to the agreed upon Alaska Area methodology, which is identified specifically for each line in Appendix A. Amounts identified are exclusive of funds for which a final distribution amount has not been determined. Such final amounts shall be determined as set forth in this AFA or in Appendix A.

**B) Base Budgets.**

1) CATEGORIES AND BASE YEAR: The IHS and Co-Signers have agreed to implement base budgets for the Compact for a period of three (3) years (FY 1998-FY 2000). The following categories are subject to base budgeting for the base year period, as noted below:

| **Category of Funding** | **Initial Base Period or Base Funding** |
|---|---|
| Headquarters TSA amounts[5] | FY 1997 |
| Equipment Replacement Funding | Not included |
| Area Tribal shares | Not included |

2) ADJUSTMENTS: Adjustments to base funding shall be permitted in direct proportion to changes in appropriated amounts (by sub-activity), as provided under section 6(A) of this AFA. Adjustments shall also be permitted for the addition of new Co-Signers to the Compact and when current Co-Signers add or retrocede PFSAs as provided in section 13(C)[6]. Adjustments also shall be permitted when Co-Signer(s) chooses to restrict or unrestrict previously "restricted" or "unrestricted" categories provided that restrictions shall be changed only during annual negotiations. Seldovia shall also be eligible for funding for new services, service increases, mandatories, specific Congressional appropriations for population growth, health service priority system, contract support costs and other increases in resources on the same basis as all other tribes. Adjustments for changes required when a tribe joins or withdraws from a tribal consortium shall also be permitted, as provided under section 9(C).

ATHC Co-Signers shall also remain eligible for the distribution of additional tribal shares in the TSA amount for assessments, workers compensation, emergency reserve, management initiatives, and other PFSAs from headquarters.

**C)** Pursuant to section 106(a)(2) of the Indian Self-Determination Act, Seldovia shall receive contract support as defined in sections 106(a)(2) and (3). As stated in section 106(a)(2), Seldovia shall receive contract support only for costs that are not normally carried out by the Secretary in his\her direct operation of the program or are provided by the Secretary in support of the contracted program from resources other than those under the Compact.

**D)** An additional lump sum of funds, in an amount to be negotiated pursuant to Article V, Section 12, of the Compact may be provided to

---

5 ATHC base budgets for TSA amounts shall be considered as a whole (entire Compact amount) and shall be subject to adjustment of the internal allocation subject to Compact AFAs.

6 This includes addition of new facilities when the addition of these facilities includes an increase in equipment funds identified for the new facilities.

Seldovia by the IHS to assist in deferring start up costs associated with the assumption of the Village of Nanwalek's alcoholism program. Negotiation of start up costs will be completed prior to October 1, 199~~6~~7, and the agreed amount shall be negotiated and paid in accordance with IHS Circular 96-4 as a new and expanded program. Seldovia has estimated the startup costs to be $15,500. Seldovia's position on the priority list for purposes of distribution of the startup costs will be May 17, 1996 in accordance with policies currently in effect.

**E)** The amounts available from Area for tribal shares reflect the transition plan agreed upon by the parties and does not reflect the full amount that will be available in future years.

**SECTION 5 -- METHOD OF PAYMENT.**

**A) Payment Schedule.** Except as provided in subsections (B) and (C), of this section, all funds identified in Section 4 of this AFA shall be paid to Seldovia, in accordance with Article II, Section 4(a) of the Compact; payment to Seldovia is to be made as follows: One annual payment in lump sum to be made in advance by check or wire transfer.

**B) Availability of Tribal Shares.**

1) HEADQUARTERS' TRIBAL SHARES: Seldovia shall be paid one hundred percent (100%) of FY 1998 negotiated Headquarters tribal shares.

2) AREA TRIBAL SHARES: Seldovia shall be paid one hundred percent (100%) of FY 1998 negotiated Area office tribal shares.

**C) Periodic Payments.** Payment of funds otherwise due to Seldovia under this AFA, which are added or identified after the initial payment is made, shall be made promptly upon request of Seldovia by check or wire transfer.

