# Exhibit E1

# Seldovia Village Tribe
# FY 1999 Annual Funding Agreement

# ANNUAL FUNDING AGREEMENT

## BETWEEN SELDOVIA AND THE NATIVE VILLAGE OF NANWALEK

## AND

## THE SECRETARY OF HEALTH AND HUMAN SERVICES

## OCTOBER 1, 1998

# TABLE OF CONTENTS

SECTION 1 -- OBLIGATIONS OF THE INDIAN HEALTH SERVICE. ....... 1
SECTION 2 -- OBLIGATIONS OF SELDOVIA. ........................ 3
SECTION 3 -- TRIBAL PROGRAMS AND BUDGET. ..................... 3

1) CONTRACT HEALTH CARE ........................................ 3
2) EMERGENCY MEDICAL SERVICES .................................. 3
3) COMMUNITY HEALTH REPRESENTATIVE ............................. 3
4) MENTAL HEALTH ............................................... 3
5) ALCOHOL AND DRUG ABUSE ...................................... 4
6) EPIDEMIOLOGY ................................................ 4
7) OTHER PROGRAMS/SERVICES FUNDED ............................... 4

SECTION 4 -- AMOUNTS AVAILABLE IN FY 1998. ................... 4

B) Base Budgets. ............................................... 7

1) CATEGORIES AND BASE YEAR .................................... 7
2) ADJUSTMENTS ................................................. 7

SECTION 5 -- METHOD OF PAYMENT. .............................. 8

A) Payment Schedule. ........................................... 8
B) Availability of Tribal Shares. .............................. 8

1) HEADQUARTERS' TRIBAL SHARES ................................. 8
2) AREA TRIBAL SHARES .......................................... 8

C) Periodic Payments. .......................................... 8
D) Buyback/Withholding. ........................................ 8

1) GENERALLY ................................................... 8
2) DETERMINATION OF COST ....................................... 9
3) METHOD OF PAYMENT ........................................... 13
4) DISPUTE RESOLUTION .......................................... 15

SECTION 6 -- ADJUSTMENTS. .................................... 15

A) Adjustment Due to Congressional Actions. .................... 15

SECTION 7 -- RECORDS. ........................................ 16
SECTION 8 -- PROGRAM RULES. .................................. 16
SECTION 9 -- RETROCESSION AND DISCONTINUANCE. ................ 16

A) Retrocession. ............................................... 16
B) Discontinuance. ............................................. 16
C) Withdrawal Procedures. ...................................... 16

1) PROCESS ..................................................... 16
2) DISTRIBUTION OF FUNDS ....................................... 17

SECTION 10 -- CONSOLIDATION OF CONTRACTS AND PREVIOUS AFAS. 17
SECTION 11-- HEADQUARTERS RESPONSIBILITIES. .................. 17
SECTION 12 -- ACCESS TO TRAINING AND TECHNICAL ASSISTANCE. . 17

SECTION 13 -- AMENDMENT OR MODIFICATION OF THIS AFA. ........ 17

A) Form of Amendments.......................................... 17
B) Services from IHS........................................... 17
C) Due to Addition of New Programs.......................... 18
D) Due to Availability of Additional Funding.............. 18
E) Other Adjustments........................................... 18
F) General Procedures for Amending or Modifying this AFA.. 18

SECTION 14 -- MEMORANDA OF AGREEMENT WITH MEMBER VILLAGES. . 18
SECTION 15 -- Memorializing Disputes. ....................... 19
SECTION 16 -- SEVERABILITY. .................................. 19
SECTION 17 -- EFFECTIVE DATE AND DURATION. .................. 20

# ANNUAL FUNDING AGREEMENT

## BETWEEN SELDOVIA AND THE NATIVE VILLAGE OF NANWALEK

## AND

## THE SECRETARY OF HEALTH AND HUMAN SERVICES

## OCTOBER 1, 1998

This Annual Funding Agreement is entered into by and between the Seldovia Village Tribe (Seldovia), I.R.A., located in the lower Cook Inlet region with withdrawal boundaries which include Seldovia Lake to Boundary Creek to Bear Cove to Laida Spit to Crescent Valley to McNeil River to Fourth of July Creek (the "Seldovia Village Withdrawal Area") for itself and on behalf of the Native Village of Nanwalek (Nanwalek), which has authorized Seldovia to sign this Annual Funding Agreement (AFA) and be responsible for carrying out certain programs, functions, services and activities (PFSAs) identified in this AFA on its behalf, and the Secretary of the Department of Health and Human Services.

**SECTION 1 -- OBLIGATIONS OF THE INDIAN HEALTH SERVICE.**

The obligations of the IHS to provide non-residual PFSAs under this section will be in a period of transition in FY 1999 as a result of a transfer to tribal management of all non-residual PFSAs of the Area Office and the Alaska Native Medical Center, not under contract or other funding agreement as of October 1, 1997. This transfer, under the authority of section 325 of P.L. 105-83, is expected to occur in stages during the course of FY 1999. Section 325 authorizes PFSAs of the Area Office be transferred to the new Alaska Native Tribal Health Consortium ("ANTHC") and PFSAs of ANMC be transferred in part to the ANTHC Consortium and in part to Southcentral Foundation ("SCF"). Accordingly, the IHS will be directly responsible for providing the PFSAs set forth in this section of the AFA during the period that, and only to the extent that Area Office and ANMC PFSAs have not been transferred to tribal management. Responsibility for delivering PFSAs transferred to tribal management shall be that of the entity to which those PFSAs have been transferred as set forth in the AFA of either the Consortium or SCF, as amended, during the course of the fiscal year.

Delivery of PFSAs shall be consistent with each Co-Signer's AFA. IHS shall remain responsible for performing all federal residual PFSAs. The IHS shall remain responsible for negotiating assurances with ANTHC and SCF on behalf of Alaska Natives and American Indians to the effect that Co-Signers continue to receive non-residual PFSAs from the Area Office and ANMC provided by ANTHC and SCF at a minimum at the level that such PFSAs were provided by the IHS as of October 1, 1997, to the extent permitted by Section 325 of P.L. 105-83. To the extent authorized by federal law, the IHS will respond to written Co-Signer concerns about the extent to which such assurances have not been

complied and take appropriate action. IHS shall further be responsible for performing its responsibilities as provided in the Indian Health Care Improvement Act, the Indian Self-Determination and Education Assistance Act, and other applicable provisions of federal law.