**D) Buyback/Withholding.**

1) GENERALLY: Seldovia has determined that it wishes to carry out its responsibility to provide certain PFSAs (e.g., supplies and services furnished by the Central Warehouse, salaries of IPA/MOA employees, Village Built Clinics Program, and costs related to specialty clinics and bio/med services) included in this AFA utilizing services, personnel, supplies or other resources of the Federal Government, (hereinafter "services") under Article V, section 22 of the Compact, as permitted by law. These services may include some that are expected to be used throughout the year and some incidental services to be identified by Seldovia on an as needed basis, and provided by IHS when IHS has the capacity to do so. The cost of providing the purchases to Seldovia shall be determined under subsection (2) below. Seldovia's purchase of services is contingent upon the availability of IHS resources to provide those services. In addition, payment for services and supplies must be paid for in advance, in order to avoid violation of the Anti-Deficiency Act.

2) DETERMINATION OF COST:

i) Generally. Seldovia may acquire services from IHS by either providing for full year withhold (with appropriate reconciliation) under terms agreed upon in FY 1997 Compact AFAs, in which case the administrative surcharge provided for under subsection (D)(2)(ii)(e) shall not apply. In the alternative, Seldovia may acquire services by authorizing partial year withhold amounts, as provided for in subsection (D)(2)(ii) of this section, in which case the payment schedule and administrative surcharge provided for in subsection (D)(2)(ii)(e) of this section shall apply. As noted on page 8 of appendix A, Seldovia authorizes withhold of 100% of the estimated costs of services it may purchase from the IHS in FY98.

ii) Conditions for Partial Year Withhold and Buyback.

a) IPA/MOA -

**I) Contingent Authorization for Partial Year Withhold and Buyback.** The authorization to acquire IPA/MOA services through a partial year withhold and buyback will become operative when the Director of IHS approves, in writing, the terms of this section for the Co-Signers of the Compact or the extension of the IPA/MOA Pilot Project to Self-Governance tribes which choose to participate, which ever occurs first.

**II) Conditions regarding IPA/MOA.**

1. Advance Withhold. The funds for IPA/MOA salary (e.g., salary, special pay, bonuses, incentive pay and all other salary costs) will be paid as a lump sum in accord with section 5(A) of this AFA, except that an amount equal to three monthly payments based on the initial mutually agreed upon estimate of the annual IPA/MOA salary costs and related surcharges, as provided in subsection (D)(2)(ii)(e), will be withheld and retained by the IHS pending final disbursement for the last three months of the Fiscal Year as provided in subsection (D)(3)(ii)(b)(II) of this section.

2. Late Payment Provision. Except as provided in subsection (D)(3)(iv), failure to make payment in full by the Default Date will result in action by the IHS to RIF or redeploy federal employees assigned to Seldovia.

b) Central Warehouse -

**I) Advance Withhold.** In order to insure stability of inventory at the central warehouse, the parties agree that an amount equal to two monthly payments based on the initial mutually agreed upon estimate of the annual cost of purchases from the Central Warehouse, related estimated user fees as provided in paragraph (II) below, and related estimated surcharges, as provided in subsection (D)(2)(ii)(e), will be withheld and retained by the IHS pending final disbursement for the last two months of the Fiscal Year as provided in subsection (D)(3)(ii)(b)(II) of this section.

**II) User Fees.** A Co-Signer, which has retained the funds for administering the Central Warehouse, as provided for by Seldovia through Seldovia's Retained/Area Amount as shown on page 2, line 31 of Appendix A, will pay a 6 percent user fee of all warehouse supply issues. A Co-Signer, which has taken its funds for administering the Central Warehouse, as shown on page 2, line 31 of Appendix A, will pay a 13 percent user fee on all warehouse supply issues.

**III) Late Payment Provision.** Except as provided in subsection (D)(3)(iv), failure to make payment in full by the Default Date will result in action by the IHS to discontinue providing Seldovia with supplies from the Central Warehouse.

c) Village Built Clinics -

**I) Advance Withhold.** To ensure that sufficient funds are available to meet contract obligations, an amount equal to three monthly payments based on the initial mutually agreed upon estimate of the annual Village Built Clinic costs and related estimated surcharges, as provided in subsection (D)(2)(ii)(e), will be withheld and retained by the IHS pending final disbursement for the last three months of the Fiscal Year as provided in subsection (D)(3)(ii)(b)(II) of this section.