This AFA obligates the Indian Health Service (IHS) to provide funding and services identified herein and as provided in the Alaska Tribal Health Compact (Compact) between Seldovia and Nanwalek and the United States in FY 1999. A Memorandum of Agreement (MOA) regarding the Continuing Services Plan for the Area Office of the Alaska Native Health Service, among the Co-Signers and the Alaska Area Native Health Service to reflect the understanding of the parties regarding services, attached as Appendix C, is hereby incorporated by reference.

In addition, although funds are provided from Headquarters and Area Office in support of this compact, the IHS will agree to continue to make available to Seldovia services from both Area Office and Headquarters unless 100 percent of the total tribal shares for these PFSAs have been specifically transferred to Seldovia in this AFA. In cases where a portion of a tribal share has been transferred, there may be some diminishment in the level of the PFSAs provided by the IHS. Furthermore, the IHS will reorganize both Headquarters and the Area Office to continue to provide the remaining functions which have not been included in this AFA in the most effective and efficient manner possible, provided that decisions about the array and level of services to be offered by the IHS shall be made in consultation with Alaska Tribes. The IHS PFSAs not negotiated or listed in Appendix A are the responsibilities of the IHS, including the Region X attorney support which Seldovia is not compacting for its share.

The Alaska Native Medical Center (ANMC) will continue, subject to available appropriations, in its historical capacity as primary, secondary, tertiary, and specialized provider of patient care to the Seldovia withdrawal area within the larger Anchorage Service Unit, to provide the PFSAs which have historically been provided to Seldovia when operating under a Title I P.L. 93-638 contract. This is to include accepting all referrals of Alaska Natives and American Indians from Seldovia, providing specialty care field clinics, consultation to Seldovia physicians (including contract Health Care physicians), pathology, radiology, and laboratory support, medivac and ambulance support, medivac support for emergencies, patient travel support for Seldovia, and patient travel for patients returning home from treatment at ANMC.

ANMC will continue to provide temporary assistance for lab, x-ray and other professional support personnel, and other services, at no lower level than that which has historically been provided and in a manner consistent with past practices to Seldovia when operating under a Title I P.L. 93-638 contract. Seldovia may exercise the option to work with ANMC to identify the specific level of services Seldovia has been provided historically from ANMC. If it does so, when complete, the "Identification of Services Historically Provided to Seldovia from ANMC" shall be attached to this Agreement as Appendix D and incorporated herein by reference after execution by the Seldovia Director, the ANMC Director and the Area Director.

The Alaska Area immunization program will continue to provide vaccines for Hepatitis A, Hepatitis B, Hemophilus Influenza B and other vaccines without charge to Seldovia, in a manner consistent with past practices, provided that this service may be discontinued by the IHS if the State of Alaska assumes these responsibilities. The Alaska Area Office will continue to provide, without charge to Seldovia, consulting radiology services and reference laboratory services.

The Alaska Area Office will continue, subject to the availability of appropriations, to provide consultations and technical support and services that have historically been provided to Seldovia when operating under a P.L. 93-638 Title I contract. These include but are not limited to services from the following offices, divisions and departments: Region X legal consultation; Environmental Health and Engineering; Financial Management; Regional and Contract Health; Awards and Administrative Services; Personnel and Training; and Community Health Services. Services from Community Health Services shall include, but not be limited to, dental, nutrition education and consultation services, as well as various program advice, coordinator support, and special project assistance in Maternal and Child Health, Community Health Representative Program, Behavioral Health, Health Promotion/ Disease Prevention, and Injury Prevention. Additionally, the Alaska Area Office shall ensure that any discretionary funding associated with the services described in this paragraph that may become available to the Area Office shall be used to provide additional services to Seldovia to the same extent as if the Tribe were operating under a P.L. 93-638 Title I contract. IHS will also provide access to the IHS Network through maintenance of a wide area network with a common downlink to the gateway or access point in Anchorage

The IHS shall continue to process RPMS core data, and accept core data from non-RPMS sites provided it is transferred on standard formatted media (such as ASCII text, dBASE, Lotus, Excel). This processing shall include patient registration data, statistical workload data and contract health data. The IHS shall continue to provide and maintain the IHSNET. This shall include LAN and WAN support, Network design and planning, IHS-wide E-mail, vendor control support, network security, Internet access, telemedicine and teleradiology planning and budgeting. The IHS shall also distribute additional IP addresses when requested by the Co-Signer. The IHS shall continue to support all ANMC and Alaska Area Native Health Service office RPMS hardware, including maintenance contracts and licenses. Confidentiality of patient records shall be maintained in accordance with procedures set forth in the Federal Privacy Act of 1974, 5 U.S.C. § 552a.

**SECTION 2 -- OBLIGATIONS OF SELDOVIA.** This AFA obligates Seldovia to be responsible for and to provide health PFSAs identified in Section 3, to the extent resources are transferred under this AFA. This AFA further authorizes Seldovia to consolidate and redesign PFSAs identified in Section 3 as provided in the Indian Self-Determination and Assistance Act, as amended, and the Compact. Seldovia is obligated to seek third party reimbursement as provided by federal law.

**SECTION 3 -- TRIBAL PROGRAMS AND BUDGET.**

**A)** Seldovia agrees to administer the delivery of certain IHS services within the Seldovia Village Withdrawal Area and to provide and be responsible for the health PFSAs identified below in accordance with the Compact and this AFA, utilizing the resources transferred under this AFA. For the purposes of this AFA, Seldovia's General Budget Categories consolidate related health PFSAs as follows:

Seldovia agrees to provide certain health care services to the Alaska Native and American Indian beneficiaries of the IHS within the Seldovia Village Withdrawal Area. Services may be provided to non-beneficiaries (i.e., persons who are not Alaska Native or Indian) on a fee-for-service basis in accordance with and subject to the provisions of section 813(b)(1)(B) of the Indian Health Care Improvement Act, as amended. These health care services include Contract Health Care services such as Hospital, Doctor & Dental Services; Emergency Medical Service (EMS); Community Health Representative (CHR); and support services including Mental Health. These services include the following:

1) CONTRACT HEALTH CARE: Seldovia is committed to purchasing the best medical and dental health care available subject to funding limitations imposed, to meet inpatient and outpatient needs on a contractual or open market basis.