**II) Late Payment Provision.** Except as provided in subsection (D)(3)(iv), failure to make payment in full by the Default Date will result in action by the IHS to terminate the village based clinic leases.

d) Other Services -

**I) Advance Withhold.** An amount equal to one monthly payment based on the initial mutually agreed upon estimate of the annual cost of other services Seldovia proposes to purchase from the IHS and related estimated surcharges, as provided in subsection (D)(2)(ii)(e), will be withheld and retained by the IHS pending final disbursement for the last month of the Fiscal Year as provided in subsection (D)(3)(ii)(b)(II) of this section.

**II) Incidental Services.** Nothing herein shall prevent Seldovia from negotiating to purchase incidental services from the IHS throughout the year, without regard to an advance withhold. Agreements for purchase of incidental services must specify the method and timing of payment by Seldovia.

**III) Late Payment Provision.** Except as provided in subsection (D)(3)(IV), failure to make payment in full by the Default Date will result in action by the IHS to terminate the services for which payment has not been made.

e) Administrative Surcharge - An administrative surcharge of .3759 percent shall be imposed on the charges for the services delivered by the IHS to Seldovia under the partial year withhold and buyback provisions of section (D)(2)(ii). This surcharge will not be imposed on purchases for which a full year's estimated

withhold is authorized. The administrative surcharge will be estimated based on the annual estimated purchase price and will be accounted for and reconciled under subsection (D)(3)(iii)(b) of this section.

f) No Other Charges - Except as provided in this subsection (D)(2)(ii), there shall be no additional overhead, user or administrative charges or assessments for providing services to Seldovia.

3) METHOD OF PAYMENT:

i) Full Year Withhold. Payment for services being purchased from the IHS may be made by Seldovia authorizing a withhold of the full year's initial mutually agreed upon estimate of the annual cost of each category of services Seldovia proposes to purchase from the IHS. In such case, no monthly payments are due from Seldovia. Upon periodic reconciliation, provided for under subsection (D)(3)(iii)(a) of this section, excess withheld funds will be paid by the IHS to Seldovia and adjustments in the amount of withhold or payments needed to pay for all services Seldovia has purchased, or proposes to purchase, will be made to the IHS by Seldovia. *See* Appendix A "FY98 Accounting Data," page 8 "Summary of Withhold/Buyback" for calculation of the amount Seldovia hereby authorizes for full year withhold, if any.

ii) Purchases Through Buyback Under Subsection (D)(2)(ii).

a) Calculations -

**I) Of Initial Estimated Monthly Payment.** The initial estimated monthly payment is determined by estimating the annual cost of services to be purchased from IHS, including the user fee for Central Warehouse purchases under subsection (D)(2)(ii)(b)(II) and the surcharge on all services under subsection (D)(2)(ii)(e), and dividing by 12. *See* Appendix A "FY98 Accounting Data," page 8 "Summary of Withhold/Buyback" for calculation of the amount of the initial estimated monthly payment.

**II) Of Total Withhold Amount.** The Co-Signer purchasing services through buyback authorizes withhold of an amount equal to the Advance Withhold under paragraphs (a)(II)(1), (b)(I), (c)(I) and (d)(I), of subsection (D)(2)(ii) of this section for each category of service being purchased, plus an amount equal to one month of the initial estimated monthly payment for each category of service being purchased (to cover the estimate for services to be provided in October). *See* Appendix A "FY98 Accounting Data," page 8 "Summary of Withhold/Buyback" for calculation of the amount Co-Signer hereby authorizes to be withheld.

b) Payment Schedule -

**I) First Payment.** The initial estimated monthly payment is due and payable on the first day of November or the first day of the month following payment to Seldovia of its lump sum

payment, whichever is later, in which case the IHS shall reduce the lump sum payment by the authorized withhold plus the initial estimated monthly payments for each month preceding the first month for which a payment is due from Seldovia for which a payment was not withheld. (This provision is intended to address delays caused in making the lump sum payment to Seldovia due to Congress authorizing continuing resolutions or other delays in making lump sum payments to Seldovia.)