2) EMERGENCY MEDICAL SERVICES: Seldovia is committed to provide trained coordination for the first responders and an organized emergency medical system.

3) COMMUNITY HEALTH REPRESENTATIVE: Seldovia is committed to provide village based services to determine health needs, improve health knowledge and promote healthy lifestyles and practices, provide advocacy service, provide administrative services.

4) MENTAL HEALTH: Seldovia is committed to provide services to address family, child, adolescent and community mental health problems subject to funding limitations.

5) ALCOHOL AND DRUG ABUSE: Seldovia is committed to provide services to reduce substance abuse and associated problems through outpatient services, prevention/education services, referral services, transitional/residential care services, outreach services, and community involvement.

6) EPIDEMIOLOGY: Seldovia intends to establish an MOA with and provide funds to the Alaska Native Health Board - Epidemiology Center to perform epidemiology functions on behalf of the Tribe. In the event that Seldovia and ANHB fail to conclude an MOA, Seldovia will assume these responsibilities.

7) OTHER PROGRAMS/SERVICES FUNDED: Seldovia agrees to administer any new health care programs funded during FY 1999 including, but not limited to, programs identified in the Indian Health Care Improvement Act; and any new health care program resulting from

the reallocation of funds and redesign of programs during FY 1999 which will be in accordance with the terms of the Compact.

**B)** Seldovia also agrees to provide alcohol program services as described in section (A)(5) above to the Alaska Native and American Indian beneficiaries located in Nanwalek in accordance with the Compact and this AFA, utilizing the resources transferred by the IHS to Seldovia under this AFA. For the purposes of this AFA, Seldovia's General Budget Categories consolidates the funds related to Nanwalek's alcohol program services with similar funds available for Seldovia.

**C)** The applicability of the Federal Tort Claims Act to all of the PFSAs described above shall be pursuant to Article V, Section 3 of the Compact.

**SECTION 4 -- AMOUNTS AVAILABLE IN FY 1999.**

**A)** The following amounts are available to Seldovia pursuant to the Compact and Title III of the Indian Self-Determination and Education Assistance Act, as amended, and are subject to reductions only in accordance with Section 106 of that Act during the term of this AFA or thereafter.

The parties acknowledge that the Indian Health Service intends to pay contract support costs according to IHS Circular 96-4. Nothing in this provision shall be interpreted to waive the Co-Signer's right to be paid the contract support costs to which it is entitled in accordance with Section 106(a)(2) of the Indian Self-Determination and Education Assistance Act.

| | |
|---|---|
| Recurring base: Inclusive of all recurring funding including recurring contract support funds and Village Built Clinic funds. | $ 679,137.00 |
| Non-Recurring funding: | $ 64,193.00[1] |
| Subtotal: (Base funding from existing P.L. 93-638) | $ 743,330.00 |
| Area "Tribal" share to include funding identified from Area Office and identified in Appendix A to this AFA: | $ 43,121.00[2] |

---

[1] This amount represents the amount of non-recurring contract support funds that the Indian Health Service paid Seldovia in FY 1998. The IHS and Seldovia Village Tribe disagree about the matters described below, which are being resolved through litigation. Seldovia believes that for two fiscal years (FY 1996 and FY 1997) IHS failed to pay the tribe non-recurring contract support funds in accordance with IHS Memorandum 92-2, the contract support cost policy applicable during those two years. Seldovia filed a claim before the Interior Board of Contract Appeals on June 2, 1997 seeking to recover these unpaid funds.

The IHS agreed to add to this AFA any increase in indirect contract support costs funds under IHS Circular 96-4 that the tribe may be entitled to in FY 1998 and FY 1999 based on the outcome of the claim. Other non-recurring funds will not be specifically identified in this AFA but will be provided to Seldovia in the future to the same extent as they have historically been provided.

[2] Funds from Area were distributed according to methodology agreed upon by Alaska Tribes and tribal organizations in a caucus open to all Alaska. The specific methodology is identified in Appendix A. The IHS and Seldovia Village

| | |
|---|---|
| Headquarters - Tribal share: "Tribal Size Adjustment pool" | $ 28,838.00[3] |
| Headquarters - Tribal share: "program formula pool" to include all funds identified in Appendix A, and such additional funds which the IHS may make available on the programs accepted for this allocation in Appendix A. | $ 195.00 |
| | |
| Subtotal - Tribal Shares: | $ 72,154.00 |

These amounts are subject to additions for new funds received during the term of this AFA, including amounts that have historically been distributed as non-recurring funds under Indian Self-Determination contracts.

---

Tribe disagree about the matters described below, which are being resolved through litigation. Although Seldovia has agreed to accept funds distributed on this basis, it protests the distribution of any funds from the IHS on the basis of authorizing resolutions from entities other than federally recognized tribes. Seldovia believes that it is improper for the IHS to distribute funds under tribal shares methodologies that are based on permitting an Alaska Native Regional Corporation to authorize a non-profit organization to serve the Alaska Native population of Anchorage. Acceptance of funds based on the Area and Headquarters' tribal share methodologies does not constitute a waiver of these objections or of any action Seldovia might choose to undertake.

The amount identified does not include the total tribal shares that Seldovia believes it should receive on behalf of the Village of Nanwalek. These remaining Tribal Shares of the Village of Nanwalek reside with Nanwalek, which may or may not provide them to Seldovia separate of this AFA. The only Tribal Shares that Seldovia receives for Nanwalek are based on the funds which Seldovia receives for Nanwalek's portion of the alcohol program known as SKIAP. These funds were negotiated between the IHS, Chugachmiut, and Seldovia in August of 1995. The amount of funds moved into Seldovia's compact for Nanwalek's portion of SKIAP (Mod 42) was $62,931 in recurring base and $16,133 in contract support. Nanwalek is entitled to this amount should it ever withdraw it's resolution from Seldovia.

3 Headquarters shares were allocated according to the following process, which was adopted in a caucus open to all Alaska Tribes and Tribal organizations: The Alaska Area Tribal Share of Headquarters was first defined using the national IHS recommended methodology. The total Alaska Area Tribal Share was then reallocated to each Co-Signer according to the agreed upon Alaska Area methodology, which is identified specifically for each line in Appendix A. Amounts identified are exclusive of funds for which a final distribution amount has not been determined. Such final amounts shall be determined as set forth in this AFA or in Appendix A.