**II) Subsequent Estimated Monthly Payments.** Subsequent payments are due and payable on the first day of each month, until the final months of the year intended to be covered by the Advance Withhold amount applicable to the category of services, as set forth in subsection (D)(2)(ii). (e.g., the last three months of payments for IPA/MOAs would come from the Advance Withhold amount, while only the last one month of payment for Other Services would come from the Advance Withhold amount.)

**III) Default Date.** If a payment is not received by the 10th day of the month in which it is due (or the first working day thereafter if the 10th day falls on a week-end or Federal holiday), the IHS will implement the late payment provisions for each category of service as provided under paragraphs (a)(II)(2), (b)(III), (c)(II) and (d)(III) of subsection (D)(2)(ii). This date shall be referred to throughout this section as "Default Date."

iii) Reconciliation and Adjustment.

a) For Categories of Service - Full accounting of all costs for each category of service, whether purchased through full year withhold or buyback, will be provided to Seldovia within 45 days of the end of each month. Reconciliation of payments made to IHS compared to actual costs for the first three quarters of the Fiscal Year will be provided quarterly within 45 days of the end of each quarter. Reconciliation of payments made to IHS compared to actual costs for the last quarter of the Fiscal Year will be provided within 60 days of the end of the last quarter. At the end of each of the first three quarters, the IHS and Seldovia will review the expenses for the preceding quarters. The monthly estimated payment due, or the full year withhold amount, for the balance of the Fiscal Year will be adjusted accordingly to account for any over or under collections in order to project a zero balance at the end of the Fiscal Year. Within 30 days after the final end-of-year reconciliation is provided to Seldovia, any over recovery by the IHS must be returned to Seldovia and within 30 days after the final end-of-year reconciliation is due any under recovery must be paid by Seldovia.

b) For Administrative Surcharge - The administrative surcharge shall be used exclusively for administration of the buyback provisions of this subsection (D). All income from the administrative surcharge will be accounted for separately and compared on an annual basis to the cost of administering buyback at the Area Office. This accounting and reconciliation shall be complete within 60 days of the end of the last day of the Fiscal Year. Any surplus in administrative surcharges shall be returned to the Co-Signers who participated in the buyback option on a pro rata basis depending on the amount of administrative surcharge paid.

(iv) Use of Other Funds Due Seldovia to Avoid Default or Satisfy Obligations to IHS. Default may be avoided to the extent funds are held by the IHS from other funds due to the Co-Signer, which may be withheld to satisfy the amount of the payment, which would otherwise be in default or to satisfy amounts due IHS after reconciliation of costs and payments when an amount is due to IHS.

4) DISPUTE RESOLUTION: The parties shall endeavor to resolve any disputes concerning amounts due by Seldovia under this subsection (D) in a manner agreeable to Seldovia and to the IHS. In the event of a failure to reach agreement on the resolution of any such dispute, Seldovia may, after providing written notice to the IHS, choose not to include the disputed amount in any subsequent payment due. Payment in such a manner shall not be considered as a resolution of the dispute. The parties shall thereafter attempt to resolve the dispute through Alternative Dispute Resolution following, as appropriate, the principles and processes set forth in Executive Order 12988 signed by President Clinton on February 5, 1996, and made effective as of May 5, 1996. Seldovia shall have the option of resolving the dispute in accordance with Article II, Section 10 of the Compact.

**SECTION 6 -- ADJUSTMENTS.**

**A) Adjustment Due to Congressional Actions.** The parties to this AFA recognize that the total amount of the funding in this AFA is subject to adjustment due to Congressional action in Appropriations Acts or other laws affecting availability of funds to the IHS and the Department of Health and Human Services. Upon enactment of any such Act or law, the amount of funding provided to Seldovia in this AFA shall be adjusted as necessary, after Seldovia has been notified of such pending action and subject to any rights which Seldovia may have under this AFA, the Compact, or the law.