**B) Base Budgets.**

1) CATEGORIES AND BASE YEAR: The IHS and Co-Signers have agreed to implement base budgets for the Compact for a period of three (3) years (FY 1998-FY 2000). The following categories are subject to base budgeting for the base year period, as noted below:

| Category of Funding | Initial Base Period or Base Funding |
|---|---|
| Headquarters TSA amounts[5] | FY 1997 |
| Equipment Replacement Funding | Not included |
| Area Tribal shares | Not included |

2) ADJUSTMENTS: Adjustments to base funding shall be permitted in direct proportion to changes in appropriated amounts (by sub-activity), as provided under section 6(A) of this AFA. Adjustments shall also be permitted for the addition of new Co-Signers to the Compact and when current Co-Signers add or retrocede PFSAs as provided in section 13(C)[6]. Adjustments also shall be permitted when Co-Signer(s) chooses to restrict or unrestrict previously "restricted" or "unrestricted" categories provided that restrictions shall be changed only during annual negotiations. Seldovia shall also be eligible for funding for new services, service increases, mandatories, specific Congressional appropriations for population growth, health service priority system, contract support costs and other increases in resources on the same basis as all other tribes. Adjustments for changes required when a tribe joins or withdraws from a tribal consortium shall also be permitted, as provided under section 9(C).

ATHC Co-Signers shall also remain eligible for the distribution of additional tribal shares in the TSA amount for assessments, workers compensation, emergency reserve, management initiatives, and other PFSAs from headquarters.

**C)** Pursuant to section 106(a)(2) of the Indian Self-Determination Act, Seldovia shall receive contract support as defined in sections 106(a)(2) and (3). As stated in section 106(a)(2), Seldovia shall receive contract support only for costs that are not normally carried out by the Secretary in his\her direct operation of the program or are provided by the Secretary in support of the contracted program from resources other than those under the Compact.

**D)** An additional lump sum of funds, in an amount to be negotiated pursuant to Article V, Section 12, of the Compact may be provided to

---

[5] ATHC base budgets for TSA amounts shall be considered as a whole (entire Compact amount) and shall be subject to adjustment of the internal allocation subject to Compact AFAs.

[6] This includes addition of new facilities when the addition of these facilities includes an increase in equipment funds identified for the new facilities.

Seldovia by the IHS to assist in deferring start up costs associated with the assumption of the Village of Nanwalek's alcoholism program. Negotiation of start up costs will be completed prior to October 1, 1996, and the agreed amount shall be negotiated and paid in accordance with IHS Circular 96-4 as a new and expanded program. Seldovia has estimated the startup costs to be $15,500. Seldovia's position on the priority list for purposes of distribution of the startup costs will be May 17, 1996 in accordance with policies currently in effect.

**E)** The amounts available from Area for tribal shares reflect the transition plan agreed upon by the parties and does not reflect the full amount that will be available in future years.

**SECTION 5 -- METHOD OF PAYMENT.**

**A) Payment Schedule.** Except as provided in subsections (B) and (C), of this section, all funds identified in Section 4 of this AFA shall be paid to Seldovia, in accordance with Article II, Section 4(a) of the Compact; payment to Seldovia is to be made as follows: One annual payment in lump sum to be made in advance by check or wire transfer.

**B) Availability of Tribal Shares.**

1) HEADQUARTERS' TRIBAL SHARES: Seldovia shall be paid one hundred percent (100%) of FY 1999 negotiated Headquarters tribal shares.

2) AREA TRIBAL SHARES: Seldovia shall be paid one hundred percent (100%) of FY 1999 negotiated Area office tribal shares.

**C) Periodic Payments.** Payment of funds otherwise due to Seldovia under this AFA, which are added or identified after the initial payment is made, shall be made promptly upon request of Seldovia by check or wire transfer.

**D) Buyback/Withholding.**

1) GENERALLY: Seldovia has determined that it wishes to carry out its responsibility to provide certain PFSAs (e.g., supplies and services furnished by the Central Warehouse, salaries of IPA/MOA employees, Village Built Clinics Program, and costs related to specialty clinics and bio/med services) included in this AFA utilizing services, personnel, supplies or other resources of the Federal Government, (hereinafter "services") under Article V, section 22 of the Compact, as permitted by law. These services may include some that are expected to be used throughout the year and some incidental services to be identified by Seldovia on an as needed basis, and provided by IHS when IHS has the capacity to do so. The cost of providing the purchases to Seldovia shall be determined under subsection (2) below. Seldovia's purchase of services is contingent upon the availability of IHS resources to provide those services. In addition, payment for services and supplies must be paid for in advance, in order to avoid violation of the Anti-Deficiency Act.

2) DETERMINATION OF COST:

i) Generally. Seldovia may acquire services from IHS by either providing for full year withhold (with appropriate reconciliation) under terms agreed upon in this AFA, in which case the administrative surcharge provided for under subsection (D)(2)(ii)(e) shall not apply. In the alternative, Seldovia may acquire services by authorizing partial year withhold amounts, as provided for in subsection (D)(2)(ii) of this section, in which case the payment schedule and administrative surcharge provided for in subsection (D)(2)(ii)(e) of this section shall apply. Whether full or partial year withhold is authorized, the full costs of IPA/MOAs including those detailed in subsection (d)(2)(iii), Determination of IPA/MOA Costs, shall be paid by Seldovia. As noted on page 8 of appendix A, Seldovia authorizes withhold of 100% of the estimated costs of services it may purchase from the IHS in FY99.

ii) Conditions for Partial Year Withhold and Buyback.

a) IPA/MOA -

I) Advance Withhold. The funds for IPA/MOA salary and other costs detailed in subsection (d)(2)(iii), Determination of IPA/MOA Costs, will be paid as a lump sum in accord with section 5(A) of this AFA, except that an amount equal to three monthly payments based on the initial mutually agreed upon estimate of the annual IPA/MOA salary costs and related surcharges, as provided in subsection (D)(2)(ii)(e), will be withheld and retained by the IHS pending final disbursement for the last three months of the Fiscal Year as provided in subsection (D)(3)(ii)(b)(II) of this section.