**SECTION 7 -- RECORDS.** Seldovia agrees to abide by the following practices relating to document disclosure and record-keeping for IHS beneficiaries: Seldovia's records policies, including those for Medical and Financial Records, meet federal requirements, including the Federal Privacy Act of 1974, as amended.

**SECTION 8 -- PROGRAM RULES.** Seldovia will make a best effort to carry out the health PFSAs in this AFA in compliance only with standards as set by Seldovia.

**SECTION 9 -- RETROCESSION AND DISCONTINUANCE.**

**A) Retrocession.**

**1)** The retrocession provisions of Section 105 (e) of the Indian Self-Determination and Education and Assistance Act, as amended, are herein adopted, except that the effective date of a retrocession request of the Compact and AFA, in whole or in part, shall be one year from the date of the request by Seldovia except as provided below. Retrocession may be effective with less than one

year's notice, providing Seldovia and the IHS agree to an effective date of less than one year from the date of retrocession request.

**2)** With respect to the retrocession of any PFSA provided by Seldovia in accordance with the resolution provided by Nanwalek, the retrocession provisions of Section 105 (e) of the Indian Self-Determination and Education and Assistance Act, as amended, are herein adopted, except that the effective date of a retrocession request of the Compact and AFA, in whole or in part, shall be one year from the date of the request by Nanwalek except as provided below. Retrocession may be effective with less than one year's notice, providing Nanwalek, Seldovia and the IHS agree to an effective date of less than one year from the date of retrocession request.

**B) Discontinuance.** Seldovia may discontinue its participation in the Compact after written notice to IHS and Nanwalek. Notice must be provided one year in advance of the effective date of the request unless Seldovia and the IHS agree to an effective date of less than one year.

**C) Withdrawal Procedures.**

1) PROCESS: A tribe or tribal organization may withdraw from a participating tribal organization, fully or partially, any PFSA (or portion thereof) included in the Compact or AFA, and such withdrawal will become effective within the time frame specified in the resolution which authorized transfer to the participating tribal organization, provided that in the absence of a specific time frame being set forth in the resolution, such withdrawal shall become effective on:

i) the earlier of (a) one year from the date of submission of such request; or (b) the date on which the AFA expires; or

ii) such date as may be mutually agreed by the Secretary, the Indian tribe or tribal organization that is withdrawing, and the tribal organization that has signed the compact and AFA on behalf of the withdrawing Indian tribe or tribal organization.

2) DISTRIBUTION OF FUNDS: When a tribe proposing to enter into a contract under Title I or a compact and AFA under Title III fully or partially withdraws from a participating tribal organization, the withdrawing tribe shall, upon written request, be entitled to be paid its tribal share of funds supporting those PFSAs (or portions thereof) which it will be carrying out under its own contract or compact and AFA, and such funds shall be removed from the AFA of the tribal organization and awarded to the tribe upon approval of a Title I contract or Title III compact and AFA. The IHS shall retain any funds removed but not awarded in a Title I contract or Title III compact and AFA.

**SECTION 10 -- CONSOLIDATION OF CONTRACTS AND PREVIOUS AFAS.** The contracts listed below and all previous AFAs shall be amended or terminated, as appropriate to transfer applicable contract funds into

(continued on page 16)

**SECTION 11 -- HEADQUARTERS RESPONSIBILITIES.** Unless funds are specifically provided from Headquarters, Headquarters retains all PFSAs and Seldovia will not be denied access to, or services from, Headquarters.

**SECTION 12 -- ACCESS TO TRAINING AND TECHNICAL ASSISTANCE.** To the extent funds are retained by the IHS, Seldovia shall have access to training, continuing education, and technical assistance in the manner and to the same extent Seldovia would have received such services if it were not a Self-Governance Tribe.

**SECTION 13 -- AMENDMENT OR MODIFICATION OF THIS AFA.**

**A) Form of Amendments.** Except as otherwise provided by this AFA, the Compact, or by law, any modification of this AFA shall be in the form of a written amendment and shall require written consent of Seldovia, and Nanwalek (acting directly or through Seldovia) and the United States. Participation or written consent of Tribes and Co-Signers not subject to the terms of this AFA shall not be required.