II) Late Payment Provision. Except as provided in subsection (D)(3)(iv), failure to make payment in full by the Default Date will result in action by the IHS to RIF or redeploy federal employees assigned to Seldovia.

b) Central Warehouse -

**I) Advance Withhold.** In order to insure stability of inventory at the central warehouse, the parties agree that an amount equal to two monthly payments based on the initial mutually agreed upon estimate of the annual cost of purchases from the Central Warehouse, related estimated user fees as provided in paragraph (II) below, and related estimated surcharges, as provided in subsection (D)(2)(ii)(e), will be withheld and retained by the IHS pending final disbursement for the last two months of the Fiscal Year as provided in subsection (D)(3)(ii)(b)(II) of this section.

**II) User Fees.** A Co-Signer, which has retained the funds for administering the Central Warehouse, as provided for by Seldovia through Seldovia's Retained/Area Amount as shown on page 2, line 42 of Appendix A, will pay a 6 percent user fee of all warehouse supply issues. A Co-Signer, which has taken its funds for administering the Central Warehouse, as shown on page 2, line 42 of

Appendix A, will pay a 13 percent user fee on all warehouse supply issues.

**III) Late Payment Provision.** Except as provided in subsection (D)(3)(iv), failure to make payment in full by the Default Date will result in action by the IHS to discontinue providing Seldovia with supplies from the Central Warehouse.

c) Village Built Clinics -

**I) Advance Withhold.** To ensure that sufficient funds are available to meet contract obligations, an amount equal to three monthly payments based on the initial mutually agreed upon estimate of the annual Village Built Clinic costs and related estimated surcharges, as provided in subsection (D)(2)(ii)(e), will be withheld and retained by the IHS pending final disbursement for the last three months of the Fiscal Year as provided in subsection (D)(3)(ii)(b)(II) of this section.

**II) Late Payment Provision.** Except as provided in subsection (D)(3)(iv), failure to make payment in full by the Default Date will result in action by the IHS to terminate the village based clinic leases.

d) Other Services -

**I) Advance Withhold.** An amount equal to one monthly payment based on the initial mutually agreed upon estimate of the annual cost of other services Seldovia proposes to purchase from the IHS and related estimated surcharges, as provided in subsection (D)(2)(ii)(e), will be withheld and retained by the IHS pending final disbursement for the last month of the Fiscal Year as provided in subsection (D)(3)(ii)(b)(II) of this section.

**II) Incidental Services.** Nothing herein shall prevent Seldovia from negotiating to purchase incidental services from the IHS throughout the year, without regard to an advance withhold. Agreements for purchase of incidental services must specify the method and timing of payment by Seldovia.

**III) Late Payment Provision.** Except as provided in subsection (D)(3)(IV), failure to make payment in full by the Default Date will result in action by the IHS to terminate the services for which payment has not been made.

e) Administrative Surcharge - An administrative surcharge of .3759 percent shall be imposed on the charges for the services delivered by the IHS to Seldovia under the partial year withhold and buyback provisions of section (D)(2)(ii). This surcharge will not be imposed on purchases for which a full year's estimated withhold is authorized. The administrative surcharge will be estimated based on the annual estimated purchase price and will be accounted for and reconciled under subsection (D)(3)(iii)(b) of this section.

f) No Other Charges - Except as provided in this subsection (D)(2)(ii), there shall be no

additional overhead, user or administrative charges or assessments for providing services to Seldovia.

**(iii) Determination of IPA/MOA Costs.**

**(a) List of Costs.** It is agreed by the parties that the entire cost of IPA/MOA assignments, including costs associated with the initiation, maintenance, and termination of the assignments are the responsibility of the Co-Signer. The IHS must be reimbursed for all such costs which include but are not limited to the following:

**(I)** Permanent change of station costs including the cost of moving replacement IPAs from the lower forty-eight to Alaska and the cost of moving IPA employees who separate back to the lower forty-eight.

**(II)** Recruitment, relocation and retention bonuses if such funds are necessary to attract or retain employees.

**(III)** Severance pay for employees who are released by the Co-Signer and separated without cause.

**(IV)** Payment of turnaround leave travel expenses. All individuals who are eligible for these expenses shall be identified in the IPA negotiated between the parties. The IHS will retain liability for existing IPAs. The Co-Signer assumes the liability for new IPAs and upon renewal of an existing IPA.

**(V)** Lump sum leave payments for employees who leave federal service. All leave accrued prior to the employee becoming employed by the Co-Signer shall be identified in the IPA/MOA negotiated between the parties. The liability for accrued leave on existing, renewing, and new IPA/MOAs shall be the responsibility of the Co-Signer.

**(VI)** Costs associated with settling or resolving employment related disputes, subject to the terms specified in subsection (b) below.

**(VII)** Centrally paid expenses, subject to the terms specified in subsection (c) below.

**(b) Costs Related to Employment Related Disputes.**

**(I) Responsibilities of the IHS.** The Indian Health Service shall be responsible for the payment of all costs of the IHS Office of Human Relations and any other section of the Indian Health Service, Office of General Counsel, and Department of Health and Human Services associated with the processing, settlement or other resolution of disciplinary actions, grievances, or appeals to the Merit System Protection Board, the Equal Employment Opportunity Commission, and matters arising under the Federal Labor Relations Act or any other law permitting the employee to appeal from such actions initiated by Federal employees assigned to a Co-Signer under an IPA or MOA. The IHS

may pay for or recover these costs from the IPA/MOA Shared Cost Pool established under paragraph (d) of this subsection to the extent permitted under subparagraph (II) of this paragraph.

**(II) Employee Dispute Costs Chargeable Against the IPA/MOA Shared Cost Pool.** The IHS may pay for or recover costs associated with processing, settlement or other resolution of employment related disputes listed in paragraph (1) of this subsection from the IPA/MOA Shared Cost Pool under the following conditions:

**(1)** Only costs associated with covered disputes that arose from conduct, performance or other conduct that was alleged to have occurred during the course of the employee's assignment to the Co-Signer may be paid from the IPA/MOA Shared Cost Pool.