**B) Services from IHS.** Should Seldovia determine that it wishes the IHS to provide PFSAs included in the AFA for which funding has been identified but not provided, the parties shall negotiate an amendment to the AFA to reflect the transfer of responsibility from Seldovia back to the IHS and the pro-rata share of funding for that program, activity, function or service shall be retained by the IHS.

**C) Due to Addition of New Programs.** Should Seldovia determine that it wishes to provide a PFSA of the IHS not included in this AFA, Seldovia shall submit a proposal to the IHS to provide such PFSA. Except that, where such a proposal relates to the ANMC, essential statewide functions remain intact whether operated by the IHS or by Alaska Native Tribes recognized by the United States. Such proposals shall be reviewed by the IHS in accordance with the contract proposal review process and timelines set forth in Section 102 of the Indian Self-Determination and Education Assistance Act, as amended. Proposals submitted pursuant to this section shall be treated as a request for amendment to the AFA and, once approved by the IHS the Alaska Area Office shall prepare within 30 days an amendment to this AFA and the amendment shall be executed through the Area Office and, added to the AFA. Seldovia intends to submit proposals for its share of the Anchorage Service Units funds for Optometry services and Tribal Management.[7]

**D) Due to Availability of Additional Funding.** Seldovia shall be eligible for any increases in funding or funding for Medicaid,

---

[7] The IHS and Seldovia Village Tribe disagree about the matters described below. The IHS has communicated its position on this matter to the Seldovia Village Tribe, and has informed the Seldovia Village Tribe of its options for remedy. Seldovia has submitted a proposal for Community Injury Control program in March 1995. During the FY 1997 negotiations Dr. Schraer agreed to investigate this matter and promptly report back to Seldovia about the status of the proposal. This matter has not been resolved yet.

**D) Due to Availability of Additional Funding.** Seldovia shall be eligible for any increases in funding or funding for Medicaid, Medicare, maintenance and improvement, other reimbursements and new programs to which it would have been eligible had it been administering programs under a Self-Determination contract, rather than under the Compact and this AFA, and for any other funds that are not restricted by appropriations language for which any Alaska tribe or tribal organizations may be eligible, including any new funds appropriated for IHS Headquarters and funds passed to Alaska Area as recurring or non-recurring funds, and this AFA shall be amended to provide for timely payment of such new funds to Seldovia. Such amendments shall be originated and prepared within 30 days by the Alaska Area Office and executed through the Area Office in consultation with Seldovia.

**E) Other Adjustments.** Upon written authorization by Seldovia, the IHS may reallocate funds retained by the IHS, which are obligated to Seldovia, for the purposes of reimbursing the IHS for services or equipment provided to Seldovia to assist Seldovia in carrying out the terms of the Compact and this AFA.

**F) General Procedures for Amending or Modifying this AFA.** Amendments or Modifications proposed by Seldovia shall be submitted in writing to the IHS, Office of Tribal Self-Governance, with a copy to the Alaska Area Native Health Service Director. Except as provided with respect to the incorporation of a provision of Title I under Article V, Section 21, of the Compact or as provided above in paragraphs (C), (D) and (E) of this section, a request to amend or modify this AFA submitted by Seldovia shall be processed and approved or declined in accordance with the provisions of sections 102(a)(2) and (4), 102(b) and 102(e) of the Act, and all provisions of those subsections are incorporated herein for this purpose.

**SECTION 14 -- MEMORANDA OF AGREEMENT WITH MEMBER VILLAGES.** Funds provided under this AFA may be allocated to and expended by an Alaska Native Village ("Village") which is a party to this AFA in accordance with the terms of the Compact, this AFA, and a MOA approved by Seldovia and the Village. The Federal Tort Claims Act shall apply to PFSAs carried out by the Village under such MOA and to the Village and its employees to the same extent as if they had been carried out directly by Seldovia. Such an MOA may include provisions for the assignment of federal employees under IPA assignment or Commissioned Corps detail and shall be subject to the approval of the Alaska Area Native Health Service Area Director. Seldovia shall be responsible for assuring compliance by the Village with the Compact, this AFA and the MOA.