**(2)** Costs which may be charged against the IPA/MOA Shared Cost Pool may include, but are not limited to, awards of back pay, compensatory damages, attorney fees, travel costs necessary to investigate the case and represent the IHS at hearings or in other proceedings during the appeal process, costs of obtaining and preserving witness testimony, and other similar costs incurred as a result of the IHS defending itself in these matters.

**(3)** No salary costs of IHS, Office of General Counsel or Department of Health and Human Service employees may be paid or recovered from the IPA/MOA Shared Cost Pool. Nor may any other cost of these proceedings be charged if such costs have ordinarily been paid from funds identified by the IHS as residual or restricted at Headquarters or the Area Office.

**(c) Costs Related to IPA/MOA Centrally Paid Expenses.** Certain costs associated with IPA and MOA employees are paid centrally by Headquarters from Area funds. These include costs detailed in columns 6, 7, and 8 of the spreadsheet entitled "Allocation of Centrally Paid Expenses (Excluding FTS)," Corrected May 11, 1998, that was prepared by David Mather. These are costs associated with Commissioned Corp, Personnel and Payroll, and Balance of Human Resources. The Area Office also has been charged $50.00 per W-2 form issued for each Federal employee, including those assigned to Co-Signers under IPAs or MOAs. The Alaska Area Native Health Service may pay for or recover assessments from Headquarters to cover these identified costs from the IPA/MOA Shared Cost Pool. If any of the expenses described in this paragraph are discontinued (such as the $50.00 per W-2 form) the IHS will adjust the amount required to be paid as a contribution to the IPA/MOA Shared Cost Pool immediately.

**(d) IPA/MOA Shared Cost Pool.** All costs of the IHS related to IPA/MOAs for which Co-Signers' are responsible under this section (iii), "Determination of IPA/MOA Costs," are the responsibility of the individual Co-Signer to whom the IPA/MOA is assigned, except as provided in this paragraph. Seldovia agrees to share with other Co-Signers the costs and risks described in the above subsections (b), "Costs Related to Employment Related Disputes," and (c), "Costs Related to IPA/MOA Centrally Paid Expenses," by each contributing a sum certain to an IPA/MOA Shared Cost Pool. The

purposes of this Shared Pool are to simultaneously ensure that IHS recovers the full costs associated with IPA/MOAs, minimize the budget uncertainties for individual Co-Signers, and minimize the accounting and administration caused by certain categories of costs. The IHS may use funds in the IPA/MOA Shared Cost Pool only as provided in subsections b and c above. An accounting of the IPA/MOA Shared Cost Pool contributions and expenditures shall be provided by the Alaska Area Native Health Service Area Office to Co-Signers on a quarterly basis. Any funds remaining in the IPA/MOA Shared Cost Pool at the end of the fiscal year shall be distributed to the Co-Signers who contributed no later than the last day of the fiscal year. The end of year distribution shall be made in the proportion in which the contributions to the IPA/MOA Shared Cost Pool were made. The amount of the contribution by each Co-Signer shall be calculated based on the number of IPAs and MOAs the Co-Signer has assigned to it. The required contribution for FY 99 is shown in column 2 on page 8 of Appendix A to this Annual Funding Agreement, which also details the basis of the calculation.

3) METHOD OF PAYMENT:

i) Full Year Withhold. Payment for services being purchased from the IHS may be made by Seldovia authorizing a withhold of the full year's initial mutually agreed upon estimate of the annual cost of each category of services Seldovia proposes to purchase from the IHS. In such case, no monthly payments are due from Seldovia. Upon periodic reconciliation, provided for under subsection (D)(3)(iii)(a) of this section, excess withheld funds will be paid by the IHS to Seldovia and adjustments in the amount of withhold or payments needed to pay for all services Seldovia has purchased, or proposes to purchase, will be made to the IHS by Seldovia. *See* Appendix A page 8 "Summary of Withhold/Buyback" for calculation of the amount Seldovia hereby authorizes for full year withhold, if any.

ii) Purchases Through Buyback Under Subsection (D)(2)(ii).

a) Calculations -

**I) Of Initial Estimated Monthly Payment.** The initial estimated monthly payment is determined by estimating the annual cost of services to be purchased from IHS, including the user fee for Central Warehouse purchases under subsection (D)(2)(ii)(b)(II) and the surcharge on all services under subsection (D)(2)(ii)(e), and dividing by 12. *See* Appendix page 8 "Summary of Withhold/Buyback" for calculation of the amount of the initial estimated monthly payment.

**II) Of Total Withhold Amount.** The Co-Signer purchasing services through buyback authorizes withhold of an amount equal to the Advance Withhold under paragraphs (a)(I), (b)(I), (c)(I) and (d)(I), of subsection (D)(2)(ii) of this section for each category of service being purchased, plus an amount equal to one month of the initial estimated monthly payment for each category of service being purchased (to cover the estimate for services to be provided in

October). *See* Appendix A" page 8 "Summary of Withhold/Buyback" for calculation of the amount Co-Signer hereby authorizes to be withheld.

b) Payment Schedule -

**I) First Payment.** The initial estimated monthly payment is due and payable on the first day of November or the first day of the month following payment to Seldovia of its lump sum payment, whichever is later, in which case the IHS shall reduce the lump sum payment by the authorized withhold plus the initial estimated monthly payments for each month preceding the first month for which a payment is due from Seldovia for which a payment was not withheld. (This provision is intended to address delays caused in making the lump sum payment to Seldovia due to Congress authorizing continuing resolutions or other delays in making lump sum payments to Seldovia.)

**II) Subsequent Estimated Monthly Payments.** Subsequent payments are due and payable on the first day of each month, until the final months of the year intended to be covered by the Advance Withhold amount applicable to the category of services, as set forth in subsection (D)(2)(ii). (e.g., the last three months of payments for IPA/MOAs would come from the Advance Withhold amount, while only the last one month of payment for Other Services would come from the Advance Withhold amount.)