**SECTION 15 -- SEVERABILITY.**

**A)** Except as provided in this section, this AFA shall not be considered invalid, void or voidable if any section or provision of this AFA is found to be invalid, unlawful or unenforceable by a court of competent jurisdiction.

**B)** If any section or provision of this AFA is found to be invalid, unlawful or unenforceable by a court of competent jurisdiction, either party may, at its option, treat this AFA as invalid, void, or voidable, in accordance with the provisions of the Compact.

**C)** In the event that the parties decide not to treat the AFA as invalid, void or voidable under the subsection (B) of this section, the parties will seek agreement to amend, revise or delete any such invalid, unlawful or unenforceable section or provision, in accordance with the provisions of the Compact.

Conclusion of Section 10 (from page 13)

**this AFA for services, materials, PFSAs, and facilities provided to Seldovia: Contract #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, as amended, Contract #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, as amended.**

**SECTION 16 -- EFFECTIVE DATE AND DURATION.**

This AFA shall become effective on October 1, 1997, and remain in effect through the 1998 federal Fiscal Year or until a successor AFA is negotiated and becomes effective pursuant to Article II, Section 12 of the Compact.

**UNITED STATES OF AMERICA**
**SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES**

BY: [signature] DATE: NOV 14 1997
DIRECTOR, IHS

**SELDOVIA VILLAGE TRIBE, I.R.A.**

BY: Fred H. Elvsaas DATE: 6-26-97
FRED ELVSAAS, PRESIDENT

BY: Crystal Collier DATE: 6-26-97
CRYSTAL COLLIER, DIRECTOR

# Summary Sheet FY98 Funds

## Seldovia Village Tribe

### Appendix A - Financial Summary for Annual Funding Agreement

| Tribal Share Summary<br>Seldovia Village Tribe | Total FY98<br>Negotiated Amount | SELDOVIA<br>Restricted | Total Due<br>SELDOVIA | Initial Lump Sum<br>Payment |
|---|---|---|---|---|
| Area TS Amount (excluding Special Pay) | $44,297 | $142 | $44,155 | $44,155 |
| Area Special Pay Amount | $0 | $0 | $0 | $0 |
| Subtotal Area TS amount | $44,297 | $142 | $44,155 | $44,155 |
| Headquarters TSA amount | $31,263 | $2,527 | $28,736 | $28,736 |
| Headquarters Equipment Replacement | $287 | $0 | $287 | $287 |
| Headquarters Other Program Formula | | | | |
| Subtotal Headquarters TS amounts | $31,550 | $2,527 | $29,023 | $29,023 |
| FY98 Total Tribal Shares | $75,847 | $2,669 | $73,178 | $73,178 |

| Transfers to Recurring Base in FY98<br>Seldovia Village Tribe | FY98<br>Recurring |
|---|---|
| Permanent Change of Station Funds (from line 7) | $4,352 |
| Continuing Medical Education Funds (from line 8) | $0 |
| Contract Health Adjustment (line 50) | $262 |
| Alcohol funds - (line 59a) | $3,644 |
| FY98 Total Funds Transferred to Recurring Base | $8,258 |

| Driving Variables<br>Seldovia Village Tribe | FY98 |
|---|---|
| Population | 428 |
| Tribes | 1 |
| Recurring Base | $646,030 |
| Percentage of Total Area TS (of all Alaskan Tribes) | 0.44961% |
| Percentage of ATHC (of all Title III Alaskan Tribes | 0.46716% |

| Individually Restricted Items<br>Seldovia Village Tribe | FY98 |
|---|---|
| Area Office (Individual Restricted Only) | |
| Supply Service Center | NO |
| Emergency Medical Services | NO |
| Village Clinic Leasing Management | YES |
| Headquarters (ATHC Restricted Only) | |
| ACOG | YES |
| OIRM | YES |
| Clin Sup. Ctr (Inc. CME Cert. & IHS Provider | YES |

A49