**III) Default Date.** If a payment is not received by the 10th day of the month in which it is due (or the first working day thereafter if the 10th day falls on a week-end or Federal holiday), the IHS will implement the late payment provisions for each category of service as provided under paragraphs (a)(II)(2), (b)(III), (c)(II) and (d)(III) of subsection (D)(2)(ii). This date shall be referred to throughout this section as "Default Date."

iii) Reconciliation and Adjustment.

a) For Categories of Service - Full accounting of all costs for each category of service, whether purchased through full year withhold or buyback, will be provided to Seldovia within 45 days of the end of each month. Reconciliation of payments made to IHS compared to actual costs for the first three quarters of the Fiscal Year will be provided quarterly within 45 days of the end of each quarter. Reconciliation of payments made to IHS compared to actual costs for the last quarter of the Fiscal Year will be provided within 60 days of the end of the last quarter. At the end of each of the first three quarters, the IHS and Seldovia will review the expenses for the preceding quarters. The monthly estimated payment due, or the full year withhold amount, for the balance of the Fiscal Year will be adjusted accordingly to account for any over or under collections in order to project a zero balance at the end of the Fiscal Year. Within 30 days after the final end-of-year reconciliation is provided to Seldovia, any over recovery by the IHS must be returned to Seldovia and within 30 days after the final end-of-year reconciliation is due any under recovery must be paid by Seldovia.

b) For Administrative Surcharge - The administrative surcharge shall be used exclusively for administration

of the buyback provisions of this subsection (D). All income from the administrative surcharge will be accounted for separately and compared on an annual basis to the cost of administering buyback at the Area Office. This accounting and reconciliation shall be complete within 60 days of the end of the last day of the Fiscal Year. Any surplus in administrative surcharges shall be returned to the Co-Signers who participated in the buyback option on a pro rata basis depending on the amount of administrative surcharge paid.

(iv) Use of Other Funds Due Seldovia to Avoid Default or Satisfy Obligations to IHS and other Remedies.

**(a)** Avoiding Default. Default may be avoided to the extent funds are held by the IHS from other funds due to the Co-Signer, which may be withheld to satisfy the amount of the payment, which would otherwise be in default or to satisfy amounts due IHS after reconciliation of costs and payments when an amount is due to IHS.

(b) Recoupment. Any amount due to the IHS by reason of Co-Signer's failure to pay in full all amounts owing under the buy-back provisions of the AFA for the immediately preceding fiscal year shall be recouped by the IHS from any funds due to the Co-Signer under this funding agreement.

(c) Full Year Withhold as Penalty for Default. Notwithstanding any other provision of this Section 5(D), the IHS may require "full year withhold" as permitted herein as a condition of permitting a Co-Signer who was in arrears at the end of the immediately preceding fiscal year to buyback services from the IHS under the terms of Section 5(D).

4) DISPUTE RESOLUTION: The parties shall endeavor to resolve any disputes concerning amounts due by Seldovia under this subsection (D) in a manner agreeable to Seldovia and to the IHS. In the event of a failure to reach agreement on the resolution of any such dispute, Seldovia may, after providing written notice to the IHS, choose not to include the disputed amount in any subsequent payment due. Payment in such a manner shall not be considered as a resolution of the dispute. The parties shall thereafter attempt to resolve the dispute through Alternative Dispute Resolution following, as appropriate, the principles and processes set forth in Executive Order 12988 signed by President Clinton on February 5, 1996, and made effective as of May 5, 1996. Seldovia shall have the option of resolving the dispute in accordance with Article II, Section 10 of the Compact.

**SECTION 6 -- ADJUSTMENTS.**

**A) Adjustment Due to Congressional Actions.** The parties to this AFA recognize that the total amount of the funding in this AFA is subject to adjustment due to Congressional action in Appropriations Acts or other laws affecting availability of funds to the IHS and the Department of Health and Human Services. Upon enactment of any such Act or law, the amount of funding provided to Seldovia in this AFA shall be adjusted as necessary, after Seldovia has been notified of such pending

action and subject to any rights which Seldovia may have under this AFA, the Compact, or the law.

**SECTION 7 -- RECORDS.** Seldovia agrees to abide by the following practices relating to document disclosure and record-keeping for IHS beneficiaries: Seldovia's records policies, including those for Medical and Financial Records, meet federal requirements, including the Federal Privacy Act of 1974, as amended.

**SECTION 8 -- PROGRAM RULES.** Seldovia will make a best effort to carry out the health PFSAs in this AFA in compliance only with standards as set by Seldovia.

**SECTION 9 -- RETROCESSION AND DISCONTINUANCE.**

**A) Retrocession.**

**1)** The retrocession provisions of Section 105 (e) of the Indian Self-Determination and Education and Assistance Act, as amended, are herein adopted, except that the effective date of a retrocession request of the Compact and AFA, in whole or in part, shall be one year from the date of the request by Seldovia except as provided below. Retrocession may be effective with less than one year's notice, providing Seldovia and the IHS agree to an effective date of less than one year from the date of retrocession request.

**2)** With respect to the retrocession of any PFSA provided by Seldovia in accordance with the resolution provided by Nanwalek, the retrocession provisions of Section 105 (e) of the Indian Self-Determination and Education and Assistance Act, as amended, are herein adopted, except that the effective date of a retrocession request of the Compact and AFA, in whole or in part, shall be one year from the date of the request by Nanwalek except as provided below. Retrocession may be effective with less than one year's notice, providing Nanwalek, Seldovia and the IHS agree to an effective date of less than one year from the date of retrocession request.

**B) Discontinuance.** Seldovia may discontinue its participation in the Compact after written notice to IHS and Nanwalek. Notice must be provided one year in advance of the effective date of the request unless Seldovia and the IHS agree to an effective date of less than one year.

**C) Withdrawal Procedures.**

1) PROCESS: A tribe or tribal organization may withdraw from a participating tribal organization, fully or partially, any PFSA (or portion thereof) included in the Compact or AFA, and such withdrawal will become effective within the time frame specified in the resolution which authorized transfer to the participating tribal organization, provided that in the absence of a specific time frame being set forth in the resolution, such withdrawal shall become effective on:

i) the earlier of (a) one year from the date of submission of such request; or (b) the date on which the AFA expires; or

ii) such date as may be mutually agreed by the Secretary, the Indian tribe or tribal organization that is withdrawing, and the tribal organization that has signed the compact and AFA on behalf of the withdrawing Indian tribe or tribal organization.

2) DISTRIBUTION OF FUNDS: When a tribe proposing to enter into a contract under Title I or a compact and AFA under Title III fully or partially withdraws from a participating tribal organization, the withdrawing tribe shall, upon written request, be entitled to be paid its tribal share of funds supporting those PFSAs (or portions thereof) which it will be carrying out under its own contract or compact and AFA, and such funds shall be removed from the AFA of the tribal organization and awarded to the tribe upon approval of a Title I contract or Title III compact and AFA. The IHS shall retain any funds removed but not awarded in a Title I contract or Title III compact and AFA.

**SECTION 10 -- CONSOLIDATION OF CONTRACTS AND PREVIOUS AFAS.** The contracts listed below and all previous AFAs shall be amended or terminated, as appropriate to transfer applicable contract funds into this AFA for services, materials, PFSAs, and facilities provided to Seldovia: Contract #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, as amended, Contract #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, as amended.

**SECTION 11 -- HEADQUARTERS RESPONSIBILITIES.** Unless funds are specifically provided from Headquarters, Headquarters retains all PFSAs and Seldovia will not be denied access to, or services from, Headquarters.

**SECTION 12 -- ACCESS TO TRAINING AND TECHNICAL ASSISTANCE.** To the extent funds are retained by the IHS, Seldovia shall have access to training, continuing education, and technical assistance in the manner and to the same extent Seldovia would have received such services if it were not a Self-Governance Tribe.

**SECTION 13 -- AMENDMENT OR MODIFICATION OF THIS AFA.**

**A) Form of Amendments.** Except as otherwise provided by this AFA, the Compact, or by law, any modification of this AFA shall be in the form of a written amendment and shall require written consent of Seldovia, and Nanwalek (acting directly or through Seldovia) and the United States. Participation or written consent of Tribes and Co-Signers not subject to the terms of this AFA shall not be required.

**B) Services from IHS.** Should Seldovia determine that it wishes the IHS to provide PFSAs included in the AFA for which funding has been identified but not provided, the parties shall negotiate an amendment to the AFA to reflect the transfer of responsibility from Seldovia back to the IHS and the pro-rata share of funding for that program, activity, function or service shall be retained by the IHS.

**C) Due to Addition of New Programs.** Should Seldovia determine that it wishes to provide a PFSA of the IHS not included in this AFA, Seldovia shall submit a proposal to the IHS to provide such PFSA. Except that, where such a proposal relates to the ANMC, essential statewide functions remain intact whether operated by the IHS or by Alaska Native Tribes recognized by the United States. Such proposals shall be reviewed by the IHS in accordance with the contract proposal review process and timelines set forth in Section 102 of the Indian Self-Determination and Education Assistance Act, as amended. Proposals submitted pursuant to this section shall be treated as a request for amendment to the AFA and, once approved by the IHS the Alaska Area Office shall prepare within 30 days an amendment to this AFA and the amendment shall be executed through the Area Office and, added to the AFA.

**D) Due to Availability of Additional Funding.** Seldovia shall be eligible for any increases in funding or funding for Medicaid, Medicare, maintenance and improvement, other reimbursements and new programs to which it would have been eligible had it been administering programs under a Self-Determination contract, rather than under the Compact and this AFA, and for any other funds that are not restricted by appropriations language for which any Alaska tribe or tribal organizations may be eligible, including any new funds appropriated for IHS Headquarters and funds passed to Alaska Area as recurring or non-recurring funds, and this AFA shall be amended to provide for timely payment of such new funds to Seldovia. Such amendments shall be originated and prepared within 30 days by the Alaska Area Office and executed through the Area Office in consultation with Seldovia.

**E) Other Adjustments.** Upon written authorization by Seldovia, the IHS may reallocate funds retained by the IHS, which are obligated to Seldovia, for the purposes of reimbursing the IHS for services or equipment provided to Seldovia to assist Seldovia in carrying out the terms of the Compact and this AFA.

**F) General Procedures for Amending or Modifying this AFA.** Amendments or Modifications proposed by Seldovia shall be submitted in writing to the IHS, Office of Tribal Self-Governance, with a copy to the Alaska Area Native Health Service Director. Except as provided with respect to the incorporation of a provision of Title I under Article V, Section 21, of the Compact or as provided above in paragraphs (C), (D) and (E) of this section, a request to amend or modify this AFA submitted by Seldovia shall be processed and approved or declined in accordance with the provisions of sections 102(a)(2) and (4), 102(b) and 102(e) of the Act, and all provisions of those subsections are incorporated herein for this purpose.

**SECTION 14 -- MEMORANDA OF AGREEMENT WITH MEMBER VILLAGES.** Funds provided under this AFA may be allocated to and expended by an Alaska Native Village ("Village") which is a party to this AFA in accordance with the terms of the Compact, this AFA, and a MOA approved by Seldovia and the Village. The Federal Tort Claims Act shall apply to PFSAs carried out by the Village under such MOA and to the Village and its employees to the same extent as if they had been carried out directly by Seldovia. Such an MOA may include provisions for the assignment of federal employees under IPA assignment or Commissioned

Corps detail and shall be subject to the approval of the Alaska Area Native Health Service Area Director. Seldovia shall be responsible for assuring compliance by the Village with the Compact, this AFA and the MOA.

**SECTION 15 -- Memorializing Disputes.** The parties to this AFA may have failed to reach agreement on certain matters which remain unresolved and in dispute. Such matters, with the exception of those included in FY 98 annual funding agreements, are set forth in an attachment to this annual funding agreement, which shall be identified as "Memorialization of Matters Remaining in Dispute." This attachment shall not be considered a part of this annual funding agreement, but is attached for the purpose of recording matters in dispute for future reference, discussion and resolution as appropriate. The Co-Signer does not waive any remedy Seldovia may have under the law with regard to these issues and any others not listed herein.

**SECTION 16 -- SEVERABILITY.**

**A)** Except as provided in this section, this AFA shall not be considered invalid, void or voidable if any section or provision of this AFA is found to be invalid, unlawful or unenforceable by a court of competent jurisdiction.

**B)** If any section or provision of this AFA is found to be invalid, unlawful or unenforceable by a court of competent jurisdiction, either party may, at its option, treat this AFA as invalid, void, or voidable, in accordance with the provisions of the Compact.

**C)** In the event that the parties decide not to treat the AFA as invalid, void or voidable under the subsection (B) of this section, the parties will seek agreement to amend, revise or delete any such invalid, unlawful or unenforceable section or provision, in accordance with the provisions of the Compact.